**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

DARYL L. HOLLOWAY,

        Plaintiff,

    v.

CITY OF MILWAUKEE, GEORGE ELLENBERGER,
DANIEL RUZINSKI,  WILLIAM HEROLD,
MICHAEL CARLSON, GREGORY NOWAKOWSKI,
JOSEPH LAGERMAN, WILLIAM STAWICKI,
JOHN DOES 1-20, MICHAEL J. BACKES,
ABC INSURANCE COMPANY,  GERALD BOYLE,
BRIDGET BOYLE, and XYZ INSURANCE
COMPANY,

        Defendants.

Case No.: _____

---

**COMPLAINT**

---

NOW COMES Plaintiff Daryl L. Holloway ("Holloway" or "Plaintiff"), by his attorneys, Cade Law Group LLC, and as and for his complaint against the Defendants, alleges and shows to the Court as follows:

**INTRODUCTION**

1.      Plaintiff Holloway was wrongly imprisoned for a pair of rapes that he did not commit.

2.      At the time of his arrest on September 30, 1992, numerous rapes by black males had terrorized women on the East Side of Milwaukee. The Milwaukee Police Department vowed to take action and put a stop to the rapes, and use any means necessary to put an end to the terror.

3.      Rather than properly investigate the rapes, the Police Defendants

immediately focused their attention and blame on Holloway as the culprit, despite evidence that the rapes continued even after Holloway was jailed.

4.      The Defendants failed to use DNA evidence to exonerate Holloway or blood and semen evidence that demonstrated that Holloway was not the rapist in at least one of the rapes, defendants continued to solely focus on Holloway and not look for other potential culprits.

5.      Holloway was sentenced to 120 years in prison. He served more than 23 years of that sentence, but never gave up on proving his innocence. Eventually, Attorney Ray Dall'Asto and the Wisconsin Innocence Project took up his cause, and on October 4, 2016, his conviction was overturned.

6.      This lawsuit seeks redress for his injuries and wrongful imprisonment.

**Jurisdiction and Venue**

7.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

8.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this Complaint occurred in this judicial district.

9.      A Notice of Injury was filed with the City of Milwaukee and the Milwaukee Police Department on January 31, 2017.

10.     A Notice of Claim was served on the City of Milwaukee and the Milwaukee Police Department on May 23, 2019. Attached hereto as **Exhibit 1** is a true and correct copy of the Notice of Claim, which contains the Notice of Injury.

2

11.     The City of Milwaukee and the Milwaukee Police Department have not accepted or rejected the Notice of Claim, and therefore, by law, the claim is rejected.

## Parties

12.     Holloway is a 51-year-old African-American male, who was born and raised in Milwaukee, Wisconsin.

13.     Defendants George Ellenberger (payroll # 28972), Daniel Ruzinski (#45032), William Herold (#50527), Michael Carlson (#36622), Gregory Nowakowski (#33803 or 35803), Joseph Lagerman (#32115) and William Stawicki (#48644), are current or former detective police officers with the City of Milwaukee Police Department. Each of the Defendant Officers is sued in his individual capacity, and each acted under color of law and in the scope of his employment in engaging in the actions alleged in this Complaint.

14.     Defendants John Does 1-20 are current or former police officers with the City of Milwaukee Police Department. Each of these Defendant John Doe Officers is sued in his individual capacity, and each acted under color of law in the scope of his employment in engaging in the actions alleged in this Complaint.

15.     Defendant City of Milwaukee is a municipal entity that employs or employed the Defendant Officers, including the as-of-yet unknown Defendants.

16.     Defendant Michael J. Backes, upon information and belief, is a citizen of the State of Wisconsin and a former attorney for Holloway. Backes represented Holloway during his trial and the preliminary matters prior to trial.

17.     Defendant  ABC Insurance Co. ("ABC"), upon information and belief, is an insurance company licensed to do business in the State of Wisconsin and currently

3

provides or did provide legal malpractice insurance for Attorney Backes for the time period(s) alleged herein. The name ABC Insurance Co. is a fictitious name, which will be substituted once the name of the insurer is identified.

