# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DARYL L. HOLLOWAY,

        Plaintiff,

v.                                     Case No. 19-CV-1460

CITY OF MILWAUKEE, DANIEL RUZINSKI,
WILLIAM HEROLD, MICHAEL CARLSON,
GREGORY NOWAKOWSKI, JOSEPH LAGERMAN,
and JOHN DOES 1-20,

        Defendants.

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

This case stems from an August 6, 1993 Milwaukee County jury verdict which found plaintiff Daryl Holloway guilty on two counts of first-degree sexual assault, and two counts of armed burglary. These charges related to the sexual assault of M.G. in her home at 2522 N. Bremen Street, at approximately 6:45 a.m. on September 2, 1992, and the sexual assault of G.D. in her home at 2760 N. Murray Avenue, at approximately 11:45 p.m. on September 26, 1992. (See Am. Compl., ¶¶ 25, 36; See also criminal complaint attached to the Lappen Aff. as Exh. SL-10.) The jury acquitted Mr. Holloway of a third charge of burglary, relative to a home invasion which occurred in Shorewood. (Compare criminal complaint, Id., to judgments of conviction, attached to Lappen Aff. as Exh. SL-11.) In 2016, evidence collected during the related criminal investigations was sent to Bode Cellmark Forensics, an independent third-party laboratory, for DNA analysis. (Note that the Wisconsin State Crime Lab did not conduct DNA analyses in 1992.) The report generated by Bode (attached to the Lappen Aff. as Exh. SL-4) presented

information which caused the Office of the Milwaukee County District Attorney to stipulate to vacate Mr. Holloway's convictions and dismiss the charges against him. An order to that effect was entered by the Honorable Jeffrey A. Wagner, the judge who presided over the 1993 criminal trial, on October 4, 2016. (See Exhibit 2, attached to the amended complaint at Docket No. 66-1, for a copy of that order.) Judge Wagner found, pursuant to the stipulation of the parties, and among other things, that the DNA testing provided information which was "exculpatory in nature," and that it was "discovered after convictions." The court also found that there was a "reasonable probability" that, had that DNA "evidence been available at Mr. Holloway's trial, a jury would have reached a different result . . . [and that] [t]he State has represented that, with this new DNA evidence, it is unlikely that the State could prove guilt beyond a reasonable doubt in a retrial." While Mr. Holloway's convictions were overturned, and he was released from prison, the district attorney did not stipulate, nor did the trial court find, that he was "innocent," or that the DNA testing results "exonerated" him. (Id.) The Bode report simply confirmed that a partial Y-STR DNA profile was found in an epithelial fraction of a sample taken from M.G.'s underwear, and that both M.G.'s husband and Mr. Holloway were excluded as the source of that partial profile. (See Bode report at Exh. SL-4.) No new DNA evidence was found relative to the investigation of the sexual assault of G.D. (Id.)

Mr. Holloway brought the instant civil suit against the City of Milwaukee and five long-retired Milwaukee Police Department detectives who were involved with investigating the criminal charges brought against him, alleging that they each were somehow responsible for his "wrongful imprisonment." The individual defendants assert that in 1992, when they were involved with the subject investigations, DNA testing was not yet being done by the Wisconsin State Crime Lab. In limited circumstances, DNA testing was being done by a few private labs at

the request of the Office of the Milwaukee County District Attorney at that time. However, it was the assistant district attorney assigned to the related criminal case, and not any MPD representative, who made the decision to send evidence out for DNA testing, either to a private lab in the 1992 to 1993 timeframe, or to the state crime lab thereafter. Defendants assert that, to the best of their memory and knowledge, any physical evidence found at either crime scene, which might have contained bodily fluids, was retrieved, inventoried, and sent to the state crime lab for blood and semen analysis, per usual protocol at that time. Furthermore, the analyses conducted with regard to the Holloway investigations did not identify Mr. Holloway as the source of the blood and semen evidence that was recovered, and that information was presented to defense counsel, and later to the jury during the 1993 criminal trial. Arguably, Mr. Holloway's convictions were largely due to the positive identifications made of him by the two sexual assault victims and other witnesses, along with the Whitty testimony from M. G-M., a woman who Mr. Holloway raped in 1985. (At the time of the sexual assaults of G.D. and M.G., Mr. Holloway was on parole for that crime, see Lappen Aff., Exhs. SL-12 and SL-13 for copies of the criminal complaint and judgments of conviction regarding that 1985 sexual assault.) Regardless, defendants Daniel Ruzinski, William Herold, Michael Carlson, Gregory Nowakowski, and Joseph Lagerman assert that all of their actions in the context of the subject investigations were consistent with standard police investigatory practices, the United States Constitution, and related caselaw, and that they are protected by qualified immunity. The moving defendants also maintain that there was no unlawful City policy which guided their actions, and that therefore, all claims raised in this case should be dismissed at this time.

## II.    STATEMENT OF THE CASE

This case was initially filed with the United States District Court for the Eastern District of Wisconsin on October 4, 2019. An amended complaint was filed on June 1, 2020, and the moving defendants' answer thereto was timely filed on June 10, 2020.  As outlined above, plaintiff claims that he was wrongfully convicted, and that contrary to 42 U.S.C. sec. 1983, his constitutional rights were violated by the retired detectives. Mr. Holloway claims that the "Defendants failed to use DNA evidence to exonerate Holloway or blood and semen evidence that demonstrated that Holloway was not the rapist in at least one of the rapes, defendants continued to solely focus on Holloway and not look for other potential culprits," and that this lawsuit "seeks redress for his injuries and wrongful imprisonment." (Am. Compl., ¶¶ 4 & 6.) Mr. Holloway complains that the individual defendants violated his due process rights and thus denied him a fair trial, because they "deliberately failed to have Holloway's DNA tested, may have withheld exculpatory evidence from plaintiff as well as fabricated false evidence, failed to have witnesses view the lineup who would have exonerated Holloway, and had a faulty lineup, thereby misleading and misdirecting the criminal prosecution of Plaintiff." (Am. Compl., Count I, ¶ 113.) Mr. Holloway also alleges that the individual defendants were responsible for a "federal malicious prosecution" against him, because they lacked probable cause to initiate, continue or perpetuate criminal proceedings against him, and that by doing so, they violated his Fourth and Fourteenth Amendment rights. (Am. Compl., Count II, header and ¶ 118.) Mr. Holloway's third cause of action asserts that he was subjected to "unlawful pre-trial detention." (Am. Compl., Count III) More specifically, plaintiff claims that he was detained without probable cause, and that he "was incarcerated prior to trial, and his incarceration continued for over twenty-three years of a one-hundred-twenty-year sentence." (Id., ¶ 125.) Plaintiff's fourth

4

cause of action alleges that the individual defendants conspired among themselves and with others to "frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights." (Am. Compl., Count IV, ¶ 129.) Finally, plaintiff alleges that each of the individual defendants failed to intervene and stop or prevent the constitutional violations committed by others. (Am. Compl., Count V, ¶ 135.)

Mr. Holloway also claims that the City maintained certain allegedly unlawful policies or practices which caused the individual defendants to violate his rights. Plaintiff asserts that the MPD had a "shoddy record of DNA evidence" ((Am. Compl., p. 21.), and presents information in his amended complaint regarding some MPD homicide investigations which occurred in the 1990s and beyond, but none of which involved MPD investigations regarding sexual assaults or armed burglaries which occurred during or prior to 1992. Furthermore, Mr. Holloway asserts that the City, through its police department, maintained unlawful policies and practices, and related training, regarding the use of memo books by its detectives (Am. Compl., ¶ 88-93.) Plaintiff asserts that the policies and training relative to memo books "often led to information and documents not being turned over to the prosecutor, which in turn led to the violation of the defendant's due process rights – just as occurred here." (Am. Compl., ¶ 97.) Plaintiff clarified that "[h]ad Defendants disclosed the potentially exculpatory information to Plaintiff, he likely would not have been prosecuted or even convicted at trial" (Am. Compl., ¶ 98.), although plaintiff fails to articulate any specifics as to what constituted that "exculpatory information," other than perhaps the DNA evidence first discovered in 2016.

The defendants assert that, while investigating the matters related to the complaints levied by M.G. and G.D., they did nothing which was contrary to standard police practices, or which violated the constitution. They also assert that they are protected by qualified immunity,

and that none of the related MPD policies or practices were unlawful. Therefore, all claims should be dismissed as a matter of law at this time.

## III.  PROPOSED FINDINGS OF FACT

1. In 1992, the detectives assigned to the MPD Vice Control Division/Sexual Assault Unit worked as a team, and were assigned to the three basic work shifts of 8 a.m. – 4 p.m. (day shift), 4 p.m. – midnight (early shift), and midnight to 8 a.m. (late shift). (Ruzinski Aff., ¶ 16.)

2. Follow-up investigatory work was assigned by supervisors, taking into account the particulars of the follow-up work, the availability of detectives, the detectives' assigned shifts, the timing involved with the availability of witnesses, and the accessibility of crime scenes and evidence. (Ruzinski Aff., ¶ 16.)

3. For instance, a sexual assault complaint might come in at midnight, and a late shift detective would be assigned to respond to the scene, conduct the initial investigation, and open the initial report, but follow-up work, like interviewing potential witnesses or obtaining business records, like time cards or surveillance video, might be assigned to detectives who work during the day shift, which covers standard business hours. (Ruzinski Aff., ¶ 16.)

