**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

DARYL L. HOLLOWAY,

        Plaintiff,

  v.

                                  Case No.: 2019-CV-1460

CITY OF MILWAUKEE, et al.

        Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT**
**OF PROPOSED FINDINGS OF FACT**

        Plaintiff, by his attorneys, responds to Defendants proposed findings of fact as

follows:

        1.     In 1992, the detectives assigned to the MPD Vice Control Division/Sexual Assault Unit worked as a team, and were assigned to the three basic work shifts of 8 a.m. – 4 p.m. (day shift), 4 p.m. – midnight (early shift), and midnight to 8 a.m. (late shift). (Ruzinski Aff., ¶ 16.)

        RESPONSE: Agree.

        2.     Follow-up investigatory work was assigned by supervisors, taking into account    the particulars of the follow-up work, the availability of detectives, the detectives' assigned shifts, the timing involved with the availability of witnesses, and the accessibility of crime scenes and evidence. (Ruzinski Aff., ¶ 16.)

        RESPONSE: Agree.

        3.     For instance, a sexual assault complaint might come in at midnight, and a late shift detective would be assigned to respond to the scene, conduct the initial investigation, and open the initial report, but follow-up work, like interviewing potential witnesses or obtaining business records, like time cards or surveillance video, might be assigned to detectives who work during the day shift, which covers standard business hours. (Ruzinski Aff., ¶ 16.)

RESPONSE: Agree.

4.     In 1992, detectives assigned to the MPD Vice Control Division/Sexual Assault Unit used department-issued memo books, and sometimes stenographic pads, to record notes about information gathered through their investigatory work. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 18; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

RESPONSE: Agree.

5.     Those detectives used their notes to prepare formal hard copy reports which contained information gleaned from their investigatory work, and which were kept with the relevant MPD investigatory file. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 18; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

RESPONSE: Agree.

6.     After their reports were filed, each of the individual defendants maintained possession of their memo books and/or steno pads, so that their notes were available for their future reference, and for copying by anyone from the district attorney's office or by defense counsel. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 19; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

RESPONSE: Dispute. Michael Backes, Mr. Holloway's trial counsel, was not provided any memo books from the Detectives. At the time of trial, Mr. Backes was only provided the Detectives' typed reports, which were apparently verbatim to their written memo notes. However, specific and material information regarding R.R's assailant was erroneously left out of Detective Carlson's report that was written in his memo book. Now knowing that Detective Carlson has provided his memo book from the investigation into the robbery and attempted assault of R.R., Mr. Backes would have wanted that information, such as the assailant's strong cigarette odor. (Backes Decl. ¶¶ 3-6).

7.     In fact, each of the individual defendants maintained all of their investigatory notes until the time of their respective retirements, and Mr. Carlson still has possession of his notes. (Ruzinski Aff., ¶ 17; Herold Aff., ¶ 18; Carlson Aff., ¶ 19; Nowakowski Aff., ¶ 14; Lagerman Aff., ¶ 10.)

RESPONSE: Agree.

2

8.      Daniel G. Ruzinski was employed with the Milwaukee Police Department from August 15, 1977 to June 15, 2012, and he retired at the rank of Lieutenant of Detectives. (Ruzinski Aff., ¶ 1.)

            RESPONSE: Agree.

9.      Then Detective Ruzinski was the initial detective to file an official report, which opened the investigation of a sexual assault complaint made by G.D. at approximately 11:45 p.m. on Saturday, September 26, 1992. (Ruzinski Aff., ¶ 6.)

            RESPONSE: Agree.

10.     Detective Ruzinski was dispatched to the scene of G.D.'s home on the subject date, and he spoke with G.D.'s roommates, Tonya Bartoletti and Kelly Mix. (Ruzinski Aff., ¶ 7.)

            RESPONSE: Agree.

11.     Detective Ruzinski wrote in his report that he was told that an unknown black male was armed with a knife and sexually assaulted G.D. while in her bedroom at her residence, and that the man subsequently removed G.D.'s wallet from her purse. (Ruzinski Aff., ¶ 6.)

            RESPONSE: Agree. Further adding that Detective Nowakowski authored one report on September 29 suggesting that the assailant took Tonya Bartolleti's wallet, not G.D.'s. (Cade Decl. Exhibit B at Ex. 18). Detective Ruzinski authored a second report the day after suggesting that the wallet was G.D.'s and it was taken after the assault. (Cade Decl. Exhibit B at Ex. 20).

12.     Neither Ms. Bartoletti nor Ms. Mix stated to Detective Ruzinski that they personally witnessed either the sexual assault of G.D., or the robbery. (Ruzinski Aff., ¶ 7.)

            RESPONSE: Agree.

13.     While at the scene, Detective Ruzinski went into G.D.'s bedroom, and made certain observations, including a blood-splattered wall, blood-stained bed linens, and shoeprints. (Ruzinski Aff., ¶ 8.)

RESPONSE: Agree.

14.     These items were thoroughly photographed by MPD technicians. (Ruzinski Aff., ¶ 8.)

RESPONSE: Agree. Further adding that fingerprint evidence was never gathered, or if it had been, there is no record of it. If fingerprints were taken from the crime scenes, the prints were never matched against Mr. Holloway's fingerprints. (*See, e.g.,* Cade Decl, Ex. 30 and Ex. 47).

15.     The blood-stained linens were collected and inventoried by Detective Ruzinski for     evidentiary purposes. (Ruzinski Aff., ¶¶ 8 & 11.)

RESPONSE: Agree.

16.     While on the scene that night, Detective Ruzinski also walked through the residence with Ms. Bartoletti, who noted that a knife was missing from the kitchen. (Ruzinski Aff., ¶ 9.)

RESPONSE: Agree

17.     Detective Ruzinski determined that G.D.'s assailant entered her home through her unlocked front door, and exited through her rear door. (Ruzinski Aff., ¶ 6.)