18.     Defendant Gerald Boyle, upon information and belief, is a citizen of the State of Wisconsin and a former attorney for Holloway. Gerald Boyle represented Holloway during his post-conviction proceedings.

19.     Defendant Bridget Boyle, upon information and belief, is a citizen of the State of Wisconsin and a former attorney for Holloway. Bridget Boyle represented Holloway during his post-conviction proceedings.

20.     Defendant  XYZ Insurance Co. ("XYZ"), upon information and belief, is an insurance company licensed to do business in the State of Wisconsin and currently provides or did provide legal malpractice insurance for Attorneys Gerald Boyle and Bridget Boyle for the time period(s) alleged herein. The name XYZ Insurance Co. is a fictitious name, which will be substituted once the name of the insurer is identified.

## FACTS

### The Milwaukee Rapes

#### *Rape #1*

21.     A rape occurred on September 2, 1992 in the 2500 block of N. Bremen in Milwaukee, Wisconsin (hereinafter "Rape 1") between 6:45 and 7:00 a.m. The victim of Rape 1 is identified by a pseudonym, in order to protect her privacy, as MG. At the time of the rape, MG was married with children.

22.     MG was raped in her home by a black male wearing a scarf over his head, such that she could only see his eyes, forehead and hairstyle. MG was unable to identify

Case 2:19-cv-01460-LA   Filed 10/04/19   Page 4 of 25   Document 1

her assailant from three different viewings of police photographs/arrays.

23.     Ellenberger testified at trial that insufficient samples of semen were collected from MG and that no usable fingerprints were found at the scene.

24.     A lineup took place on September 30, 1992 in which Holloway participated.

25.     Prior to the lineup, upon information and belief, MG was shown a third photo array which contained the photograph of Holloway, and he was the only person in the photo array who also was in the lineup.

26.     At the lineup, MG identified Mr. Holloway as her assailant. She identified Mr. Holloway based on his voice and his eyes, hairstyle and general build. The lineup was improper because MG admitted she had not  clearly seen her assailant's face. Instead, a lineup should have taken place behind a screen with a lineup of men who had similar voices to Holloway.

27.     The lineup also was improper because the men in the lineup all did not have the same build and height as Holloway.

28.     Raymond Menard, a forensic serologist with the Wisconsin State Crime Lab, testified at Holloway's trial MG tested positive for semen. However, there was not enough semen to run tests on.

29.     On September 30, 1992, Ellenberger showed a neighbor of MG's, Ms. M. Block, a photo array of potential suspects of MG's assault. I is unclear if the photo array contained Holloway's photo. However, it did contain the photograph of another suspect in MG's rape, a co-worker of hers, whom MG initially had suspected of the rape because he was black and of similar build. M. Block did not pick the co-worker out of the photo array.

5

30.	Ellenberger showed M. Block the photo array because she claimed she saw a black male, approximately 5'7", on her block at the time of Rape #1, as she was outside feeding the birds at approximately 6:20 a.m. It does not appear that M. Block was shown Holloway in the line-up and she did not testify at trial, even though she told Ellenberger that she had a good look at the suspect.

### Rape #2

31.	A second rape occurred on September 26, 1992 in the 2700 block of N Murray in Milwaukee, Wisconsin (hereinafter "Rape 2"). The victim of Rape 2 is identified by a pseudonym, in order to protect her privacy, as GD.

32.	GD, a single UWM student, was raped in her home by a black male using a knife. She admitted that she only saw the rear of the man as he exited her room, and never saw his face. GD alleged that her assailant did ejaculate. GD did not indicate her assailant wore gloves during the assault.

33.	During her assault, GD's assailant cut her with the knife, and GD bled in the room. Because of the blood stains, the assailant left a shoe impression. The shoe impression did not match Holloway.

34.	On September 28, 1992, Nowkowski retrieved a knife from the rear yard of a home in the 2700 N. Murray, which the knife that GD's assailant used (and belong to GD's roommate). The knife did not have Holloway's fingerprints on it.