4. In 1992, detectives assigned to the MPD Vice Control Division/Sexual Assault Unit used department-issued memo books, and sometimes stenographic pads, to record notes about information gathered through their investigatory work. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 18; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

6

5.    Those detectives used their notes to prepare formal hard copy reports which contained information gleaned from their investigatory work, and which were kept with the relevant MPD investigatory file. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 18; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

6.    After their reports were filed, each of the individual defendants maintained possession of their memo books and/or steno pads, so that their notes were available for their future reference, and for copying by anyone from the district attorney's office or by defense counsel. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 19; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

7.    In fact, each of the individual defendants maintained all of their investigatory notes until the time of their respective retirements, and Mr. Carlson still has possession of his notes. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 18; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

8.    Daniel G. Ruzinski was employed with the Milwaukee Police Department from August 15, 1977 to June 15, 2012, and he retired at the rank of Lieutenant of Detectives. (Ruzinski Aff., ¶ 1.)

9.    Then Detective Ruzinski was the initial detective to file an official report, which opened the investigation of a sexual assault complaint made by G. D. at approximately 11:45 p.m. on Saturday, September 26, 1992. (Ruzinski Aff., ¶ 6.)

10.   Detective Ruzinski was dispatched to the scene of G.D.'s home on the subject date, and he spoke with G.D.'s roommates, Tonya Bartoletti and Kelly Mix. (Ruzinski Aff., ¶ 7.)

11.      Detective Ruzinski wrote in his report that he was told that an unknown black male was armed with a knife and sexually assaulted G.D. while in her bedroom at her residence, and that the man subsequently removed G.D.'s wallet from her purse. (Ruzinski Aff., ¶ 6.)

12.      Neither Ms. Bartoletti nor Ms. Mix stated to Detective Ruzinski that they personally witnessed either the sexual assault of G.D., or the robbery. (Ruzinski Aff., ¶ 7.)

13.      While at the scene, Detective Ruzinski went into G.D.'s bedroom, and made certain observations, including a blood-splattered wall, blood-stained bed linens, and shoeprints. (Ruzinski Aff., ¶ 8.)

14.      These items were thoroughly photographed by MPD technicians. (Ruzinski Aff., ¶ 8.)

15.      The blood-stained linens were collected and inventoried by Detective Ruzinski for evidentiary purposes. (Ruzinski Aff., ¶¶ 8 & 11.)

16.      While on the scene that night, Detective Ruzinski also walked through the residence with Ms. Bartoletti, who noted that a knife was missing from the kitchen. (Ruzinski Aff., ¶ 9.)

17.      Detective Ruzinski determined that G.D.'s assailant entered her home through her unlocked front door, and exited through her rear door. (Ruzinski Aff., ¶ 6.)

18.      Detective Ruzinski did not interview either of Mr. Holloway's complaining witnesses, G.D. or M.G., during the course of the MPD investigations regarding their sexual assaults, and he also did not interview Mr. Holloway. (Ruzinski Aff., ¶ 10.)

19.   Detective Ruzinski was not involved with any decision-making or action taken relative to sending any inventoried items from the crime scene to the Wisconsin State Crime Lab for analysis. (Ruzinski Aff., ¶ 11.)

20.   However, any item that appeared to contain bodily fluids, like blood, was sent to the state crime lab for analysis regarding blood typing and the presence of semen, per usual protocol. (Ruzinski Aff., ¶ 12.)

21.   Detective Ruzinski was not involved with any decision-making or action taken relative to either Mr. Holloway's arrest or his live lineup on September 30, 1992. (Ruzinski Aff., ¶ 14.)

22.   In addition to the work that Detective Ruzinski did at G.D.'s home on the night of her assault, he also did some follow-up work, at the request of the prosecuting attorney, for Mr. Holloway's criminal case. (Ruzinski Aff., ¶ 15.)

23.    In short, Detective Ruzinski checked the status of a phone number, and he timed driving a route of travel, to follow-up on Mr. Holloway's alibi for the September 2, 1992 sexual assault of M.G.  (Ruzinski Aff., ¶ 15.)

24.   William Herold was employed with the Milwaukee Police Department from February 15, 1982 to April 9, 2007, and he retired at the rank of detective. (Herold Aff., ¶ 1.)

25.   Then Detective Herold was not involved with any decision-making or action taken relative to arresting Mr. Holloway. (Herold Aff., ¶ 17.)

26.   However, at about 7:50 p.m. on September 30, 1992, Detective Herold participated in conducting a live lineup at the Police Administration Building, and that lineup included Mr. Holloway. (Herold Aff., ¶¶ 6-7.)

9

27.   A copy of a photograph of that lineup, wherein Mr. Holloway was/is subject number two, is attached to the Herold Affidavit filed in support of defendants' motion as page 163 in Exhibit WH-A. (Herold Aff., ¶ 6.)

28.   During the lineup, victim G.D. positively identified Mr. Holloway as the perpetrator of her sexual assault, and following the lineup, Detective Herold took a formal statement from G.D. (Herold Aff., ¶ 9.)

29.   G.D. stated to Detective Herold that she was absolutely sure that Mr. Holloway was the person who sexually assaulted her in her home on September 26, 1992, and that she recognized Mr. Holloway's voice as the voice of her assailant, who said "Don't scream, if you scream, I'll kill you" during her assault. (Herold Aff., ¶ 9; Herold trial 8/4/93 testimony, at Exhibit WH-B at pp. 76-78.)

30.   G.D. also stated that Mr. Holloway shared the same general physical characteristics as her perpetrator, including height and build. (Herold Aff., ¶ 9.)

31.   On a scale of "1 to 10," G.D. said that her identification of Mr. Holloway was a "10." (Herold Aff., ¶ 9.)

32.   During the September 30 lineup, a non-victim citizen witness, Charles Humes, positively identified Mr. Holloway as the person with whom he interacted and gave a ride in his car, on both September 25 and September 27, 1992, and in the area of G.D.'s residence. (Herold Aff., ¶ 10.)

33.   Upon completion of the lineup, Detective Herold took a formal statement from Mr. Humes, and had technicians check his car, to look for Mr. Holloway's fingerprints. (Herold Aff., ¶ 10.)

34.   That check met with negative results. (Id.)

35.     Detective Herold did not take any statements from either Mr. Holloway or victim M.G. during the course of the subject investigations. (Herold Aff., ¶ 12.)

36.     Detective Herold, along with Detective Gregory Nowakowski, brought Mr. Holloway to a lab before the lineup on September 30, 1992, where with Mr. Holloway's permission, blood, saliva, and hair samples were retrieved from him by medical personnel. (Herold Aff., ¶ 15; See also Lappen Aff., Exh. SL-14 for a copy of the authorization signed by Mr. Holloway.)

37.     Those retrieved items were sent to the state crime lab for analysis, per usual protocol. (Herold Aff., ¶ 15.)

38.     Detective Herold's only involvement with the Holloway investigations was to assist with conducting the September 30, 1992 lineup, escort Mr. Holloway to a medical facility to obtain hair, blood and saliva samples before the lineup started, and take statements from G. D. and Mr. Humes, immediately following the completion of the lineup. (Herold Aff., ¶¶ 12 & 15.)

39.     Detective Herold never responded to either of the two crime scenes. (Herold Aff., ¶ 12.)

40.     Detective Herold was not involved with the process of inventorying any of the evidentiary items taken from either crime scene, nor was he involved with any decision-making or action taken relative to sending any inventoried items from either crime scene to the Wisconsin State Crime Lab for analysis. (Herold Aff., ¶ 13.)

41.     Michael B. Carlson was employed with the Milwaukee Police Department from November 2, 1970 to September 1, 2001, and he retired at the rank of detective. (Carlson Aff., ¶ 1.)

42.     Then Detective Carlson did some investigatory work relative to the September 26, 1992 sexual assault of R.R. at her home at 3320 W. Hackett Street. (Carlson Aff., ¶ 11.)

43.      R.R. lived in the area of U.W. Milwaukee, where Milwaukee abuts Shorewood, and in the context of investigating her September 26, 1992 sexual assault, on September 28, 1992 Detective Carlson inquired of representatives of the Shorewood Police Department about any similar offenses which occurred in the area. (Carlson Aff., ¶ 12.)

44.     Detective Carlson was told by Sergeant Glenn Wagner from the Shorewood Police Department that Daryl Holloway was a suspicious person stopped by both Shorewood police and Whitefish Bay police on September 21, 1992; that he was taken into custody by the Shorewood police for prowling; that Mr. Holloway's arrest record had been checked; and that he was on parole for a sexual assault conviction. (Carlson Aff., ¶ 12; Carlson 8/4/93 trial testimony, at Exhibit MC-B, pp. 118-119.)

45.     Detective Carlson researched that conviction, and found that in 1985, Mr. Holloway had sexually assaulted and burglarized a woman (M.G-M.) in the bedroom of her residence, while threatening to kill her, and the detective concluded that this description matched the descriptions provided by R.R., G.D., and M.G., regarding their September, 1992 sexual assaults, in that they all

12

involved a home invasion, a single woman who was alone, and a perpetrator who threatened to kill them, and who stole their property. (Carlson Aff., ¶ 12; Carlson 8/4/93 trial testimony, at Exhibit MC-B, p. 119; See also Lappen Aff., Exh. SL-12 for a copy of the criminal complaint regarding the crimes committed in 1985 against M.M-G., as well as Exh. SL-13, for a copy of the related judgments of conviction.)