RESPONSE: Agree.

18.     Detective Ruzinski did not interview either of Mr. Holloway's complaining witnesses, G.D. or M.G., during the course of the MPD investigations regarding their sexual assaults, and he also did not interview Mr. Holloway. (Ruzinski Aff., ¶ 10.)

RESPONSE: Agree. Further adding that Detective Ruzinski interviewed G.D.'s roommates, Tonya Bartolleti and Kelly Mix. (Cade Decl. Exhibit A at 95: 2-7).

19.     Detective Ruzinski was not involved with any decision-making or action taken relative to sending any inventoried items from the crime scene to the Wisconsin State Crime Lab for analysis. (Ruzinski Aff., ¶ 11.)

4

RESPONSE: Dispute. Detective Ruzinski personally placed items found at the scene of the G.D. assault and inventoried them. Specifically, Detective Ruzinski inventoried the bed linens from victim G.D.'s rape. (Cade Decl. Exhibit A at 46: 4-23). There is no report or document identifying the chain of custody from Detective Ruzinski to the State Crime Lab.

20. However, any item that appeared to contain bodily fluids, like blood, was sent to the state crime lab for analysis regarding blood typing and the presence of semen, per usual protocol. (Ruzinski Aff., ¶ 12.)

RESPONSE: Agree. Further adding that two different sources of semen were detected on two of G.D's blankets. However, the Detectives collectively failed to ensure the semen was tested to exclude other people, such as G.D's then boyfriend or others. (Cade Decl. Exhibit A at 152: 4-25 – 153: 1-25, Ex. 17). There is no report or document identifying the chain of custody from Detective Ruzinski to the State Crime Lab.

21. Detective Ruzinski was not involved with any decision-making or action taken relative to either Mr. Holloway's arrest or his live lineup on September 30, 1992. (Ruzinski Aff., ¶ 14.)

RESPONSE: Dispute. Pursuant to Timothy T. Williams, Jr.'s expert report, Detective Ruzinski was responsible at all times for the production of inculpatory and exculpatory evidence to the District Attorney and thus played a significant role in the decision-making and actions leading to either Mr. Holloway's arrest and live lineup. (Cade Decl. Exhibit G).

22. In addition to the work that Detective Ruzinski did at G.D.'s home on the night of her assault, he also did some follow-up work, at the request of the prosecuting attorney, for Mr. Holloway's criminal case. (Ruzinski Aff., ¶ 15.)

RESPONSE: Agree.

23. In short, Detective Ruzinski checked the status of a phone number, and he timed driving a route of travel, to follow-up on Mr. Holloway's alibi for the September 2, 1992 sexual assault of M.G. (Ruzinski Aff., ¶ 15.)

RESPONSE: Agree.

24. William Herold was employed with the Milwaukee Police Department from

5

February 15, 1982 to April 9, 2007, and he retired at the rank of detective. (Herold Aff., ¶ 1.)

RESPONSE: Agree.

25. Then Detective Herold was not involved with any decision-making or action taken relative to arresting Mr. Holloway. (Herold Aff., ¶ 17.)

RESPONSE: Dispute. Pursuant to Timothy T. Williams, Jr.'s expert report, Detective Herold was responsible at all times for the production of inculpatory and exculpatory evidence to the District Attorney and thus played a significant role in the decision-making and actions leading to Mr. Holloway's arrest. (Cade Decl. Exhibit G). Additionally, Detective Herold interviewed Charles Humes after the lineup. Charles Humes was a significant piece of the lineup as he positively identified Mr. Holloway. Charles Humes told Detective Herold that he gave a ride to a black male on September 25 at 2:00 PM. Interviewing Charles Humes shows Detective Herold's involvement in the decision-making relative to the arrest of Mr. Holloway. Cade Decl. Exhibit C at 26:7-23, Ex. 26 (PPFOF - Ex. 26, at Bates #0025-28; Ex. 51, at p. 4 (page 25 of 184).

26. However, at about 7:50 p.m. on September 30, 1992, Detective Herold participated in conducting a live lineup at the Police Administration Building, and that lineup included Mr. Holloway. (Herold Aff., ¶¶ 6-7.)

RESPONSE: Agree.

27. A copy of a photograph of that lineup, wherein Mr. Holloway was/is subject number two, is attached to the Herold Affidavit filed in support of defendants' motion as page 163 in Exhibit WH-A. (Herold Aff., ¶ 6.)

RESPONSE: Agree.

28. During the lineup, victim G.D. positively identified Mr. Holloway as the perpetrator of her sexual assault, and following the lineup, Detective Herold took a formal statement from G.D. (Herold Aff., ¶ 9.)

RESPONSE: Agree. Further adding that victim G.D. did not see her perpetrator and the only basis for her positive identification of Mr. Holloway was that his voice and build was similar to her as assailant. (Cade Decl.

6

Exhibit F at 45: 21-25 – 46:1-8; Exhibit C at 37: 9-25 – 39: 1-25, Ex. 26).

29.     G.D. stated to Detective Herold that she was absolutely sure that Mr. Holloway was the person who sexually assaulted her in her home on September 26, 1992, and that she recognized Mr. Holloway's voice as the voice of her assailant, who said "Don't scream, if you scream, I'll kill you" during her assault. (Herold Aff., ¶ 9; Herold trial 8/4/93 testimony, at Exhibit WH-B at pp. 76-78.)

RESPONSE: Agree. Further adding that victim G.D. did not see her perpetrator and the only basis for her positive identification of Mr. Holloway was that his voice and build was similar to her as assailant. (Cade Decl. Exhibit F at 45: 21-25 – 46:1-8; Exhibit C at 37: 9-25 – 39: 1-25, Ex. 26).