35.	A lineup took place on September 30, 1992 in which Holloway participated.

36.	Prior to the September 30 lineup, upon information and belief, GD was shown a third photo array which contained the photograph of Holloway, and he was the only person in the photo array who also was in the lineup.

6

37. At the lineup, GD identified Mr. Holloway as her assailant. She identified Mr. Holloway based on his voice only. The lineup was improper because GD admitted she had seen her assailant's face. Instead, a lineup should have taken place behind a screen with a lineup of men who had similar voices to Holloway.

38. The lineup also was improper because the men in the lineup all did not have the same build and height as Holloway.

39. Raymond Menard also testified that he tested two blankets from GD's residence, which were both on her bed at the time of the assault, with both containing semen. He testified that the source of semen on a blue blanket was different than the source of semen on a white blanket, as one was semen from a male secretor and the other was semen from a male non-secretor.

40. Raymond Menard also testified that Holloway was a Type A secretor, and he was not the source of semen on either blanket.

41. Raymond Menard further testified at trial that there was no request for DNA testing by either the police department or the DA's office.

42. There is no evidence that Backes requested DNA testing on Holloway's behalf.

43. Holloway could not have committed Rape #1, as he lived on the 3900 block of W. Congress in Milwaukee, and he made two phone calls the morning of September 2, 1992 to Froedtert Hospital, where his then fiancé was hospitalized. One phone call was at 5:07 am, and the other was at 7:15 a.m. The police had Holloway's phone records to prove this.

44. Carlson picked up Holloway's shoes after Rape #2 as Holloway had been

arrested in Shorewood, Wisconsin for an alleged burglary. The shoes did not have blood on them and did not match the shoe impression. Holloway's fiancé testified at trial that Holloway only owned two pairs of shoes, both black, and that the police (Carlson) had one pair, but never came for the second pair.

## The Shorewood Burglary

45.     A burglary had taken place in Shorewood, Wisconsin in September, and the victim, LG, had several items stolen. She did witness the thief leave her home.

46.     Subsequently, one of the items stolen from her home, a small music box, was recovered in Shorewood and had Holloway's fingerprints on it. Holloway admitted finding the music box in an alley, picking it up, then discarding it. He was in the alley because he had to urinate urgently.

47.     Subsequently, Holloway was picked up in Shorewood for loitering, and his fingerprints matched the music box. However, a later search of his home failed to turn up any stolen items.

48.     Carlson went to the Shorewood Police Department to see if Shorewood had any similar rapes as the Eastside of Milwaukee. He somehow discovered that Holloway was a suspect in a burglary, and that was the basis for the Milwaukee Police department warrant to arrest Holloway and search his home, and how he came to be in the September 30, 1992 lineup.

49.     Even though Victim LG had seen the thief, she failed to pick Holloway out of the lineup on September 30.

## Plaintiff's Criminal Conviction

50.     Holloway continued to maintain his innocence and went to trial to prove

he was innocent.

51.     Holloway's trial occurred August 2-6, 1993 before the Hon. Jeffrey A. Wagner of the Milwaukee County Circuit Court.

52.     At the time of his arrest on September 30, 1992, at the urging of the police, Holloway voluntarily submitted blood and saliva samples. Those samples failed to support evidence that Holloway committed either rape.

53.     The only evidence used to tie Holloway to the rapes were Holloway's fingerprints on the music box, one victim's claims that Holloway's eyes looked similar and his voice. No other physical evidence, other than Holloway's fingerprints on the music box, was produced to the jury. The police could not tie Holloway to any physical evidence located at the crime scenes of the rapes, including the knife used against GD, nor could any witnesses actually place Holloway inside of the homes at the time the rapes occurred.

54.     Mr. Holloway testified at trial protesting his innocence and describing his whereabouts. Mr. Holloway called multiple witnesses to corroborate his whereabouts.

55.     At trial, Holloway was convicted and sentenced to 120 years in prison based on the paltry evidence produced by the police. No DNA evidence tied him to any of the rapes.

**The Boyles**

56.     Holloway retained Gerald Boyle and Bridget Boyle to handle his post-conviction appeal.  The Boyles did file an appeal for post-conviction relief, but failed to identify the lack of DNA evidence as a basis for Holloway's innocence.