46. Detective Carlson obtained a booking photo of Mr. Holloway, which was taken on January 18, 1992, placed that photo in an array, and showed the array to R.R. on September 29, 1992. (Carlson Aff., ¶ 12.)

47. R.R. stated to Detective Carlson that Mr. Holloway's photo looked very similar to her attacker, but that she would like to see him in person to make a positive identification. (Carlson Aff., ¶ 12.)

48. On September 29, 1992, Detective Carlson asked victim G.D. to view a photo array containing the January18, 1992 booking photo of Mr. Holloway, but she was unable to identify Mr. Holloway through that photo. (Carlson Aff., ¶ 3; See also pp. 115-118 of Detective Carlson's trial testimony, found in Exhibit MC-B.)

49. Mr. Holloway was taken into custody at the request of Detective Carlson by other MPD officers on September 30, 1992. (Carlson Aff., ¶ 3; See also Exh. MC-A, pp. 33-36, 84-85.).)

50. Detective Carlson did not participate in effecting Mr. Holloway's arrest, or in conducting the September 30, 1992 lineup. (Carlson Aff., ¶ 13.)

51. In the context of the investigations involving Mr. Holloway, on October 1, 1992, Detective Carlson obtained Mr. Holloway's tennis shoes, pursuant to a search

warrant, and state crime lab technicians determined that those shoes could not have produced the shoeprints found in G.D.'s bedroom on the night of her attack. (Carlson Aff., ¶¶ 7-8; See also Lappen Aff., Exh. SL-7 for a copy of the related technician's report.)

52.    On October 2, 1992, Detective Carlson obtained a search warrant relative to searching Mr. Holloway's home for evidence of burglaries and sexual assaults that were under investigation, but no evidence was found during the search. (Carlson Aff., ¶ 9)

53.    That warrant was requested because Mr. Holloway's fingerprints were identified by state crime lab technicians as those lifted from a jewelry box stolen from a residence in Shorewood, relative to the burglary charged in Count 5 of the criminal complaint issued against Mr. Holloway.  (Carlson Aff., ¶ 9; See Lappen Aff., Exh. SL-9 for a copy of the state crime lab report dated October 2, 1992, and Exh. SL-10 for a copy of the criminal complaint.)

54.    Detective Carlson also assisted a potential witness regarding the sexual assault of G.D., with reviewing a drawer containing photographs at the MPD identification bureau. (Carlson Aff., ¶ 10.)

55.    A sweater was obtained from Mr. Holloway's residence when he was arrested on September 30, 1992, and the sweater matched the description of a sweater worn by R. R's rapist, so on October 2, 1992, Detective Carlson brought the sweater to R.R.. (Carlson Aff., ¶ 11.)

56.    R.R. told Detective Carlson that it could have been the sweater worn by her assailant. (Carlson Aff., ¶ 11.)

14

57.   Other than showing G.D. the photo array on September 29, Detective Carlson did not have any other contact with either G.D. or M.G. during the course of the investigations which stemmed from their sexual assaults. (Carlson Aff., ¶ 15.)

58.   Also, Detective Carlson did not have any contact with Mr. Holloway. (Carlson Aff., ¶ 15.)

59.   Detective Carlson never went to the scenes of the crimes involving G.D. and M.G., and he had no involvement with the process of inventorying any of the evidentiary items taken from either scene, nor was he involved with any decision-making or action taken relative to sending any inventoried crime scene items to the Wisconsin State Crime Lab for analysis. (Carlson Aff., ¶ 16.)

60.   Gregory J. Nowakowski was employed with the Milwaukee Police Department from December 8, 1969 to August 18, 2000, and he retired at the rank of detective. (Nowakowski Aff., ¶ 1.)

61.   On September 27, 1992, then Detective Nowakowski responded to the yard of a neighbor to G.D., because the neighbor found a knife in his yard on that date. (Nowakowski Aff., ¶ 6.)

62.   Detective Nowakowski contacted G.D.'s roommate, Tonya Bartoletti, who came with him to the neighbor's yard and identified the knife as the one that belonged to her, and was taken from her home at the time of G.D.'s assault. (Nowakowski Aff., ¶ 6.)

63.   Detective Nowakowski observed fingerprints and dried blood on the knife, and it was placed on MPD inventory. (Nowakowski Aff., ¶ 6.)

64. On September 29, 1992, Detective Nowakowski met with a woman named Elsa Gomez, who lived near G.D., and who thought she may have interacted with G.D.'s attacker on the night before her assault. (Nowakowski Aff., ¶ 7.)

65. On September 30, 1992 Ms. Gomez viewed the lineup which included Mr. Holloway, but she was unable to make an identification of him as the person with whom she interacted. (Nowakowski Aff., ¶ 7.)

66. On September 30, 1992, Detective Nowakowski assisted with conducting the live lineup which included Mr. Holloway. (Nowakowski Aff., ¶ 8.)

67. During that lineup, G.D. positively identified Mr. Holloway as the person who sexually assaulted her in her home at 2760 N. Murray Avenue, at around 11:45 pm on September 26, 1992, and M.G. positively identified Mr. Holloway as the person who sexually assaulted her in her home at 2522 N. Bremen Street on September 2, 1992 at approximately 6:45 am. (Nowakowski Aff., ¶ 8; Exh. GN-A at p. 58.)

68. During the course of the investigations which centered on the sexual assaults of G.D. and M.G., Detective Nowakowski did not interview Mr. Holloway. (Nowakowski Aff., ¶ 9.)

69. However, on September 30, 1992, Detective Nowakowski accompanied Detective Herold in bringing Mr. Holloway to the medical facility where medical personnel retrieved samples of his blood, saliva, and hair. (Nowakowski Aff., ¶ 9.)

70. Detective Nowakowski was not involved with the process of inventorying any of the evidentiary items taken from either crime scene, nor was he involved with any

decision-making or action taken relative to sending any inventoried crime scene items to the Wisconsin State Crime Lab for analysis. (Nowakowski Aff., ¶ 10.)

71. Detective Nowakowski was not involved with any decision-making or action taken relative to arresting Mr. Holloway on September 30, 1992. (Nowakowski Aff., ¶ 13.)

72. Joseph Lagerman was employed with the Milwaukee Police Department from March 20, 1967 to July 8, 1999, and retired at the rank of detective. (Lagerman Aff., ¶ 1.)

73. Then Detective Lagerman took a statement from Daryl Holloway after he was arrested, but before he participated in the live lineup, on September 30, 1992. (Lagerman Aff., ¶¶ 3-4.)

74. Detective Lagerman's report confirms that on September 30, 1992, Mr. Holloway was brought to the detective bureau, advised of his Miranda rights, and told about the charges for which he was under arrest. (Lagerman Aff., ¶ 4.)

75. At that time, Mr. Holloway denied any involvement in the crimes that were under investigation, stated that he was willing to stand in a lineup, and also stated he was willing to give samples of his blood, hair and saliva. (Lagerman Aff., ¶ 4; See also Lappen Aff., Exh. SL-14 for a copy of the authorization signed by Mr. Holloway.)

76. Mr. Holloway also told Detective Lagerman that he lived with his fiancé Penny Schultz, and that during the weekend of September 25-26, 1992, he attended a party in the 2600-2700 block of N. Frederick, and that he had seen a friend named "Beth" at that party. (Lagerman Aff., ¶ 4.)

77. Detective Lagerman was never present at any crime scene regarding the sexual assaults of either G.D. or M.G., and he did not take any statements from any witnesses regarding those crimes. (Lagerman Aff., ¶ 6.)

78. Detective Lagerman was not involved in any way with the decision to place Mr. Holloway under arrest, or any event related to effecting his arrest, and he was not involved in any way with conducting the lineup of September 30, 1992. (Lagerman Aff., ¶ 6.)

79. The only work done by Detective Lagerman on the Holloway investigations was to take the above-described statement from Mr. Holloway upon Mr. Holloway's admission to the detective bureau on September 30, 1992. (Lagerman Aff., ¶ 6.)

80. No individual defendant was involved with any decision-making relative to sending any evidentiary items inventoried from the Holloway investigations out for DNA analysis. (Ruzinski Aff., ¶13; Herold Aff., ¶ 16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12; Lagerman Aff., ¶ 9.)

81. In fact, in 1992, the Wisconsin State Crime Lab had not yet begun to conduct any DNA analyses. (Ruzinski Aff., ¶ 13; Herold Aff., ¶16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12; Lagerman Aff., ¶ 9; Gahn Aff., ¶ 5.)

82. The crime lab did not begin to conduct DNA analyses until 1994 or 1995. (Ruzinski Aff., ¶ 13; Herold Aff., ¶ 16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12; Lagerman Aff., ¶ 9.; Gahn Aff., ¶ 6)

83. Regardless, the decision to send evidentiary items out for DNA analysis was made by the assistant district attorney assigned to a criminal case, and not by any MPD personnel assigned to the related investigation. (Ruzinski Aff., ¶ 13; Herold

18

Aff., ¶ 16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12; Lagerman Aff., ¶ 9.; Gahn Aff., ¶¶ 9-11.)