30.     G.D. also stated that Mr. Holloway shared the same general physical characteristics as her perpetrator, including height and build. (Herold Aff., ¶ 9.)

RESPONSE: Agree.

31.     On a scale of "1 to 10," G.D. said that her identification of Mr. Holloway was a "10." (Herold Aff., ¶ 9.)

RESPONSE: Agree. Further adding that victim G.D. did not see her perpetrator and the only basis for her positive identification of Mr. Holloway was that his voice and build was similar to her as assailant. (Cade Decl. Exhibit F at 45: 21-25 – 46:1-8; Exhibit C at 37: 9-25 – 39: 1-25, Ex. 26).

32.     During the September 30 lineup, a non-victim citizen witness, Charles Humes, positively identified Mr. Holloway as the person with whom he interacted and gave a ride in his car, on both September 25 and September 27, 1992, and in the area of G.D.'s residence. (Herold Aff., ¶ 10.)

RESPONSE: Agree. Further adding that Charles Humes indicated the individual called himself "Al". (Cade Decl. Exhibit C at Ex. 26, at Bates #000025-28; Exhibit A at Ex. 51, at p. 4 (page 5 of 184)). Further adding that Bartoletti identified and told Ruzinski that a similar individual had followed her and G.D. home from a Store, but Ruzinski never followed-up on the individual named "Al". (Cade Decl. Exhibit D at Ex. 43; Exhibit A at Ex. 52, at p. 4 (page 93 of trial transcript)).

33.     Upon completion of the lineup, Detective Herold took a formal statement

from Mr. Humes, and had technicians check his car, to look for Mr. Holloway's fingerprints. (Herold Aff., ¶ 10.)

> RESPONSE: Agree that a statement was made, and the technician checked for fingerprints. However, the technician checked for any fingerprints, not specifically Holloway's. (Cade Decl. Exhibit C at 59: 10-23, Ex. 26).

34.    That check met with negative results. (Id.)

> RESPONSE: Agree.

35.    Detective Herold did not take any statements from either Mr. Holloway or victim M.G. during the course of the subject investigations. (Herold Aff., ¶ 12.)

> RESPONSE: Agree.

36.    Detective Herold, along with Detective Gregory Nowakowski, brought Mr. Holloway to a lab before the lineup on September 30, 1992, where with Mr. Holloway's permission, blood, saliva, and hair samples were retrieved from him by medical personnel. (Herold Aff., ¶ 15; See also Lappen Aff., Exh. SL-14 for a copy of the authorization signed by Mr. Holloway.)

> RESPONSE: Agree.

37.    Those retrieved items were sent to the state crime lab for analysis, per usual protocol. (Herold Aff., ¶ 15.)

> RESPONSE: Agree.

38.    Detective Herold's only involvement with the Holloway investigations was to assist with conducting the September 30, 1992 lineup, escort Mr. Holloway to a medical facility to obtain hair, blood and saliva samples before the lineup started, and take statements from G. D. and Mr. Humes, immediately following the completion of the lineup. (Herold Aff., ¶¶ 12 & 15.)

> RESPONSE: Agree.

39.    Detective Herold never responded to either of the two crime scenes. (Herold Aff., ¶ 12.)


        RESPONSE: Agree.


40.    Detective Herold was not involved with the process of inventorying any of the evidentiary items taken from either crime scene, nor was he involved with any decision-making or action taken relative to sending any inventoried items from either crime scene to the Wisconsin State Crime Lab for analysis. (Herold Aff., ¶ 13.)


        RESPONSE: Dispute. Pursuant to Timothy T. Williams, Jr.'s expert report, Detective Herold was responsible at all times for the production of inculpatory and exculpatory evidence to the District Attorney and thus played a significant role in the decision-making and actions leading to Mr. Holloway's arrest. (Cade Decl. Exhibit G).


41.    Michael B. Carlson was employed with the Milwaukee Police Department from November 2, 1970 to September 1, 2001, and he retired at the rank of detective. (Carlson Aff., ¶ 1.)


        RESPONSE: Agree.


42.    Then Detective Carlson did some investigatory work relative to the September 26, 1992 sexual assault of R.R. at her home at 3320 W. Hackett Street. (Carlson Aff., ¶ 11.)


        RESPONSE: Agree.


43.        R.R. lived in the area of U.W. Milwaukee, where Milwaukee abuts Shorewood, and in the context of investigating her September 26, 1992 sexual assault, on September 28, 1992 Detective Carlson inquired of representatives of the Shorewood Police Department about any similar offenses which occurred in the area. (Carlson Aff., ¶ 12.)


        RESPONSE: Agree.


44.    Detective Carlson was told by Sergeant Glenn Wagner from the Shorewood Police Department that Daryl Holloway was a suspicious person stopped by both Shorewood police and Whitefish Bay police on September 21, 1992; that he was

taken into custody by the Shorewood police for prowling; that Mr. Holloway's arrest record had been checked; and that he was on parole for a sexual assault conviction. (Carlson Aff., ¶ 12; Carlson 8/4/93 trial testimony, at Exhibit MC-B, pp. 118-119.)

RESPONSE: Agree.

45. Detective Carlson researched that conviction, and found that in 1985, Mr. Holloway had sexually assaulted and burglarized a woman (M.G-M.) in the bedroom of her residence, while threatening to kill her, and the detective concluded that this description matched the descriptions provided by R.R., G.D., and M.G., regarding their September, 1992 sexual assaults, in that they all involved a home invasion, a single woman who was alone, and a perpetrator who threatened to kill them, and who stole their property. (Carlson Aff., ¶ 12; Carlson 8/4/93 trial testimony, at Exhibit MC-B, p. 119; See also Lappen Aff., Exh. SL-12 for a copy of the criminal complaint regarding the crimes committed in 1985 against M.M-G., as well as Exh. SL-13, for a copy of the related judgments of conviction.)