57.     Subsequently, the Boyles had DNA testing of the semen discovered at both scenes in October 1996, February and November 1998, and October 1999.

9

58. All of the tests excluded Holloway as the suspect. The tests, however, did not exclude MG's husband as a potential contributor of semen.

59. After the tests excluded Holloway, the Boyles were in contact with Milwaukee County Assistant DA Norman Gahn, the DA's DNA specialist, about Holloway.

60. Despite evidence that Holloway was not the suspect, the Boyles subsequently dropped Holloway's post-conviction efforts because they continually demanded more money from Holloway and his family.

### Plaintiff is exonerated

61. After the Boyles dropped Holloway's case, he enlisted the help of Attorney Ray Dall'asto and the Wisconsin Innocence Project.

62. Additional motions were filed with the trial court, Judge Wagner, along with the acquiescence of Assistant District Attorney Gahn to allow additional testing to be performed.

63. This additional testing profile conclusively showed that Holloway was not the perpetrator in either rape.

64. On October 4, 2016, Judge Wagner overturned Holloway's conviction, and he subsequently was freed from prison on October 5, 2019.

### The City of Milwaukee Police Department's Shoddy Record of DNA Evidence

65. The Milwaukee Police Department has a shoddy record with regards to DNA evidence and wrongful convictions.

66. For example, In 2002, the State conducted DNA testing on the forensic material in the Jessica Payne homicide. The State was able to generate a DNA profile from the semen on the vaginal swabs taken from Ms. Payne; that profile did not match

10

Mr. Ott, Mr. Gwin or Sam Hadaway, or any of the four men with whom Ms. Payne interacted with

67.     On information and belief, about one year later, or on or about May 19, 2003 at the latest, the Wisconsin State Police Crime Laboratory ran the male DNA profile generated from the evidence in Ms. Payne's murder through the Casework and Convicted Offender Indices of the Wisconsin Databank. In doing so, the State Police established that the DNA profile from Ms. Payne's murder matched a DNA profile from the murder of Joyce Mims. Ms. Mims had been found dead on or about June 20, 1997, and her body, like Ms. Payne's, was left in an abandoned building just a few blocks away from where Ms. Payne's body was found.

68.     Although the certain Milwaukee police officers were informed of the match between the DNA profile in Ms. Payne's and Ms. Mims' murders not later than 2003, this exculpatory evidence was not disclosed to Sam Hadaway, who remained convicted for the Payne murder—or even to Hadaway's co-defendant, Mr. Ott, who remained both convicted and imprisoned.

69.     No later than June 13, 2007, the State police discovered that the DNA profile generated from the forensic evidence in the murder of Ouithrean Stokes also matched the profile developed in the Payne and Mims case. Ms. Stokes had been found dead in an abandoned building in April 2007, just a few houses away from where Ms. Payne's body was found.

70.     Ultimately, in 2009, the State was able to match Walter Ellis' DNA profile to the unknown male DNA profile developed from the evidence in the Stokes, Mims and Payne cases. Indeed, all told, through DNA, the State linked each of the following ten

11

cases to Walter Ellis:

    a.    In October 1986, Deborah Harris was strangled to death. Her body was found in a river.

    b.    Also in October 1986, Tanya Miller was strangled to death. Her body was found between an abandoned house and a garage.

    c.    In November 1992, Irene Smith was stabbed and strangled to death. Her body was found in an alley.

    d.    In October 1994, Carron D. Kilpatrick was stabbed and strangled to death. Her body was found in a garbage truck.

    e.    In April 1995, Florence McCormick was strangled to death. Her body was found in the basement of a vacant home.

    f.    In June 1995, Sheila Farrior was strangled to death. Her body was found in a bedroom inside a vacant home.

    g.    In August 1995, Jessica Payne was found stabbed to death. Her body was found under a mattress behind an abandoned house.

    h.    In June 1997, Joyce Mims was strangled to death. Her body was found in an abandoned building.

    i.    In February 1998, Marietta Griffin was strangled to death. Her body was found in an abandoned garage at 3033 North 7th Street in Milwaukee.

    j.    In April 2007, Ouithrean Stokes was strangled to death. Her body was found in a vacant building.