84.    In 1992 and 1993, prosecutors with the Office of the Milwaukee County District Attorney were submitting evidence for DNA testing to a few private laboratories, but only in limited circumstances, and those decisions were largely based upon the strength of other evidence in the case, the costs associated with the testing, and the length of time needed to complete the testing. (Gahn Aff., ¶¶ 7-9.)

85.    Such testing was expensive, and was paid for by the DA's office, in conjunction with Milwaukee County. (Gahn Aff., ¶ 10.)

86.    No defendant conspired to "frame" Mr. Holloway. (Ruzinski Aff., ¶ 18; Herold Aff., ¶ 19; Carlson Aff., ¶ 20; Nowakowski Aff., ¶ 15; Lagerman Aff., ¶ 11.)

87.    No defendant was aware of any unlawful or inappropriate activity by any other personnel involved with the subject investigations, and so there was no need to "intervene" to stop such activity. (Ruzinski Aff., ¶ 18; Herold Aff., ¶ 19; Carlson Aff., ¶ 20; Nowakowski Aff., ¶ 15; Lagerman Aff., ¶ 11.)

88.    Representatives of the District Attorney's Office made the decision to charge and prosecute Mr. Holloway, and not any of the detectives. (Ruzinski Aff., ¶ 19; Herold Aff., ¶ 20; Carlson Aff., ¶ 21; Nowakowski Aff., ¶ 16; Lagerman Aff., ¶ 12.)

89.    All decisions made regarding the presentation of evidence at trial were made by the prosecutor assigned to the case, and not by any of the detectives. (Ruzinski Aff., ¶ 19; Herold Aff., ¶ 20; Carlson Aff., ¶ 21; Nowakowski Aff., ¶ 16; Lagerman Aff., ¶ 12.)

90. Prior to September 28, 1992, none of the defendants had ever personally encountered Mr. Holloway, nor were they aware of him by name; they first learned of Mr. Holloway in the context of their work regarding the subject investigations. (Ruzinski Aff., ¶ 20; Herold Aff., ¶ 21; Carlson Aff., ¶ 22; Nowakowski Aff., ¶ 17; Lagerman Aff., ¶ 13.)

91. Regarding the lineup conducted on September 30, 1992, the lineup participants were dressed in identical coveralls, to give them "the same general shape," and they had similar hairstyles, skin tone, and facial features. (Herold 8/2/92 motion-hearing testimony, Exhibit WH-B, at p. 37; Lineup photo, Exhibit WH-A at p. 163.)

92. Mr. Holloway's attorney, Public Defender Stephen Foley, was present for the lineup, made no objection to the lineup, and he even directed that Mr. Holloway be placed at position number "2." (Herold Aff., ¶ 7; Herold 8/2/93 motion-hearing testimony, Exh. WH-B at pp. 35-36.)

93. The group of victims and witnesses who viewed the lineup did not say anything to each other, nor did they gesture or make any motions, after the lineup panel came into the room. (Id., pp. 38, 41-42; Herold 8/4/93 trial testimony, Exhibit WH-B, at pp. 72-74; Nowakowski 8/2/93 motion-hearing testimony, Exhibit GN-B, at pp. 44-48.)

94. Judge Jeffrey Wagner, who presided over Mr. Holloway's 1993 criminal trial, ruled that, based upon the photo of the lineup, along with testimony from various witnesses, the lineup was conducted in "a fair and impartial manner." (Transcript of 8/2/93 motion hearing, Lappen Aff., Exh. SL-1, at p.62.)

95.	That ruling was upheld by the Wisconsin Court of Appeals in the context of Mr. Holloway's post-conviction appeal. (See May 31, 1995 decision of Court of Appeals, copied and attached to Lappen Aff. as Exhibit SL-3, p. 7.)

96.	Wisconsin State Crime Lab serologist Raymond E. Menard testified as an expert at trial, without objection from defense counsel. (Menard 8/4/93 trial testimony, Lappen Aff., Exh. SL-2 at pp. 50-51.)

97.	Mr. Menard testified that he analyzed some vaginal and cervical swabs attributed to victim M.G., and a preliminary test indicated the presence of semen, but that he was unable to determine any potential source of semen found in those samples because there "physically was not enough present," (Id., pp.52-55.) so he could not provide information regarding the person who produced the semen. (Id., p. 56; See Lappen Aff., Exhs. SL-5 to SL-8 for copies of related reports from the Wisconsin State Crime Lab.)

98.	Mr. Menard clarified that he could not include or exclude M.G.'s assailant by blood type. (Id., p. 57; See also Exh. SL-6.)

99.	Mr. Menard further testified that he analyzed two blankets retrieved from the residence of G.D., he detected the presence of semen in the blue blanket, he conducted further testing, and was able to determine that the source of that semen was a "non-secretor" (Id., pp. 58-60; See also Exh. SL-6.)

100.	Mr. Menard also detected semen on the white blanket, and he determined that the most likely source of the semen was an individual who was an "AB secretor." (Id., pp. 61-62; See also Exh. SL-6.)

101. Mr. Menard explained that a semen stain can remain in fabric, like a blanket, indefinitely, so there is/was no way of knowing how long the stains had been in those two blankets. (Id., p. 68.)

102. He also clarified that there was no way for him to determine how long sperm or semen had been in a woman's vaginal tract, from a vaginal swab provided to him. (Id., p. 68.)

103. Mr. Menard testified that the blood type of the blood stains found on the two blankets was consistent with G.D.'s blood type. (Id., p. 63.)

104. Mr. Menard testified that Mr. Holloway's shoes and sweater were tested, but no blood was detected on those items. (Id., p. 65.)

105. Mr. Menard confirmed that as of the date of his trial testimony in August, 1993, the state crime lab did not do DNA testing, and that he did not anticipate that they would be doing DNA testing for at least another five months. (Id., pp. 64-66.)

106. Mr. Menard also confirmed that at that time, the FBI and two private firms were conducting DNA testing (Id., p. 66.)

107. Mr. Menard also clarified that the state crime lab was not a law enforcement agency, and that defense attorneys could ask the state crime lab to perform certain tests. (Id.)

## IV.    STATEMENT OF THE ISSUES

The following issues are presented for review by this Court:

1.    Are the five retired detectives proper parties with regard to all of the claims raised against them in this lawsuit?
2.    Did the action or inaction of any of the detectives violate plaintiff's due process right to a fair trial?
3.    Did any detective initiate or maintain a "federal malicious prosecution" against the plaintiff?

4. Did any detective subject the plaintiff to an unlawful pretrial detention?

5. Did the detectives conspire to "frame" the plaintiff, and thus violate his constitutional rights?

6. Did any detective fail to intervene and attempt to stop the unlawful actions of any other detective?

7. Are the individual defendants each entitled to qualified immunity?

8. In 1992, did the City, through its MPD policy makers, maintain an unlawful policy regarding either a.) investigating potential DNA evidence, or b.) the use of memo books, which caused the defendant detectives to violate plaintiff's constitutional rights?

## V. STANDARD OF REVIEW

### A. Summary Judgment Generally

Defendants seek summary judgment, pursuant to Rule 56, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment must demonstrate that no genuine issue of material fact exists for trial and that the movant is entitled to judgment as a matter of law. *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir. 1990). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Whetstine v. Gates Rubber Co*., 895 F.2d 388, 392 (7th Cir. 1990).

The parties cannot rest on mere allegations in the pleadings, *Koclanakis v. Merrimac Mut. Fire Ins. Co*., 899 F.2d 673, 675 (7th Cir. 1990), or upon conclusory allegations in affidavits*, Palucki v. Sears, Roebuck & Co*., 879 F.2d 1568, 1572 (7th Cir. 1989). The court must draw any permissible inferences from the materials before it in favor of the non-moving party, *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989), as long as the inferences are reasonable, *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir. 1989). The non-moving party must show that the disputed fact is material, or outcome determinative, under

Case 2:19-cv-01460-LA   Filed 01/14/21   Page 23 of 47   Document 107

applicable law. Local 1545, *United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir. 1989). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Issues need only be submitted to a jury where the evidence is sufficient to warrant a jury verdict in favor of the party in question, and this mandate requires more than a scintilla of evidence. Rather, it requires an inquiry by the court before submitting matters to juries as to whether there is sufficient evidence upon which a jury could properly proceed to find a verdict for the party bearing the burden of proof. *Anderson*, 477 U.S. at 248. Therefore, summary judgment must be granted in favor of the defendants if there is no genuine issue as to any material fact and if they are entitled to judgment as a matter of law.

## B.     Qualified Immunity

The threshold question of qualified immunity is properly resolved on summary judgment because its analysis is ostensibly objective. See *Rakovich v. Wade*, 850 F.2d 1180, 1203-04 (7th Cir. 1988), cert. denied, 488 U.S. 968 (1988). Although intertwined with facts of a case, the qualified immunity issue is a question of law for the court. *Alvarado v. Picur*, 859 F.2d 448, 452 (7th Cir. 1988).