RESPONSE: Agree to the extent that Mr. Holloway has a prior second-degree sexual assault conviction from 1985. However, disputing the underlying factual basis of the sexual assault conviction. Mr. Holloway and M.G-M were engaged in consensual sex. Only after M.G-M learned that Mr. Holloway was underage (17 yrs. old) did she claim sexual assault and seek to press charges. Mr. Holloway agreed to accept a plea deal for second degree sexual assault. (Holloway Decl. ¶ 21.

46. Detective Carlson obtained a booking photo of Mr. Holloway, which was taken on January 18, 1992, placed that photo in an array, and showed the array to R.R. on September 29, 1992. (Carlson Aff., ¶ 12.)

RESPONSE: Agree.

47. R.R. stated to Detective Carlson that Mr. Holloway's photo looked very similar to her attacker, but that she would like to see him in person to make a positive identification. (Carlson Aff., ¶ 12.)

RESPONSE: Agree. Further adding that R.R. was unable to positively identify Mr. Holloway out of the lineup on September 30, 1992. (Cade Decl. Exhibit D at 66: 3-24; Exhibit B at 114:1-25, 115:1-12, Ex. 19).

48. On September 29, 1992, Detective Carlson asked victim G.D. to view a photo array containing the January 18, 1992 booking photo of Mr. Holloway, but she

was unable to identify Mr. Holloway through that photo. (Carlson Aff., ¶ 3; See also pp. 115-118 of Detective Carlson's trial testimony, found in Exhibit MC-B.)

RESPONSE: Agree.

49.     Mr. Holloway was taken into custody at the request of Detective Carlson by other MPD officers on September 30, 1992. (Carlson Aff., ¶ 3; See also Exh. MC-A, pp. 33-36, 84-85.).)

RESPONSE: Agree.

50.     Detective Carlson did not participate in effecting Mr. Holloway's arrest, or in conducting the September 30, 1992 lineup. (Carlson Aff., ¶ 13.)

RESPONSE: Dispute. Pursuant to Timothy T. Williams, Jr.'s expert report, Detective Carlson was responsible at all times for the production of inculpatory and exculpatory evidence to the District Attorney and thus played a significant role in the decision-making and actions leading to either Mr. Holloway's arrest and live lineup. Further adding that Detective Carlson was active in the photo array being shown to victims on Tuesday, September 29, 1992. (Cade Decl. Exhibit G; Exhibit A at Ex. 14).

51.     In the context of the investigations involving Mr. Holloway, on October 1, 1992, Detective Carlson obtained Mr. Holloway's tennis shoes, pursuant to a search warrant, and state crime lab technicians determined that those shoes could not have produced the shoeprints found in G.D.'s bedroom on the night of her attack. (Carlson Aff., ¶¶ 7-8; See also Lappen Aff., Exh. SL-7 for a copy of the related technician's report.

RESPONSE: Dispute. There is no written evidence that Carlson had a search warrant to obtain Holloway's shoes. The only search warrant dated October 2, 1992 in evidence is contained at Exhibit 9, which pertained to a search of Holloway's home for evidence pertaining to the robberies in Shorewood. (Cade Decl. Exhibit D at Ex. 9).

52.     On October 2, 1992, Detective Carlson obtained a search warrant relative to searching Mr. Holloway's home for evidence of burglaries and sexual assaults that were under investigation, but no evidence was found during the search. (Carlson Aff., ¶ 9)

RESPONSE: Agree. Further adding that Detective Carlson swore out a

11

search warrant on October 2, 1992 to permit a search of Mr. Holloway's home despite R.R., Anne Kustner and Beth David being unable to identify Mr. Holloway from the September 30, 1992 lineup. (Cade Decl. Exhibit A at Ex. 9, Ex. 10, at Bates #0078; Exhibit D at Ex. 34. (PPFOF - Ex. 9, Ex. 10, Ex. 34).

53.    That warrant was requested because Mr. Holloway's fingerprints were identified by state crime lab technicians as those lifted from a jewelry box stolen from a residence in Shorewood, relative to the burglary charged in Count 5 of the criminal complaint issued against Mr. Holloway. (Carlson Aff., ¶ 9; See Lappen Aff., Exh. SL-9 for a copy of the state crime lab report dated October 2, 1992, and Exh. SL-10 for a copy of the criminal complaint.)

RESPONSE: Dispute. The search warrant does not detail fingerprints as the basis for the search warrant. Detective Carlson sought a search warrant on the basis of R.R.'s statement after viewing the photo array that Mr. Holloway looked like her assailant but was not 100% certain. Renzelmann did not live in Shorewood, nor were any fingerprints identified from Renzelmann's home. (PPFOF - Ex. 9, Ex. 10, Ex. 34).

_____CITY_____ of ____MILWAUKEE_____ in said County, occupied
      (City, Town, Village)                (Name of City, Town or Village)
by _Daryl D. Holloway_ , and more particularly described as follows:
      (Name of occupant, if any)
Describe  _3909 W. Congress, Multi Family Unit_
premises  _with the Front Door to the unit on the left hand_
_side upon entering common hallway , Dream Brick, Trim Trim, Black Roof_
                                   certain goods, chattels and property, to-wit:
Describe  _Womens purse Tan w/Flap + Credit cards check book + checks personal_
object(s)  _belonging to Ruth Renzelman - Burgandy, wallet + credit cards of Ann_
of search  _Kustner - also blue wallet + check Book of Beth David_
2 18" yellow gold necklace's one rope type 1 "Fossil" watch black bead, white face w/turqois
which thing(s) (were used in the commission) or (may constitute evidence) of a crime, to-wit: shell decoration.