71.    In each of the above-mentioned cases, the victims were found in a small geographic area on the North side of Milwaukee. Indeed, Walter Ellis became known as the "North Side strangler."

72.    Based on some of the early DNA testing, in 2007, Sam Hadaway's co-defendant, Chaunte Ott, petitioned the court to vacate his conviction.

73.    Mr. Ott's conviction was ultimately vacated and the State of Wisconsin declared that he was wrongfully convicted of the homicide of Ms. Payne.

74.    Following his exoneration, Mr. Ott brought a lawsuit against the City of Milwaukee and certain Milwaukee police officers. That lawsuit, *Ott v. City of Milwaukee*, No. 09-c-870, the City of Milwaukee and defendant officers settled Mr. Ott's case for 6.5

million dollars.

***Sam Hadaway Exonerated***

75.     The Wisconsin Innocence Project filed a Writ of Coram Nobis on Sam Hadaway's behalf, alleging that the DNA evidence implicating Walter Ellis in the Payne homicide warranted vacating Mr. Hadaway's plea. In that filing, Hadaway also explained that his confession was coerced and fabricated by certain police officers with the Milwaukee Police Department.

76.     On August 14, 2018, the Court of Appeals issued an opinion ordering the Circuit Court to grant Plaintiff's *coram nobis*, vacate his conviction and withdraw his guilty plea.

77.     The charges against Hadaway were ultimately dismissed in October 2019.

78.     Mr. Hadaway subsequently has filed a lawsuit against the Milwaukee Police Department, certain Milwaukee Police Officers and the City of Milwaukee for his wrongful conviction.

***William Avery Wrongful Conviction and Exoneration***

79.     William Avery also was wrongfully convicted of the 1998 murder of Marietta Griffin, another one of Walter Ellis's victims.

80.     In Mr. Avery's case, two Milwaukee homicide detectives, fabricated a false confession that was used to prosecute and convict Mr. Avery of Ms. Griffin's murder.

81.     Despite the fact that the MPD knew that there was a likely link between Ms. Griffin's murder and Walter Ellis as of 2009, Mr. Avery had to file a *pro se* petition for DNA testing. That testing implicated Walter Ellis and exonerated Mr. Avery. In May 2010, Mr. Avery was released from prison and four months later, all charges were dismissed

13

against him. Mr. Avery's civil rights case, *Avery v. City of Milwaukee, et al.*, No. 11-c-408, went to trial in 2015. A jury found that the detective defendants fabricated Mr. Avery's confession in violation of his civil rights and also found the City of Milwaukee liable for the defendants' misconduct based on its policy and practice of inadequately investigating homicides, which led to the fabrication of evidence. In *Avery*, the City was the moving force behind the fabrication of a confession and fabricated witness statements. The jury awarded him $1 million dollars in damages.

### *City of Milwaukee and MPD's Policies and Practices*

82.     The wrongful conviction of Plaintiff was not an isolated incident. Rather, the City of Milwaukee's and the Milwaukee Police Department's policies and practices and inadequate training were the moving force behind the misconduct at issue here.

83.     For example, during the operative time period, detectives were issued "Memo Books," where they were told to keep all pertinent notes about any given criminal investigation. Notwithstanding that policy, however, upon information and belief, detectives were using "steno pads" to take notes during witness interviews—notes that would be kept separate from and not a part of the Official Memo Book.

84.     These notes often contained exculpatory information, including about alternative offenders—just as was the case in the rapes described above.

85.     These notes and any other accompanying exculpatory evidence were not part of the Official Milwaukee Police Department file for any given rape or homicide. Instead, they were kept separate and destroyed.

86.     Policymakers in the City of Milwaukee had notice of this practice. Indeed, during the *Ott* and *Avery* litigation, a Rule 30(b)(6) witness for the City stated that the

MPD was aware that detectives were not taking notes in their Memo Books, and that there was no policy or requirement that these notes be disclosed to the prosecutor.