In *Hunter v. Bryant*, 502 U.S. 224 (1991), the United States Supreme Court "stressed the importance of resolving immunity questions at the earliest possible stage of litigation." Id. at 227. The Supreme Court reversed the Ninth Circuit's denial of summary judgment, holding that

> [t]he decision of the Ninth Circuit ignores the import of these
> decisions. The Court of Appeals' confusion is evident from its
> statement that "whether a reasonable officer could have believed
> he had probable cause is a question for the trier of fact, and

24

summary judgment . . . based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach." This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

Id. at 227-28 (citations omitted).

## VI.    ARGUMENT

### A.    The Five Retired Detective Defendants Are Not Proper Parties To All Claims Raised Against Them.

The defendants assert that any claims related to the fact that no DNA testing was done on physical evidence collected in the context of the subject criminal investigations should be dismissed as to all defendants, and all claims as against Mr. Lagerman should be dismissed outright, for their lack of personal involvement. Courts have held that "individual liability under § 1983 can only be based on a finding that the defendant caused the deprivation at issue." *Kelly v. Mun. Courts of Marion County, Inc*., 97 F.3d 902, 909 (7th Cir. 1996). A viable § 1983 claim against individuals must be supported by evidence of personal involvement in the alleged constitutional deprivation. *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 811 (7th Cir. 2000). Furthermore, a "causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). Although his amended complaint is somewhat ambiguous, it appears that most of Mr. Holloway's claims center on the fact that DNA evidence first discovered in 2016 led to dismissal of the criminal charges against him and his release from prison in 2016. However, back in 1992, the Wisconsin State Crime Lab had not yet begun to conduct DNA analyses. At that time, the state crime lab was able to analyze evidence for the presence of blood and semen, which was

done in the context of the G.D. and M.G. investigations, per usual protocol. There was no obligation on behalf of investigating detectives to seek out DNA testing of physical evidence, much less provide the results of a testing mechanism that was not readily available at the time of the Holloway investigations in 1992. While the FBI and a few private labs were conducting DNA analyses in the 1992 to 1993 timeframe, the state crime lab did not begin to conduct DNA analyses until 1994 or 1995. Regardless of the timeframe or testing agency, it was the decision of the assistant district attorney assigned to a criminal case, and not the investigating detectives, to send evidence out for DNA analysis. Per the affidavit of retired ADA Norman Gahn, in the 1992 to 1993 timeframe, prosecutors with the Office of the Milwaukee County District Attorney were submitting evidence for DNA testing to a few private laboratories, but only in limited circumstances, and those decisions were largely based upon the strength of other evidence in the case, the costs associated with the testing, and the length of time needed to complete the testing. Such testing was expensive, and was paid for by the DA's office, in conjunction with Milwaukee County. Mr. Gahn confirms that investigating detectives were not responsible for arranging DNA testing. Therefore, none of the individual defendants can be held liable for any claim which relates to plaintiff's suggestion that potentially exculpatory DNA evidence was intentionally withheld from him, or that the defendants conspired to keep such evidence from him, or that any defendant failed to intervene and stop another defendant from keeping such evidence from him.

The remainder of Mr. Holloway's claims appear to center on his assertions that 1. he was arrested and detained without probable cause; 2. he was subjected to an improper lineup; 3. the detectives fabricated unidentified evidence, withheld unidentified exculpatory evidence, and generally conspired to frame him; and 4. very generally, that he was unlawfully prosecuted. However, representatives of the district attorney's office, and not the investigating detectives,

made the decision to charge and prosecute Mr. Holloway. Furthermore, the prosecutor assigned to the case made all decisions regarding the presentation of evidence during the subject criminal trial, and not any investigating detective. Therefore, no claim regarding the decisions to charge and prosecute, or relative to decisions regarding presenting evidence to the jury, can proceed as against any of the individual defendants in this case, because they were not personally responsible for same.

Finally, to the extent that Mr. Holloway challenges 1.) the propriety of his September 30, 1992 arrest; 2.) the propriety of the September 30, 1992 lineup, wherein he was subject number "2"; 3.) whether potentially exculpatory blood and semen test results were provided to his counsel; and 4.) whether potentially exculpatory evidence was properly investigated and documented, Joseph Lagerman had nothing to do with the process of interviewing witnesses, gathering evidence, submitting any physical evidence for testing, or reporting the testing results to the prosecutor. Also, he had no involvement with the decision to arrest Mr. Holloway, the September 30, 1992 lineup, or any decision regarding any follow-up work done regarding Mr. Holloway's claimed alibis. Detective Lagerman's only involvement was to take Mr. Holloway's statement upon his arrival at the detective bureau on September 30, 1992. Therefore, all claims in this case as against Mr. Lagerman should be dismissed outright at this time, due to his utter lack of personal involvement. As discussed below, all remaining claims as against Mr. Ruzinski, Mr. Carlson, Mr. Herold and Mr. Nowakowski should also be dismissed.

###    B.    Mr. Holloway Was Lawfully Arrested

Plaintiff claims that he was unlawfully arrested. However, police have probable cause to arrest if the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent man in believing

that the suspect had committed, or was committing, an offense. *Adams v. Williams*, 407 U.S. 143 (1972); see also *Donahue v. Wihongi*, 948 F. 3d 1177 (10th Cir. 2020). Furthermore, the Supreme Court has clearly established that the focus of a Fourth Amendment analysis is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1968) Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. (*United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); see also *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir., 2014).) Regardless, the facts should be analyzed from the perspective of an objectively reasonable police officer. (*Ornelas v. United States*, 517 U.S. 690, 696-697 (1996).) Also, due to qualified immunity's protection, an officer needs only "arguable" probable cause, and that exists "when a reasonable officer 'in the same circumstances and . . . possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law.'" *Huff*, Id., citing *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) The Supreme Court has reminded that "reasonable suspicion" and "probable cause" are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). The Ornelas court confirmed that

> [t]he principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. (Ornelas, Id. at 696.)

In the case at hand, Detective Carlson is the only defendant who had any involvement whatsoever with the arrest of Mr. Holloway on September 30, 1992. Therefore, consistent with

the law cited in Section A, above, any unlawful-arrest claims should be dismissed as against all of the other individual defendants, due to their lack of personal involvement.

While Detective Carlson did not personally participate in effecting Mr. Holloway's arrest, he did direct other MPD officers to take Mr. Holloway into custody. Defendants assert that Detective Carlson had ample information upon which he reasonably concluded that he had arguable probable cause to request the arrest of Mr. Holloway. In late September, 1992, the detective was investigating the sexual assault of R.R., who was assaulted in her home, which was located in the area of U.W. - Milwaukee, near the border between Milwaukee and Shorewood. Detective Carlson contacted representatives of the Shorewood Police Department, and asked them about any similar or related offenses which occurred in the area. He was told by Shorewood police personnel that Daryl Holloway was a suspicious person stopped by both Shorewood police and Whitefish Bay police on September 21, 1992; that he was taken into custody by the Shorewood police for prowling; that his arrest record had been checked; and that he was on parole for a sexual assault he committed in 1985. Detective Carlson then further investigated the circumstances surrounding that crime, and learned that in 1985, Mr. Holloway sexually assaulted a woman in the bedroom of her residence, while threatening to kill her, and that he had also burglarized his victim. Detective Carlson concluded that this description matched the descriptions provided by R.R., G.D., and M.G. relative to their September, 1992 sexual assaults, which all involved a home invasion, where a woman alone was sexually assaulted by a perpetrator who threatened to kill her, and who also stole from her. Detective Carlson then obtained a January, 1992 booking photo of Mr. Holloway, placed it in a photo array, and showed it to R.R. on September 29, 1992. R.R. said that Mr. Holloway's photo looked very similar to her attacker, but that she would like to see him in person to make a positive

identification. Detective Carlson determined that all of this information gave him probable cause to take Mr. Holloway, who was then on parole for the 1985 sexual assault, into custody, and have him participate in a live lineup.

Detective Carlson notes that he was entitled to rely upon the information provided to him by representatives of the Shorewood Police Department, because the Supreme Court has held that "no settled Fourth Amendment principle requires [an officer] to second guess the earlier steps already taken by his fellow officers." *White v. Pauly*, 580 U.S. _____ (Slip op. p. 7) (2017) Also, pursuant to the "collective knowledge" doctrine, Detective Carlson was entitled to rely on the Shorewood information, as well as the information he found by researching Mr. Holloway's conviction for the 1985 sexual assault, along with the information gathered by his fellow Sexual Assault Unit detectives while investigating the sexual assaults of G.D. and M.G. See *United States v. Hensley*, 469 U.S. 221, 222-223 (1985); *United States v. Williams*, 627 F. 3d 247, 252 (7th Cir. 2010). Based upon all of the information then known to him, including the tentative identification made by R.R. of Mr. Holloway via his January 1992 booking photo, defendants respectfully assert that Detective Carlson had arguable probable cause to request that Mr. Holloway be taken into custody, and have him participate in a live lineup, and therefore plaintiff's unlawful arrest and unlawful detention claims must be dismissed at this time.

### C.    No Defendant Denied Mr. Holloway a Fair Trial.

Mr. Holloway appears to claim that he was denied a fair trial, and thus due process of law, because defendants 1) failed to have items tested for DNA evidence; 2) "may have" withheld certain unspecified "exculpatory evidence;" 3) "may have" "fabricated false evidence;" and because they 4) conducted a faulty lineup. Such a due process claim can be maintained against a law enforcement officer if the officer kept exculpatory evidence from the prosecutor.