Describe  _Burglary    and    First Degree Sexual Assault_
crime or
crimes _____

committed in violation of section(s) ___943.10  +  940.225 (1)(b)___ of the Wisconsin Statutes.

Now THEREFORE in the name of the State of Wisconsin you are commanded forthwith

54.    Detective Carlson also assisted a potential witness regarding the sexual assault of G.D., with reviewing a drawer containing photographs at the MPD identification bureau. (Carlson Aff., ¶ 10.)

RESPONSE: Dispute. Detective Carlson assisted witness Martha ("Marti") Block, who was a witness to the M.G. assault, not G.D. (Cade Decl. Exhibit D at Ex. 38; Exhibit F at Ex. 55.

55.    A sweater was obtained from Mr. Holloway's residence when he was arrested on September 30, 1992, and the sweater matched the description of a sweater worn by R. R's rapist, so on October 2, 1992, Detective Carlson brought the sweater to R.R. (Carlson Aff., ¶ 11.)

RESPONSE: Dispute. Further adding that while R.R. agreed the sweater was similar to that of her attacker, she indicated that it was not the same. Further adding that the sweater was free of blood splatter. If R.R was attacked roughly two hours prior, on the same day as G.D.'s attack, the sweater identified likely should have had G.D.'s blood on it. (Cade Decl. Exhibit A at 157: 13-25, 158: 1-25, 159: 1-25, 160: 1-4, Ex. 4, Ex. 17; Ex. 10, at Bates #000080; Exhibit B at Ex. 18, at Bates 000034; Ex. 23, at Bates #000085; Renzelmann Decl., at ¶ 9.)

56.    R.R. told Detective Carlson that it could have been the sweater worn by her assailant. (Carlson Aff., ¶ 11.)

RESPONSE: Dispute. R.R. stated the sweater looked similar, not identical. (Cade Decl. Exhibit A at 84:13-25 – 85: 1-12; Exhibit B at Ex. 10, at Bates #000080, Ex. 18, at Bates 000034, Ex. 23, at Bates #000085; Renzelmann Decl., at ¶ 9).

57.    Other than showing G.D. the photo array on September 29, Detective Carlson did not have any other contact with either G.D. or M.G. during the course of the investigations which stemmed from their sexual assaults. (Carlson Aff., ¶ 15.)

RESPONSE: Agree.

58.    Also, Detective Carlson did not have any contact with Mr. Holloway. (Carlson Aff., ¶ 15.)

RESPONSE: Agree.

59.    Detective Carlson never went to the scenes of the crimes involving G.D. and M.G., and he had no involvement with the process of inventorying any of the evidentiary items taken from either scene, nor was he involved with any decision- making

or action taken relative to sending any inventoried crime scene items to the Wisconsin State Crime Lab for analysis. (Carlson Aff., ¶ 16.)

> RESPONSE: Dispute. Detective Carlson, on October 1, visited the jail to take Mr. Holloway's size 10 Nike Air men's shoes during the investigation into G.D's and after the lineup, and inventoried the shoes with the M.P.D. (Cade Decl. Exhibit D at 104:22-25 – 105:1-13, Ex. 35). Further adding that Detective Carlson took the previously inventoried sweater to be viewed by R.R. on October 2. Detective Carlson subsequently re-sealed and conveyed the sweater back to the Property Control Section where it was sent to the Crime Lab to be checked for evidence. (Cade Decl. Exhibit A at Ex. 10; Exhibit B at Ex. 18).

60. Gregory J. Nowakowski was employed with the Milwaukee Police Department from December 8, 1969 to August 18, 2000, and he retired at the rank of detective. (Nowakowski Aff., ¶ 1.)

> RESPONSE: Agree.

61. On September 27, 1992, then Detective Nowakowski responded to the yard of a neighbor to G.D., because the neighbor found a knife in his yard on that date. (Nowakowski Aff., ¶ 6.)

> RESPONSE: Agree.

62. Detective Nowakowski contacted G.D.'s roommate, Tonya Bartoletti, who came with him to the neighbor's yard and identified the knife as the one that belonged to her and was taken from her home at the time of G.D.'s assault. (Nowakowski Aff., ¶ 6.)

> RESPONSE: Agree.

63. Detective Nowakowski observed fingerprints and dried blood on the knife, and it was placed on MPD inventory. (Nowakowski Aff., ¶ 6.)

> RESPONSE: Agree. Further add that there is no evidence that the fingerprints, which were covered in blood, matched Holloway. (Cade Decl. Exhibit B at Ex. 20, at #000006-7)

64.     On September 29, 1992, Detective Nowakowski met with a woman named Elsa Gomez, who lived near G.D., and who thought she may have interacted with G.D.'s attacker on the night before her assault. (Nowakowski Aff., ¶ 7.)

        RESPONSE: Agree.


65.     On September 30, 1992 Ms. Gomez viewed the lineup which included Mr. Holloway, but she was unable to make an identification of him as the person with whom she interacted. (Nowakowski Aff., ¶ 7.)

        RESPONSE: Agree.


66.     On September 30, 1992, Detective Nowakowski assisted with conducting the live lineup which included Mr. Holloway. (Nowakowski Aff., ¶ 8.)

        RESPONSE: Agree.


67.     During that lineup, G.D. positively identified Mr. Holloway as the person who sexually assaulted her in her home at 2760 N. Murray Avenue, at around 11:45 pm on September 26, 1992, and M.G. positively identified Mr. Holloway as the person who sexually assaulted her in her home at 2522 N. Bremen Street on September 2, 1992 at approximately 6:45 am. (Nowakowski Aff., ¶ 8; Exh. GN-A at p. 58.)