87. Such a policy had obvious problems. As the district court in *Ott* explained, not only could the City be liable under *Monell* for such a policy, but also "it would have been clear to DeValkenaere and Buschmann long before 1995 that creating and then destroying separate notes in an attempt to skirt *Brady* would be impermissible."

88. Nonetheless, the City did nothing to correct the problem; instead, it turned a blind eye to it, acting deliberately indifferent to the rights of other individuals. This led to multiple wrongful convictions, including that of Plaintiff, Mr. Ott and others.

89. In addition, the City had inadequate training. In particular, the City had little to no training on disclosure obligations and *Brady v. Maryland*, notwithstanding the obvious need for such training.

90. As a result of the inadequate training, disclosures were left to the discretion of individual officers.

91. This often led to information and documents not being turned over to the prosecutor, which in turn led to the violation of defendant's due process rights—just as occurred here.

92. Had Defendants disclosed the potentially exculpatory information to Plaintiff, he likely would not have been prosecuted or even convicted at a trial.

### Plaintiff's Damages

93. Without the Defendants' misconduct, Plaintiff would never have been convicted. He spent over 23 years in prison for a pair of rapes that he did not commit.

94. Plaintiff's life was forever damaged. Plaintiff was deprived his liberty even

15

though he committed no crime and was completely innocent.

95.　　During his more than 23 years of incarceration, Plaintiff was detained in harsh and dangerous conditions, which was particularly difficult.

96.　　Although Plaintiff was married while he was in prison, he has not had an opportunity to fully enjoy the fruits of his marriage or spend time with his spouse.

97.　　Plaintiff also was denied an opportunity to have a family with his wife.

98.　　Plaintiff was taken away from his family and friends. He has missed countless experiences and was deprived of the basic, everyday freedoms he deserved to enjoy.

99.　　After his exoneration, Mr. Holloway suffered a series of psychological trauma. Shortly after his release from prison, Mr. Holloway's brother and son were both killed in separate events only a short time apart.

100.　　After his son and brother's deaths, Mr. Holloway believed that he had nothing to live for and decided to commit suicide. While walking in the City of Milwaukee, he saw an open window with a handgun. Determined to killed himself, Mr. Holloway grabbed the gun and ran. Unfortunately, the gun was attached to a holster on a purse, and so in grabbing the gun, Mr. Holloway also grabbed the purse.

101.　　After running for a short period of time, Mr. Holloway placed the gun in his mouth to commit suicide, but could not pull the trigger, as he heard his mother plead with him to not kill himself.

102.　　Shortly after stealing the gun, it was determined that Holloway had taken it and he pleaded no contest to a  charge of burglary and possession of a firearm by a felon. Mr. Holloway was sentenced to eight years in prison for this theft, and he currently

is incarcerated at the Racine Correctional Institution.

103.    For the following two decades, even after his initial release from incarceration, Plaintiff continued to suffer emotional and physical harm as a result of Defendants' misconduct, which falsely branded him as a rapist.

104.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, and other physical and psychological effects, as well as financial loss.

**Count I**
**42 U.S.C. § 1983 – Due Process**

105.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

106.    As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

107.    In the manner described more fully above, the Defendant Officers deliberately failed to have Holloway's DNA tested, may have withheld exculpatory evidence from Plaintiff as well as fabricated false evidence, failed to have witnesses view the lineup who would have exonerated Holloway, had a faulty lineup, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

108.    The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by

17

the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

109.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

110.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count II**
**42 U.S.C. § 1983 – Federal Malicious Prosecution**

111.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

112.     In the manner described above, the Defendant Officers, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that there was no reasonable basis to suspect Plaintiff of the crime, in violation of his rights secured by the Fourth and Fourteenth Amendments.

113.     In so doing, the Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

114.     The misconduct described in this Count was objectively unreasonable and

18

was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

115.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

116.   Plaintiff does not have an adequate post-deprivation state tort remedy for his malicious prosecution because Wisconsin Gen. Stat. §893.80(3) caps any damage award Plaintiff has against Defendants at $50,000 and strictly prohibits punitive damages.