*Newsome v. McCabe*, 256 F. 3d 747, 752 (7th Cir. 2001). A state actor suppresses evidence "when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2.) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F. 3d 561, 567 (7th Cir. 2008) As to the first item noted above, the discussion in Section A establishes that the defendants cannot be held liable for not having items tested for DNA evidence, when the state crime lab had not yet begun to do that kind of testing, and because such testing was only ordered and paid for by the prosecutor's office, and not any investigating detective. No defendant here knew of exculpatory DNA evidence, and failed to provide it to the prosecutor. Also, if the FBI and/or private labs were performing DNA testing as early as 1992, they were independent agencies, and therefore were available to Mr. Holloway, so he could have obtained that testing on his own.

Regarding the second and third items, it is difficult for these moving defendants to present argument about issues involving unspecified "exculpatory evidence" and unspecified "fabricated false evidence." However, they note that a claim alleging that law enforcement officers fabricated evidence is in essence a claim for malicious prosecution, which is eliminated and cannot be prosecuted under 42 U.S.C. sec. 1983 if there is a common law tort action for malicious prosecution. *Newsome v. McCabe*, 256 F. 3d 747, 750 (7th Cir. 2001). Wisconsin law recognizes such a tort action. *Krieg v. Dayton-Hudson Corp*., 104 Wis. 2d 455, 460-61, 311 N.W. 2d 641 (1981) Therefore, any due process claim asserting that the defendants fabricated evidence should be dismissed. In the alternative, defendants assert that no DNA evidence, or related testing results, were withheld or fabricated, because DNA testing was not yet being done by the state crime lab at the time of the subject 1992 investigations, and the defendants had no involvement with any DNA-related decision-making or action. As to blood and semen evidence,

31

the affidavits of the defendants and their attached reports establish that items which appeared to contain bodily fluids were all retrieved from the crime scenes and placed on MPD inventory, and then forwarded to the state crime lab for blood and semen analysis, consistent with usual protocol. Also, vaginal swabs were taken from G.D. and M.G., and hair, saliva and blood samples were retrieved from Mr. Holloway, with his permission, and by medical professionals. These items were also forwarded to the state crime lab for analysis. The state crime lab reports attached to the Lappen affidavit, as well as the trial testimony of Raymond Menard, the serologist from the state crime lab, confirms that the state crime lab tested the received items, and found that they did not contain blood or semen evidence which could be connected to Mr. Holloway. In other words, the blood and semen evidence that was tested by the state crime lab did not determine that Mr. Holloway was the person who produced any of the blood or semen evidence found at the crime scene or in the swabs taken from the victims. Furthermore, Mr. Holloway's shoes and the shoe print on G.D.'s bed sheet were analyzed, and the analyst concluded that his shoe could not have produced the print found on the sheet. Clearly, the potentially exculpatory results of the state crime lab testing were shared with the prosecutor, who presented them at trial, and who was obligated to share them with Mr. Holloway's defense counsel. Mr. Menard's testimony establishes that this potentially exculpatory evidence was presented to the jury during the subject criminal trial. Intuitively, that evidence should have helped Mr. Holloway with his defense.

Furthermore, the detectives' reports and testimonies establish that they investigated Mr. Holloway's alleged alibis and reported any potentially exculpatory evidence. Detective Ruzinski followed-up on the phone number from the hospital, where Mr. Holloway's girlfriend was a patient on September 2, 1992 (Am. Compl., ¶ 48), which was the date of M.G.'s assault.

Detective Ruzinski also followed up by checking the time it would take to travel from victim M.G.'s residence to Mr. Holloway's residence. Detective Herold had Mr. Humes' car checked for Mr. Holloway's prints, and reported that the technician found none. Detective Carlson interviewed Donna Berth about Mr. Holloway's presence at a party near U.W.- Milwaukee on the night before G.D.'s assault, and reported that she said she remembered seeing Mr. Holloway at that party. Detective Carlson reported finding no evidence as a result of executing search warrants at Mr. Holloway's home, in the presence of his girlfriend. Detective Carlson reported that he went to Hardee's, to gather employment records and follow up on Mr. Holloway's alibi for the 9/26/92 sexual assault of G.D. Detective Carlson retrieved Mr. Holloway's shoes, and technicians determined that the shoes did not match the bloody shoeprints found in G.D.'s bedroom on the night of her attack.  Detective Nowakowski inventoried the knife found in the yard of G.D.'s neighbor, and it was also sent to the crime lab for analysis.  Clearly, defendants carried out all tasks assigned to them in the context of the subject investigations. They documented the results of their work in formal police reports, which were shared with the prosecutor, and presumably, the defense. The defendants documented the results of their work, regardless of whether the information they obtained supported or refuted the claims made by either the prosecution or the defense. Defendants testified consistent with their reports. Clearly, no evidence, much less exculpatory evidence, was hidden, and no evidence was fabricated. Therefore, there is no evidence which supports any claim against the defendants that they either withheld exculpatory evidence, or fabricated evidence, and thus denied Mr. Holloway his due process right to a fair trial.

The fourth item relates to Mr. Holloway's assertion that the September 30, 1992 lineup was faulty because 1.) unspecified witnesses, who would have exonerated Mr. Holloway, did not

view it; 2.) prior to the lineup, M.G. was shown a photo array which included a photo of Mr. Holloway; 3.) "the lineup should have taken place behind a screen with a lineup of men who had similar voices to Holloway;" (Am. Compl., ¶¶ 31, 43); and 4.) because "the men in the lineup all did not have the same build and height as Holloway." (Id., ¶¶ 32, 44.) First, any claim challenging the lineup should be dismissed, because in 1995, the Wisconsin Court of Appeals already ruled that the lineup was not impermissibly suggestive, and so collateral estoppel applies. The United States Supreme Court has confirmed that federal courts generally have consistently accorded a preclusive effect to issues decided by state courts. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) The Court advised that "[r]es judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." Id., pp. 95-96. Therefore, this court should decline to reconsider Mr. Holloway's challenges to the propriety of the September 30, 1992 lineup. Second, defendants assert that only Detectives Herold and Nowakowski were involved with the lineup process, so consistent with Section A, above, any related claims as against any other defendant should be dismissed, due to their lack of personal involvement. Third, as asserted by Mr. Holloway in his amended complaint, he was represented by Attorney Stephen Foley at the lineup, and Atty. Foley did not object to any lineup "irregularity." (Am. Compl., ¶ 29.) In fact, Atty. Foley placed Mr. Holloway at position number "2". Because no objection was raised by counsel regarding any aspect of the lineup at that time, any such objection was waived.

As to the merits of the first of Mr. Holloway's lineup-related claims - that certain unidentified witnesses should have been allowed to view the lineup, so that they could exonerate Mr. Holloway - defendants note that it is difficult to respond with specificity to a claim involving

unidentified witnesses. However, whoever they were, there was nothing which prohibited Mr. Holloway and/or his defense counsel from presenting those unidentified witnesses at trial, and eliciting alibi testimony from them in front of the jury. Even if certain unidentified witnesses did not view the September 30, 1992 lineup, the positive identifications made of Mr. Holloway by both G.D. and M.G. are not invalidated. There were witnesses who did view the lineup, but did not identify Mr. Holloway, and that fact did not overcome the eyewitness identifications by the victims. With regard to the remainder of plaintiff's belated lineup challenges, both the trial judge and the Wisconsin Court of Appeals held that there was nothing improper about the September 30, 1992 lineup. The trial judge concluded that the lineup was conducted in a "fair and impartial manner." In its May 31, 1995 decision, the Wisconsin Court of Appeals found that

> "[t]he lineup consisted of five participants whose height ranged from
> 5' 10" to 6' 1", whose weight ranged from 170 pounds to 220 pounds,
> and whose age ranged from seventeen to twenty-seven. Holloway was
> 5' 10", 200 pounds and twenty-three years old at the time of the
> assaults. The police spent about one hour picking other participants
> from the city jail that were similar in height, weight, complexion,
> facial hair and head hair. The fact that each participant varied slightly
> in height, weight and age will not render a lineup impermissibly
> suggestive. See *Wright v. State*, 46 Wis. 2d 75, 86, 175 N.W. 2d 646,
> 652 (1970) (lineup participants do not need to have characteristics
> identical to the suspect). Accordingly, we see no reason to conclude
> that this lineup was impermissibly suggestive." (Decision, pp. 7-8.)
> The appellate court also found that "Holloway's claim that the voice
> identification rendered the lineup worthless is not supported by
> citation to authority and [the court declined] to consider it. See *State v.
> Petit*, 171 Wis. 2d 627, 646-47; 492 N.W. 2d 633, 642 (Ct. App. 1992)
> (arguments not supported by legal authority will not be considered)."
> (Id., p. 8.)

The defendants offer as if their own the analysis presented by the appellate court decision, and refer the court to the photo of the lineup presented in Exhibit WH-A at page 163, and they assert that there was nothing impermissible or improper about the makeup of the lineup panel. Furthermore, there is no caselaw which required the panelists to have similar voices or be kept

35

behind a screen, or which holds that a suspect cannot be placed in a lineup if one of the viewing witnesses was previously shown his picture in the context of a photo array. Therefore, any lineup-related claim must be dismissed.