        RESPONSE: Agree. Further adding that neither victim G.D or M.G saw their attacker. While M.G did identify Mr. Holloway from the lineup, police officer Vicki Crowell reported that M.G. never saw her assailant because he had a handkerchief covering his face. (Cade Decl. Exhibit B at 30:1-25 – 32: 1-2, Ex. 21; Exhibit F at 45: 21-25 – 46:1-8; Exhibit C at 37: 9-25 – 39: 1-25, Ex. 26).


68.     During the course of the investigations which centered on the sexual assaults of G.D. and M.G., Detective Nowakowski did not interview Mr. Holloway. (Nowakowski Aff., ¶ 9.)

        RESPONSE: Agree.


69.     However, on September 30, 1992, Detective Nowakowski accompanied Detective Herold in bringing Mr. Holloway to the medical facility where medical personnel retrieved samples of his blood, saliva, and hair. (Nowakowski Aff., ¶ 9.)

RESPONSE: Agree.

70.    Detective Nowakowski was not involved with the process of inventorying any of the evidentiary items taken from either crime scene, nor was he involved with any decision-making or action taken relative to sending any inventoried crime scene items to the Wisconsin State Crime Lab for analysis. (Nowakowski Aff., ¶ 10.)

RESPONSE: Dispute. Detective Nowakowski authored a report suggesting that he surrendered the Cutco knife that was found at the scene of G.D.'s assault to the Wisconsin Regional Crime Lab for analysis by placing it into M.P.D Inventory. (Cade Decl. Exhibit B at Ex. 20 pages 6-7).

71.    Detective Nowakowski was not involved with any decision-making or action taken relative to arresting Mr. Holloway on September 30, 1992. (Nowakowski Aff., ¶ 13.)

RESPONSE: Dispute. Pursuant to Timothy J. Williams, Jr.'s expert report, Detective Nowakowski was responsible at all times for the production of inculpatory and exculpatory evidence to the District Attorney and thus played a significant role in the decision-making and actions taken to Mr. Holloway's arrest. (Cade Decl. Exhibit G).

72.    Joseph Lagerman was employed with the Milwaukee Police Department from March 20, 1967 to July 8, 1999, and retired at the rank of detective. (Lagerman Aff., ¶ 1.)

RESPONSE: Agree.

73.    Then Detective Lagerman took a statement from Daryl Holloway after he was arrested, but before he participated in the live lineup, on September 30, 1992. (Lagerman Aff., ¶¶ 3-4.)

RESPONSE: Agree.

74.    Detective Lagerman's report confirms that on September 30, 1992, Mr. Holloway was brought to the detective bureau, advised of his Miranda rights, and told about the charges for which he was under arrest. (Lagerman Aff., ¶ 4.)

RESPONSE: Agree.

75.     At that time, Mr. Holloway denied any involvement in the crimes that were under investigation, stated that he was willing to stand in a lineup, and also stated he was willing to give samples of his blood, hair and saliva. (Lagerman Aff., ¶ 4; See also Lappen Aff., Exh. SL-14 for a copy of the authorization signed by Mr. Holloway.)

RESPONSE: Agree.

76.     Mr. Holloway also told Detective Lagerman that he lived with his fiancé Penny Schultz, and that during the weekend of September 25-26, 1992, he attended a party in the 2600-2700 block of N. Frederick, and that he had seen a friend named "Beth" at that party. (Lagerman Aff., ¶ 4.)

RESPONSE: Agree.

77.     Detective Lagerman was never present at any crime scene regarding the sexual assaults of either G.D. or M.G., and he did not take any statements from any witnesses regarding those crimes. (Lagerman Aff., ¶ 6.)

RESPONSE: Agree.

78.     Detective Lagerman was not involved in any way with the decision to place Mr. Holloway under arrest, or any event related to effecting his arrest, and he was not involved in any way with conducting the lineup of September 30, 1992. (Lagerman Aff., ¶ 6.)

RESPONSE: Agree.

79.     The only work done by Detective Lagerman on the Holloway investigations was to take the above-described statement from Mr. Holloway upon Mr. Holloway's admission to the detective bureau on September 30, 1992. (Lagerman Aff., ¶ 6.)

RESPONSE: Agree.

80.     No individual defendant was involved with any decision-making relative to sending any evidentiary items inventoried from the Holloway investigations out for DNA analysis. (Ruzinski Aff., ¶13; Herold Aff., ¶ 16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12;

Lagerman Aff., ¶ 9.)

> RESPONSE: Dispute. Detective Ruzinski testified that he took the bed linen to be inventoried by the Wisconsin Crime Lab (Cade Decl. Exhibit A at 46: 4-23). Detective Michael Carlson authored a Property Inventory document after seizing Mr. Holloway's Nike shoes pursuant to a search warrant (Cade Decl. Exhibit D at Ex. 35). Detective Nowakowski arrived to G.D.'s scene to investigate the Cutco knife and place it into M.P.D Inventory. (Cade Decl. Exhibit B at Ex. 20 at p. 6-7).

81. In fact, in 1992, the Wisconsin State Crime Lab had not yet begun to conduct any DNA analyses. (Ruzinski Aff., ¶ 13; Herold Aff., ¶16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12; Lagerman Aff., ¶ 9; Gahn Aff., ¶ 5.)

> RESPONSE: Agree.

82. The crime lab did not begin to conduct DNA analyses until 1994 or 1995. (Ruzinski Aff., ¶ 13; Herold Aff., ¶ 16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12; Lagerman Aff., ¶ 9.; Gahn Aff., ¶ 6)

> RESPONSE: Dispute. Detective Weber f/k/a Gaglione did not have knowledge of when the crime lab began to conduct DNA analyses, but testified that the department began using DNA testing when she worked in Sexual Assault. (Cade Decl. Exhibit E at 52: 12-18). Further, Detective Carlson was aware of DNA testing in September 1992 based on his memo notes regarding another case where a suspect was willing to provide blood for DNA testing. (PPFOF Ex. 50, at p. 7).