The damages Plaintiff suffered as result of Defendants' malicious prosecution, including more than two decades of false imprisonment, cannot be adequately compensated under state tort law given the $50,000 cap on any damage award.

## Count III
## 42 U.S.C. § 1983 – Unlawful Pre-trial Detention

117.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

118.   In the manner described more fully above, the Defendants caused Plaintiff to be detained and imprisoned without probable cause. Plaintiff was incarcerated prior to trial, and his incarceration continued for over twenty-three years of a one hundred-twenty year sentence.

119.   The misconduct described in this Count was undertaken by the Defendants under color of law and within the scope of their employment.

120.   The misconduct described in this Count was objectively unreasonable and

was undertaken intentionally, with malice, or with reckless indifference to the rights of others.

121.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count IV**
**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

122.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

123.    After the two rapes described above, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

124.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

125.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

126.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

127.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as

20

set forth above.

**Count V**
**42 U.S.C. § 1983 – Failure to Intervene**

128.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

129.     In the manner described above, during the constitutional violations described herein, one or more of the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

130.     As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

131.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

132.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VI**
**42 U.S.C. § 1983 – Monell Claims Against the City of Milwaukee**

133.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

134.    The actions of all the Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Milwaukee with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

135.    The policies and practices described in this Count were maintained and implemented by the City of Milwaukee with deliberate indifference to Plaintiff's constitutional rights.

136.    As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

137.    The City of Milwaukee is therefore liable for the misconduct committed by the Defendant Officers.

## Count VII
## State Law Claim – Indemnification

138.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139.    Wisconsin law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

140.    The Defendants were employees, members, and agents of the City of Milwaukee, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

141.    The City of Milwaukee is obligated by Wisconsin statute to pay any

22

judgment entered against the Defendant Officers in his official capacity, including any punitive damages awarded.

**Count VIII**
**Legal Malpractice – Michael Backes**

142.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

143.    Backes had a legal duty to represent Holloway to the best of his ability during the pretrial phase and at trial.

144.    Backes breached that duty by failing to have Holloway's DNA tested, or insisting that the police and/or district attorney's office test Holloway's DNA, especially as Holloway's blood type did not match the semen in either rape.

145.    As a result of Backes' failure, Holloway was convicted and spent more than 23 years in prison.

146.    As a result of Backes' negligent representation described in this Count, Holloway suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages in an amount to be determined at trial.

**Count XI**
**Legal Malpractice – Gerald Boyle and Bridget Boyle**

147.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

148.    Gerald Boyle and Bridget Boyle had a legal duty to represent Holloway to the best of his ability during the post-conviction proceedings.

149.    Gerald Boyle and Bridget Boyle breached that duty by failing to continue

to pursue the DNA testing and post-conviction relief on behalf of Holloway.

150.     As a result of Gerald Boyle and Bridget Boyle's failure, Holloway remained in prison for crimes he did not commit.

151.     As a result of Gerald Boyle and Bridget Boyle's negligent representation described in this Count, Holloway suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages in an amount to be determined at trial.

**Count X**
**Wisconsin Direct Action**

152.     Pursuant to Wis. Stat. § 632.24, Holloway can maintain this action against ABC and XYZ directly.

153.     ABC is liable to Holloway for damages suffered as a result of Backes' actions and failures, as alleged in this Complaint, up to the amount of the applicable insurance policies that Backes had/has with ABC.

154.     XYZ is liable to Holloway for damages suffered as a result of Gerald Boyle and/or Bridget Boyle's actions and failures, as alleged in this Complaint, up to the amount of the applicable insurance policies that either had/has with XYZ.

**JURY DEMAND**

Plaintiff Daryl Holloway hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For damages in an amount to be determined at trial;

2.     For attorney's fees pursuant to 42 U.S.C. § 1988;

3.     For all costs and fees incurred in bringing this suit; and,

24

4.    For such other and further relief as the Court deems proper.

Dated this 4th day of October, 2019.

**CADE LAW GROUP LLC**

By: s/Nathaniel Cade, Jr.
    Nathaniel Cade, Jr.
    P.O. Box 170887
    Milwaukee, WI  53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com

    Attorneys for Plaintiff