Mr. Holloway cannot support his claim that his due process right to a fair trial was violated because defendants withheld exculpatory evidence, or fabricated evidence, or conducted a faulty lineup. Therefore, plaintiff's due-process/unfair-trial claims must be dismissed at this time.

### D.   No Defendant Subjected Mr. Holloway to a "Malicious Federal Prosecution."

Mr. Holloway asserts that he was subjected to a "malicious federal prosecution" (Count II, Am. Compl., p. 31.)  First, Mr. Holloway was charged by the local state prosecutor's office, and his trial was held in the Milwaukee County Circuit Court, so it is unclear why he is claiming he was subjected to a "malicious federal prosecution." Furthermore, there is no viable constitutional tort of malicious prosecution because of the availability of such a remedy under state law (*Newsome v. McCabe*, 256 F. 3d 747, 752 (7th Cir. 2001)), so this claim should be dismissed outright. In the alternative, defendants assert that one element of a malicious prosecution cause of action is that the prior proceedings must have been by, or at the instance of a defendant in the instant case (*Pollock v. Vilter Mfg. Corp.*, 23 Wis. 2d 29, 37 (1964)), and that was not the case here. Rather, representatives of the Milwaukee County District Attorney's office made the decisions to charge and prosecute Mr. Holloway. The defendant detectives did not make either of those decisions, or any decisions regarding the presentation of evidence during the jury trial. Rather, the defendants simply gathered information, which they documented and relayed to the prosecutor's office. There is no evidence which even suggests that the detectives were untruthful in either their reports or their testimony. None of them even knew of

36

Mr. Holloway prior to September 28, 1992, so there was no previous history between any of them and Mr. Holloway, from which one might infer some sort of personal bias. Probable cause was determined largely by the identifications of Mr. Holloway made by R.R., G.D., and M.G., and the similarities between their sexual assaults and the sexual assault of M.M-G., who was Mr. Holloway's 1985 rape victim. Therefore, consistent with the law presented in Section A, above, any claim alleging an unlawful prosecution, federal or state, cannot be maintained as against any of the individual defendants due to their lack of personal involvement, and must be dismissed at this time. Furthermore, given the discussion presented in Section B above, arguable probable cause existed to take Mr. Holloway into custody. At that time, he was on parole for the rape he committed in 1985, and his parole would have been revoked as a result of his arrest on September 30, 1992. To the extent that the initial arrest and initial detention of Mr. Holloway began his "malicious federal prosecution," Detective Carlson's actions were consistent with the constitution, and any related claims against him should be dismissed.

E.      **Mr. Holloway was not Subjected to an Unlawful Pretrial Detention**

As noted in Section B, above, Detective Carlson was the only defendant involved with the process of taking Mr. Holloway into custody on September 30, 1992, and he had at least arguable probable cause to have other MPD personnel effect Mr. Holloway's arrest. Mr. Holloway was on parole for his 1985 sexual assault conviction at the time, and his parole would have been revoked upon his arrest. Because Mr. Holloway was lawfully arrested, which would have triggered the revocation of his parole, he was not subjected to an unlawful pretrial detention, and any such claim must be dismissed at this time.

**F.      No defendant Conspired to "Frame" Mr. Holloway, or Otherwise Violate His Constitutional Rights**

In Mr. Holloway's amended complaint, he very generally asserts that the defendants conspired together to frame him for the charged crimes, thereby violating his constitutional rights. However, Mr. Holloway utterly failed to present any specific description of the circumstances by which any individual defendant engaged in any such conspiratorial act. In this circuit, the principle element of an unlawful civil conspiracy is an agreement between the parties to inflict a wrong against or injury upon another. *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984). "In order to establish the existence of a conspiracy . . . a plaintiff must demonstrate that the conspirators have an agreement to inflict injury or harm upon him." *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999) (citing *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670 (1980)). "The conspirators must act with a single plan, the general nature and scope of which is known to each would-be conspirator." *Hernandez*, 197 F.3d at 263 (citing *Hampton*, 600 F.2d at 621, *rev'd in part on other grounds*, 446 U.S. 754). "The agreement may be inferred from circumstantial evidence, but only if there is sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Hernandez*, 197 F.3d at 263 (citing *Hampton*, 600 F.2d at 621, *rev'd in part on other grounds*, 446 U.S. 754). The principal element of a civil conspiracy is an agreement among the parties to inflict a wrong or injury against another. *Hernandez*, 197 F.3d at 263. In order to maintain a conspiracy claim, plaintiff must show that there was a violation of his constitutional rights. *Hampton v. Hanrahan*, 600 F.2d 600, 620 (7th Cir. 1979).

38

No agreement existed between any of the defendants to violate any right of Mr. Holloway, as evidenced by their affidavits, and their reports and testimonies attached thereto. While they worked as a team to accomplish the tasks associated with any given investigation, they each were assigned to perform separate and distinct tasks. There is no evidence even suggesting that any one of them engaged in inappropriate investigative activities, much less that they all conspired to frame Mr. Holloway, or otherwise deprive him of his constitutional rights. Each of the defendants documented the information they gathered in their reports. The reports were placed in the MPD investigatory file, and provided to the District Attorney's office. Presumably, the prosecutor shared the reports, and any other evidence, with defense counsel during pretrial discovery. We know from the trial transcripts that the potentially exculpatory results from the blood and semen testing done by the state crime lab were shared with the defense and presented to the jury, and we know from the detectives' reports that the inability of witnesses to identify Mr. Holloway in photo arrays and/or the lineup was described and shared with the prosecutor, and by inference, the defense. There was no "framing" or "conspiring" by defendants Therefore, the plaintiff cannot maintain a proper cause of action for civil conspiracy against the individual defendants, and any such claim must now be dismissed.

G. **No Defendant Observed any Unlawful or Otherwise Inappropriate Action by any Other MPD Personnel, so They Did Not Fail to Intervene and Stop or Prevent Such Activity**

Mr. Holloway very generally claims that each of the defendants failed to intervene and prevent or stop other MPD personnel from violating his constitutional rights. However, he does not specifically identify any defendant or other person, or describe exactly what they did, or did not do, which constituted a failure to intervene. To succeed on a failure-to-intervene claim, Mr. Holloway must prove that:

1. someone involved with the subject investigations committed an unconstitutional act;
2. a defendant knew that person was committing or was about to commit a constitutional violation;
3. that defendant had a reasonable opportunity to prevent harm from occurring;
4. that defendant failed to take reasonable steps to prevent harm from occurring; and
5. the failure to intervene caused harm.

(*See Lanigan v. Village of East Hazel Crust, Ill.*, 110 F.3d 467, 477-78 (7th Cir. 1997); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994.) Under *Yang*, "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under §1983 if that officer had reason to know . . . that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring. 37 F.3d at 285. However, without an underlying violation of a plaintiff's constitutional rights, intervention is not required. *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004), because a failure -to-intervene claim is dependent on the issue of whether a constitutional violation occurred in the first place. See *Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009). Moreover, even if an underlying constitutional deprivation did occur, a plaintiff must generally show that the officer ordered or condoned the action. Fillmore, *Id*. At 506. The mere presence of an officer is not sufficient evidence to support a failure to intervene claim. *Id.*

As discussed above, there is no evidence which establishes that anyone involved with the subject criminal investigations violated the constitution, much less that any one of the defendants knew about and/or condoned such activity. Therefore, plaintiff cannot support his failure-to-intervene claim, and it must be dismissed at this time.

40

**H.    The Retired Detective Defendants Are Each Entitled to the Protection of Qualified Immunity**

The defense of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. _____ (2015) (Slip op., at 4-5); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations and footnote omitted). The principle behind the doctrine is that if the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he or she fairly be said to know that the law forbade conduct not previously identified as unlawful. *Id*. The Seventh Circuit has noted that "[w]hat is important, in the final analysis, is 'whether the legal norms governing [the government official's] behavior were clearly established at the time of the challenged actions.'" *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (citations omitted). In fact, existing precedent must have placed the statutory or constitutional question beyond debate. (*Mullenix*, Slip op. at 5.)

Accordingly, the question of whether qualified immunity applies is made up of three analytic components: (1) the identification of the specific right allegedly violated, (2) the determination of whether that right was so "clearly established" as to alert a reasonable official to its constitutional parameters, and (3) the ultimate determination of whether a reasonable official could have believed lawful the particular conduct at issue. *See Gooden v. Howard County*, 917 F.2d 1355, 1361 (4th Cir. 1990); *Burns v. Loranger*, 907 F.2d 233, 235-36 (1st Cir. 1990); *Robison v. Via*, 821 F.2d 913, 920-21 (2d Cir. 1987). Courts have the discretion to resolve a qualified immunity challenge at the outset by utilizing the "clearly established" prong without first having to decide whether there was any underlying constitutional violation. *Camreta v.*

*Greene*, 563 U.S. 692, 707, 131 S. Ct. 2020, 2032, 179 L. Ed. 2d 1118 (2011). In fact, the court

need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact

has merit. Id, 563 U.S. at 705-706.

In revisiting the defense of qualified immunity, the United States Supreme Court has held

that, even assuming that a constitutional right may have been violated, a lower court must review

the second question – whether the right was clearly established – in a case-specific manner.

*Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 148 L.Ed. 2d 454 (2001). The Court held that this

inquiry,

> must be undertaken in light of the specific context of the case, not as a broad
> general proposition; and it too serves to advance understanding of the law and to
> allow officers to avoid the burden of trial if qualified immunity is
> applicable…The relevant dispositive inquiry in determining whether a right is
> clearly established is whether it would be clear to a reasonable officer that his
> conduct was lawful in the situation he confronted…If the law did not put the
> officer on notice that his conduct would be clearly unlawful, summary judgment
> based on qualified immunity is appropriate (*Id.*, 121 S.Ct. at 2156-57) (citations
> omitted.)

Furthermore, the Court also held that even if the officer's mistake as to what the law requires is

reasonable, the officer is entitled to the immunity defense. (*Id.* at 2158.) When considering the

defense of qualified immunity, the Court must consider only the facts that were knowable to the

defendant officer. *White v. Pauly*, 580 U.S. ___ (2017) (Slip op., at 3); See also *Kingsley v.*

*Hendrickson,* 576 U.S. ____, ____ (2015) (Slip op., at 9.)

The Seventh Circuit has stated with respect to qualified immunity that it is "designed to

shield from civil liability 'all but the plainly incompetent or those who knowingly violate the

law.'" *Mullenix*, slip. op. at 5; *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). It should be

applied unless "it has been authoritatively decided that certain conduct is forbidden." *Upton*, 930

F.2d at 1212 (quoting *Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 875 (7th Cir.

1987)).  Courts have maintained the longstanding principle that "clearly established law" should not be defined "at a high level of generality."  *White v. Pauly*, 580 U.S. ___ at ___ (Slip op. at 6, citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Qualified immunity thus provides officers with an additional layer of protection against civil liability.  *Hughes*, 880 F.2d at 970.

As described in the above sections of this brief, no caselaw clearly put the individual defendants on notice that any of their actions in the context of the subject criminal investigations violated any known constitutional right of Mr. Holloway. In fact, the caselaw and facts discussed above establish that the actions of the individual defendants were consistent with standard police procedures, the constitution, and relevant caselaw. Therefore, all defendants are protected from suit by qualified immunity.

I.     **The City of Milwaukee Is/Was Not Deliberately Indifferent Regarding Its Policies Related to Investigating DNA Evidence or the Use of Memo Books; Therefore, Plaintiffs Cannot Support Their Unlawful Policy Claim.**

In his amended complaint, plaintiff alleges that the City, through the MPD, maintained unlawful policies regarding DNA testing and the use of memo books. Specifically, Mr. Holloway suggests that the MPD had "a shoddy record with regards [sic] to DNA evidence and wrongful convictions. (Am. Compl., ¶ 71.) He supports his claim by presenting incomplete information about investigations which culminated in 2009, when DNA evidence led MPD homicide detectives to determine that Walter Ellis was the "Northside Strangler." (Id., ¶¶ 71-86.) From those investigations and subsequent civil suits against a few homicide detectives, plaintiff concludes that the City maintained a policy and practice of "inadequately investigating homicides" (Id., ¶ 87.) without providing the specifics regarding that policy or practice. However, it appears that plaintiff is asserting that DNA evidence was not adequately investigated regarding those homicide cases. The plaintiff also asserts that MPD detectives "were told to keep

all pertinent notes about any given criminal investigation," but that a few of the detectives in the described homicide investigations kept their investigatory notes separate, and then destroyed them, thus destroying potentially exculpatory information. (Id., ¶¶ 88-98.) To state a § 1983 claim against a municipality, the complaint must allege that the constitutional deprivation was caused by an official municipal policy, custom, or practice. *Oklahoma City v. Tuttle*, 471 U.S. 808, 810, 105 S.Ct. 2427, 2429, 85 L.Ed.2d 791, 796 (1985); *Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638 (1978); *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986). "To establish a municipal policy or custom, the plaintiff must allege a specific pattern or series of incidents that support the general allegation of a custom or policy." *Henry*, 808 F.2d at 1237. A single incident, when unaccompanied by supporting history, does not provide an adequate basis for inferring a policy. *McKee v. City of Rockwell*, 877 F.2d 409, 416 (5th Cir. 1989). Moreover, the plaintiff must show a 'direct causal link between the municipal policy and the constitutional deprivation.'" *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 509-10 (7th Cir. 1993). "[F]ailing to eliminate a practice cannot be equated to approving it." *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993), (cert. den. 511 U.S. 1088, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994).

To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas*, 604 F.3d at 303. "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, there must

44

be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

Defendants assert that the investigatory practices of a few homicide detectives involved with the "Northside Strangler" cases in the late 1990s and early 2000s, and regarding DNA evidence, had nothing to do with defendants' practices in investigating the 1992 sexual assaults and burglaries at issue in this case. Furthermore, what those homicide detectives did or did not do years after Mr. Holloway's conviction did not cause any defendant to violate his constitutional rights – in other words, there is no cause and effect relationship here between the alleged unlawful practices by a few homicide detectives, the defendants' actions, and Mr. Holloway's 1993 conviction. As discussed above, in the 1992 to 1993 timeframe, the Wisconsin State Crime Lab was not yet conducting DNA analyses. While the DA's office, in limited circumstances, sought DNA analyses from private labs during that time, the prosecuting attorney, and not any investigating detective, made the decision to send out physical evidence for DNA analysis. There was no formal, written MPD policy regarding DNA testing during the 1992 to 1993 timeframe. That makes sense, given that MPD personnel were not involved with any decision-making or action regarding DNA testing. Consistent with that premise, there certainly was no direction given to detectives assigned to the Sexual Assault Unit to fabricate or withhold DNA evidence from criminal defendants. In Mr. Holloway's case, sources of blood and semen evidence were gathered and sent to the state crime lab, pursuant to usual protocol. Furthermore, the potentially exculpatory results of the blood and semen testing that was done by the state crime lab on those items were shared with the prosecutor. If Mr. Holloway and/or his defense counsel wanted to determine whether there was any available DNA evidence which would support his defenses, they could have requested either the FBI or one of the private firms to

45

Case 2:19-cv-01460-LA   Filed 01/14/21   Page 45 of 47   Document 107

conduct DNA analyses of any or all of the evidentiary items gathered during the subject investigations. Apparently, Mr. Holloway's counsel at the time, like the prosecuting attorney, did not see any need to have DNA testing done. Regardless, any *Monell* claim regarding an alleged unlawful MPD policy in 1992 or 1993 regarding DNA testing must be dismissed.

As for memo books, plaintiff correctly points out that MPD policy requires detectives to maintain their investigatory notes, which are usually kept in memo book form. The problem noted regarding the cases cited by the plaintiff in his amended complaint was that the involved detectives apparently kept a separate set of notes, and destroyed them. In 1992, the defendants in the instant case were all assigned to the MPD Vice Control Division/ Sexual Assault Unit. They used department-issued memo books and sometimes stenographic pads to record their investigatory notes. They drafted formal reports which contained the information they gathered, and they placed those reports in the MPD investigatory file. After the formal reports were filed, the detectives all maintained their investigatory notes until the time of their respective retirements. Therefore, unlike the homicide detectives involved with the cases described by the plaintiff, the detectives in the instant case followed department directives. They kept all of their investigatory notes until they retired, with the exception of Mr. Carlson, who still has his memo books. There was nothing about the manner by which the defendants maintained their investigatory notes which was improper. With specific reference to the Holloway investigations, defendants' investigatory notes were available for inspection and/or copying by either the prosecutor or defense counsel. There is no evidence in this case even suggesting that the individual defendants destroyed their notes prior to the 1993 criminal trial, or did anything to prevent Mr. Holloway's defense counsel from having access to any information they gathered in the course of the subject investigations. There certainly was no policy which directed them to

destroy their notes, or otherwise prevent the notes from being available for inspection. Therefore, plaintiff's Monell claim relating to the use of memo books must also be dismissed at this time.

## VII.  CONCLUSION

Consistent with the above argument and all matters of record, defendants City of Milwaukee, Daniel Ruzinski, William Herold, Michael Carlson, Gregory Nowakowski, and Joseph Lagerman respectfully request that this Court rule as a matter of law that none of their actions in investigating the matters pertaining to the criminal complaints against Mr. Holloway in 1992 and 1993 were unconstitutional.  Additionally, qualified immunity protects them from liability regarding any claims raised against them in their individual capacities. Finally, in 1992, there was no unlawful MPD policy regarding either investigating DNA evidence or maintaining investigatory notes, which kept Mr. Holloway, or any other criminal defendant, from being provided with potentially exculpatory evidence. Defendants therefore respectfully request an order granting summary judgment in their favor on all Monell policy-related claims, and dismissal of the entirety of this lawsuit.

Dated at Milwaukee, Wisconsin this 14th day of January, 2021.

TEARMAN SPENCER
City Attorney


s/Susan E. Lappen
SUSAN E. LAPPEN
Assistant City Attorney
State Bar No. 01003567
Email:  slappe@milwaukee.gov
*Attorneys for Defendants*

P.O. Address:
800 City Hall
200 East Wells Street
Milwaukee, WI  53202
Telephone: 414-286-2601
Fax:  414-286-8550
Email:  slappe@milwaukee.gov
1032-2019-2313/272956