83. Regardless, the decision to send evidentiary items out for DNA analysis was made by the assistant district attorney assigned to a criminal case, and not by any MPD personnel assigned to the related investigation. (Ruzinski Aff., ¶ 13; Herold Aff., ¶ 16; Carlson Aff., ¶ 18; Nowakowski Aff., ¶ 12; Lagerman Aff., ¶ 9.; Gahn Aff., ¶¶ 9-11.)

> RESPONSE: Agree.

84. In 1992 and 1993, prosecutors with the Office of the Milwaukee County District Attorney were submitting evidence for DNA testing to a few private laboratories, but only in limited circumstances, and those decisions were largely based upon the strength of other evidence in the case, the costs associated with the testing, and the length of time needed to complete the testing. (Gahn Aff., ¶¶ 7-9.)

RESPONSE: Agree.

85.     Such testing was expensive, and was paid for by the DA's office, in conjunction with Milwaukee County. (Gahn Aff., ¶ 10.)

RESPONSE: Agree.

86.     No defendant conspired to "frame" Mr. Holloway. (Ruzinski Aff., ¶ 18; Herold Aff., ¶ 19; Carlson Aff., ¶ 20; Nowakowski Aff., ¶ 15; Lagerman Aff., ¶ 11.)

RESPONSE: Dispute. Whether or not the Defendants conspired to frame Mr. Holloway is a legal conclusion rather than a factual one. Despite this, and pursuant to Timothy T. Williams, Jr.'s expert report, the Defendants here failed to follow their investigative duty until they were positive that they had the correct individual. (Cade Decl. Exhibit G). No defendant was aware of any unlawful or inappropriate activity by any other personnel involved with the subject investigations, and so there was no need to "intervene" to stop such activity. (Ruzinski Aff., ¶ 18; Herold Aff., ¶ 19; Carlson Aff., ¶ 20; Nowakowski Aff., ¶ 15; Lagerman Aff., ¶ 11.)

RESPONSE: Dispute. Through Timothy Williams Jr.'s expert opinion, each Defendant knew or should have been aware of the unlawful or inappropriate conduct occurring by targeting a specific black male and halting all other investigative inquiries into other suspects. (Cade Decl. Exhibit G). Further, the Seventh Circuit Jury Instructions Section 7.14(c) discusses concealment of exculpatory/impeachment evidence. The Detectives failed to ensure that the District Attorney was properly provided all inculpatory and exculpatory materials by failing to mention preceding Shorewood robberies, failing to produce prior lineup results of Ernest McIntosh, and failing to turn over Detective Carlson's memo book containing information regarding the smoke odor of R.R's assailant. Cade Decl. Exhibit F at 157:4-25 – 158:1-2; Renzelmann Decl. ¶¶ 5, 9; Backes Decl. ¶¶ 5-6). All of these actions led to a conspiracy to frame Mr. Holloway for rapes that he never committed. These actions taken together rise to the level of unlawful and inappropriate activity that should have been noticed and corrected during investigations. Accordingly, the named Detectives here can be held liable for a due process violation for their concealment of exculpatory and impeaching evidence from the District Attorney. *See, e.g., Carvajal v. Dominquez*, 542 F.3d 561, 566 (7th Cir. 2008).

87.     Representatives of the District Attorney's Office made the decision to charge and prosecute Mr. Holloway, and not any of the detectives. (Ruzinski Aff., ¶ 19;

Herold Aff., ¶ 20; Carlson Aff., ¶ 21; Nowakowski Aff., ¶ 16; Lagerman Aff., ¶ 12.)

> RESPONSE: Agree. Further adding that the detectives are responsible for presenting to the district attorney's office all materials, not selective materials solely to obtain a conviction of a single individual.

88. All decisions made regarding the presentation of evidence at trial were made by the prosecutor assigned to the case, and not by any of the detectives. (Ruzinski Aff., ¶ 19; Herold Aff., ¶ 20; Carlson Aff., ¶ 21; Nowakowski Aff., ¶ 16; Lagerman Aff., ¶ 12.)

> RESPONSE: Agree.

89. Prior to September 28, 1992, none of the defendants had ever personally encountered Mr. Holloway, nor were they aware of him by name; they first learned of Mr. Holloway in the context of their work regarding the subject investigations. (Ruzinski Aff., ¶ 20; Herold Aff., ¶ 21; Carlson Aff., ¶ 22; Nowakowski Aff., ¶ 17; Lagerman Aff., ¶ 13.)

> RESPONSE: Agree. Further adding it was upon the Detectives to ensure that Mr. Holloway was in fact the perpetrator of these crimes. However, the Detectives failed to continue their investigation until they were positive that they had the correct individual. (Cade Decl. Exhibit G.)

90. Regarding the lineup conducted on September 30, 1992, the lineup participants were dressed in identical coveralls, to give them "the same general shape," and they had similar hairstyles, skin tone, and facial features. (Herold 8/2/92 motion-hearing testimony, Exhibit WH-B, at p. 37; Lineup photo, Exhibit WH-A at p. 163.)

> RESPONSE: Agree. Further adding that it is apparent Mr. Holloway was the shortest suspect in the lineup. Mr. Holloway had different shoes than the other line-up participants. Mr. Holloway also was the only suspect to appear in the photo array shown to the victims the day prior. (Cade Decl. Exhibit A at Ex. 12 and 14; Cade Decl. Exhibit G).

91. Mr. Holloway's attorney, Public Defender Stephen Foley, was present for the lineup, made no objection to the lineup, and he even directed that Mr. Holloway be placed at position number "2." (Herold Aff., ¶ 7; Herold 8/2/93 motion- hearing testimony, Exh. WH-B at pp. 35-36.)

RESPONSE: Agree.

92. The group of victims and witnesses who viewed the lineup did not say anything to each other, nor did they gesture or make any motions, after the lineup panel came into the room. (Id., pp. 38, 41-42; Herold 8/4/93 trial testimony, Exhibit WH-B, at pp. 72-74; Nowakowski 8/2/93 motion-hearing testimony, Exhibit GN-B, at pp. 44-48.)

RESPONSE: Agree.

93. Judge Jeffrey Wagner, who presided over Mr. Holloway's 1993 criminal trial, ruled that, based upon the photo of the lineup, along with testimony from various witnesses, the lineup was conducted in "a fair and impartial manner." (Transcript of 8/2/93 motion hearing, Lappen Aff., Exh. SL-1, at p. 62.)

RESPONSE: Agree. Further adding that Mr. Holloway's conviction was overturned by the same judge who presided over the 1993 criminal trial, the Honorable Jeffrey A. Wagner, to hold Mr. Holloway innocent as a matter of law. (PPFOF 96; Ex. 24, at pages 8-12).

94. That ruling was upheld by the Wisconsin Court of Appeals in the context of Mr. Holloway's post-conviction appeal. (See May 31, 1995 decision of Court of Appeals, copied and attached to Lappen Aff. as Exhibit SL-3, p. 7.)

RESPONSE: Agree.

95. Wisconsin State Crime Lab serologist Raymond E. Menard testified as an expert at trial, without objection from defense counsel. (Menard 8/4/93 trial testimony, Lappen Aff., Exh. SL-2 at pp. 50-51.)

RESPONSE: Agree.

96. Mr. Menard testified that he analyzed some vaginal and cervical swabs attributed to victim M.G., and a preliminary test indicated the presence of semen, but that he was unable to determine any potential source of semen found in those samples because there "physically was not enough present," (Id., pp.52-55.) so he could not provide information regarding the person who produced the semen. (Id., p. 56; See Lappen Aff., Exhs. SL-5 to SL-8 for copies of related reports from the Wisconsin State Crime Lab.)

RESPONSE: Agree.

97.     Mr. Menard clarified that he could not include or exclude M.G.'s assailant by blood type. (Id., p. 57; See also Exh. SL-6.)

RESPONSE: Agree.

98.     Mr. Menard further testified that he analyzed two blankets retrieved from the residence of G.D., he detected the presence of semen in the blue blanket, he conducted further testing, and was able to determine that the source of that semen was a "non-secretor" (Id., pp. 58-60; See also Exh. SL-6.)

RESPONSE: Agree. Further adding that two different sources of semen were detected on G.D's blankets – one blue blanket and one white blanket. However, the Detectives failed to test the semen to exclude other people, such as G.D's then boyfriend. (Cade Decl. Exhibit A at 152: 4-25, 153: 1-25; Ex. 17). Holloway was excluded as the source of semen for G.D.'s blankets as he is a secretor with blood type A and the source of the semen is an AB or a B blood type who is a non-secretor. (Cade Decl. Exhibit A at Ex. 17, at Bates #000312-314).

99.     Mr. Menard also detected semen on the white blanket, and he determined that the most likely source of the semen was an individual who was an "AB secretor." (Id., pp. 61-62; See also Exh. SL-6.)

RESPONSE: Agree. Further adding that Mr. Holloway was excluded as the source of semen for G.D.'s blankets as he is a secretor with blood type A and the source of the semen is an AB or a B blood type who is a non-secretor. (Cade Decl. Exhibit A at Ex. 17, at Bates #000312-314).

100.    Mr. Menard explained that a semen stain can remain in fabric, like a blanket, indefinitely, so there is/was no way of knowing how long the stains had been in those two blankets. (Id., p. 68.)

RESPONSE: Agree.

101.    He also clarified that there was no way for him to determine how long sperm or semen had been in a woman's vaginal tract, from a vaginal swab provided to him. (Id., p. 68.)

RESPONSE: Agree.

102.    Mr. Menard testified that the blood type of the blood stains found on the two blankets was consistent with G.D.'s blood type. (Id., p. 63.)

RESPONSE: Agree. Further adding that Mr. Holloway was excluded as the source of semen for G.D.'s blankets as he is a secretor with blood type A and the source of the semen is an AB or a B blood type who is a non-secretor. (Cade Decl. Exhibit A at Ex. 17, at Bates #000312-314).

103.    Mr. Menard testified that Mr. Holloway's shoes and sweater were tested, but no blood was detected on those items. (Id., p. 65.)

RESPONSE: Agree. Further adding that a report from John Nielson stated that the shoes could not have made the imprint Detective Ruzinski identified during his investigation of G.D's rape. (Cade Decl. Exhibit A at 145:11-19; Ex. 16).

104.    Mr. Menard confirmed that as of the date of his trial testimony in August, 1993, the state crime lab did not do DNA testing, and that he did not anticipate that they would be doing DNA testing for at least another five months. (Id., pp. 64-66.)

RESPONSE: Agree. Further add that the Milwaukee Police Department and/or the Milwaukee District Attorney's office did send out rape kits for DNA testing during the time frame of Holloway's arrest and wait for trial. *See* March 5, 1993 news article. (PPFOF 95)

105.    Mr. Menard also confirmed that at that time, the FBI and two private firms were conducting DNA testing (Id., p. 66.)

RESPONSE: Agree.

106.    Mr. Menard also clarified that the state crime lab was not a law enforcement agency, and that defense attorneys could ask the state crime lab to perform certain tests. (Id.)

RESPONSE: Agree.

Dated this April 1, 2021.

**CADE LAW GROUP LLC**


By: s/Nathaniel Cade, Jr.

Nathaniel Cade, Jr., SBN 1028115
P.O. Box 170887
Milwaukee, WI 53217
(414) 255-3802 (phone)
(414) 255-3804 (fax)
nate@cade-law.com

Attorneys for Plaintiff