# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**DARYL HOLLOWAY,**
                    **Plaintiff,**

        **v.**                                    **Case No.  19-cv-1460**

**CITY OF MILWAUKEE, et al.,**
                    **Defendants.**

---

## DECISION AND ORDER

Daryl Holloway's amended complaint alleges various civil rights violations arising out of 1993 rape and burglary convictions for which he served twenty-three years in prison before being released upon post-conviction testing of DNA evidence. He seeks relief against the City of Milwaukee and retired police officers Daniel Ruzinski, William Herold, Michael Carlson, Gregory Nowakowski, and Joseph Lagerman. Defendants have moved for summary judgment. As explained below, the motion is **GRANTED in full.**

### I.    BACKGROUND

#### A.  Complaint's Allegations & Claims

According to the amended complaint, Holloway was wrongly convicted and imprisoned for two 1992 rapes and burglaries that occurred on the East Side of Milwaukee and served twenty-three years in prison before being released in 2016 after his convictions were vacated. ECF No. 66, ¶¶ 1–6; 68–71. Rather than properly investigate, the defendant-officers wrongly focused their attention on Holloway as the culprit and failed to use either DNA evidence to exclude Holloway as a suspect or blood and semen evidence that demonstrated that he was not the culprit in at least one of the rapes. *Id*., ¶¶ 3–4.

Holloway's amended complaint raises several claims against the defendant-officers under 42 U.S.C. § 1983. Specifically, he accuses them of (1) violating his Due Process rights, (2) violating his Fourth Amendment right to be free of unreasonable seizures, (3) maliciously prosecuting him, (3) conspiring to deprive him of his constitutional rights, and (4) failing to intervene to prevent the violation of his constitutional rights. *Id.*, ¶¶ 112–39. The amended complaint also raises *Monell* claims against the City, alleging inadequate policies regarding officers' notes and memo books, identification procedures, and DNA testing. ECF No. 66, ¶¶ 89–99, 140–44; ECF No. 123 at 28–31.

### B. Facts[1]

#### 1. Assaults

The basic facts of the attacks for which Holloway was convicted are as follows: In the summer of 1992, several sexual assaults occurred on the East Side of Milwaukee and in the Riverwest neighborhood in which white females were robbed by a Black male wielding a knife or other sharp object. ECF No. 138, ¶ 1. The first victim for whose assault Holloway was convicted, M.G., was sexually assaulted at around 7 a.m. in her home in the Riverwest neighborhood on September 2, 1992. ECF No. 138, ¶ 4. M.G. indicated that her attacker was a Black male in his mid-twenties, medium-to-muscular build, 5'7'' to 5'8'' in height, and that he wore a bright (possibly red) handkerchief around his face under his eyes. ECF No. 138, ¶ 5; ECF No. 130-19 at 2.

The second such victim, G.D., was sexually assaulted in her apartment on the East Side at around 11:45 p.m. on September 26, 1992. ECF No. 138, ¶ 9. G.D. indicated that her attacker was a Black male, about 5'8" in height, "approximately 160, 170 pounds,"

---

[1] Facts in this section are taken from the parties' proposed findings of fact, responses, and supporting materials. ECF No. 107 at 6–22; ECF Nos. 108–114, 124–134, & 137–138.

and held a knife to her face during the attack. ECF No. 138, ¶¶ 9–10; ECF No. 129-1 at 59. The lighting in her room (or lack thereof), however, prevented her from getting a good look at her attacker's face. ECF No. 129-1 at 44, 46–47, 61; ECF No. 129-2 at 117. *See also* ECF No. 129-1 at 64 (G.D. explaining her nearsightedness), & 66 (testimony identifying Holloway based on his height and build). Upon running outside immediately after her attacker left, G.D. saw a large white car driving away, heading south on her street. ECF No. 129-1 at 65.[2]

### 2. Other assaults & robberies in the area

On July 7, 1992, K.R. was sexually assaulted in her home in the Riverwest neighborhood around dusk. ECF No. 138, ¶ 24; ECF No. 125, ¶¶ 2–5. Though she did not get a good look at his face because she was attacked from behind, K.R., who is 5'8", indicated that her attacker was Black male who was slightly taller than her. ECF No. 138, ¶ 24; ECF No. 125, ¶ 6. K.R. also indicated to the police who took her statement that, because he held a knife to her neck from around her right side, she believed her attacker was right-handed. ECF No. 138, ¶ 25; ECF No. 125, ¶ 5. He did not smell like smoke. ECF No. 138, ¶ 124; ECF No. 125, ¶ 8.

On September 26, 1992, R.R. was also assaulted and robbed in her home just east of the University of Wisconsin-Milwaukee ("UWM") main campus around 9:45 p.m. ECF No. 138, ¶ 18; ECF No. 124, ¶¶ 2, 4. R.R. identified her attacker as a Black male, approximately 5'7"–5'8" in height and weighing 165–175 pounds. ECF No. 138, ¶ 21; ECF No. 124, ¶ 6. R.R. also noted that her attacker was wearing a grey and white-striped

---

[2] Holloway argues that the fact that the attacker, while on top of her, cut G.D. on her *left* side suggests that he was right-handed. ECF No. 138, ¶ 10. Defendants object to this assertion as unsupported by anything more than mere speculation. *See id.*

horizontal pullover knit sweater and had "a very strong odor of smoke, especially on his clothes." ECF No. 124, ¶ 5.

On August 29, 1992, A.K. was attacked and robbed in her home in Shorewood, WI, a suburb just north of Milwaukee's East Side and the UWM main campus. ECF No. 138, ¶ 27; ECF No. 131-4. She indicated that her attacker was a black male, 5'10"–6'0", and armed with a knife. ECF No. 138, ¶ 27; ECF No. 131-4.[3] Holloway was never charged with committing any of the above assaults.

Finally, on September 28, 1992, a music box, among other things, was stolen from the home of L.G. ECF No. 138, ¶ 31.[4] Holloway was eventually formally charged with the robbery of L.G. but found not guilty at trial. *See* ECF No. 129-10. Defendants emphasize that the Shorewood crimes were investigated by Shorewood police, not officers from Milwaukee. *See* ECF No. 138, ¶¶ 27–30, 32; ECF No. 131-4; ECF No.129-2 at 127–139.

### 3. Defendants' initial investigation

At all relevant times, each individual defendant was a detective with the Milwaukee Police Department ("MPD"). *See* ECF No. 132, ¶¶ 8–9, 24–25, 41–42, 60–61, 72–73. In 1992, detectives assigned to the MPD Vice Control Division/Sexual Assault Unit worked as a team and were assigned to the three basic work shifts of 8 a.m. – 4 p.m. (day shift), 4 p.m. – midnight (early shift), and midnight to 8 a.m. (late shift). ECF No. 132, ¶ 1. Follow-up investigatory work was assigned by supervisors, taking into consideration the

---

[3] One of A.K.'s roommates indicated that she saw a Black male in his 20s, approximately 5'8" in height and of medium build, walk past their house and turn to look at them as she and A.K. returned home approximately thirty minutes before the attack, though the roommate had left the house by the time A.K. was attacked. ECF No. 138, ¶ 28. ECF No. 131-4 at 9. Another of A.K.'s roommates had seen a Black male, approximately 5'10" in height and of medium build prowling around their house as she returned home at around midnight one or two nights prior. ECF No. 131-4 at 11.

[4] The criminal complaint filed against Holloway also alleged that, as she was entering her home from the rear, L.G. was "confronted by a Black male subject who grabbed her purse." ECF No. 130-1 at 3.

particulars of the follow-up work, the availability of detectives, the detectives' assigned shifts, the timing involved with the availability of witnesses, and the accessibility of crime scenes and evidence. *Id.*, ¶ 2. For instance, a sexual assault complaint might come in at midnight, and a late shift detective would be assigned to respond to the scene, conduct the initial investigation, and open the initial report, but follow-up work, like interviewing potential witnesses or obtaining business records, such as time-cards or surveillance video, might be assigned to detectives who work during the day shift. *Id.*, ¶ 3. In 1992, detectives assigned to the MPD Vice Control Division/Sexual Assault Unit used department-issued memo books, and sometimes stenographic pads, to record notes about information gathered through their investigatory work. *Id.*, ¶ 4. Those detectives used their notes to prepare formal hard copy reports which contained information gleaned from their investigatory work, and which were kept with the relevant MPD investigatory file. *Id.*, ¶ 5.[5] Prior to September 28, 1992, Defendants had never personally encountered Holloway nor were they aware of him by name; they first learned of him in the context of their investigative work on these cases. *Id.*, ¶ 89.

Defendant Det. Daniel Ruzinski was the initial detective to file an official report in the G.D. case, which opened the investigation of the complaint made by G.D. at approximately 11:45 p.m. on September 26, 1992. ECF No. 132, ¶ 9. Ruzinski was dispatched to the scene of G.D.'s home that night/early morning, speaking with G.D.'s roommates. *Id.*, ¶¶ 10, 12. Ruzinski noted in his report that the attacker removed G.D.'s wallet from her purse and that he observed a blood-splattered wall, blood-stained bed linens, and shoeprints in G.D.'s bedroom, all of which were thoroughly photographed by

---

[5] Each of the individual defendants maintained all of his investigatory notes until the time of their respective retirements; Defendant Carlson still has possession of his notes. *Id.*, ¶ 7.

MPD technicians. *Id*., ¶¶ 11, 13–14; ECF No. 110-1. Ruzinski walked through the residence with one of the roommates, Tonya Bartoletti, who noted that a knife was missing from the kitchen, and Ruzinski determined that the attacker entered the home through her unlocked front door. ECF No. 132, ¶¶ 16–17; ECF No. 110-1 at 7. Bartoletti also mentioned to Ruzinski that she had been followed home from the store the night before by a Black male known as "Al." See ECF No. 138, ¶¶ 85–87. Specifically, Bartoletti and G.D. had gone to two separate but nearby stores; upon leaving the store she went into, the roommate noticed G.D. approximately one-half block ahead of her on the route back home and called out to her by G.D.'s name. ECF No. 131-21 at 93:1–13 (trial testimony). "Al" happened to be on the sidewalk between the roommate and G.D. and, in response, approached the roommate, who subsequently crossed the street and was followed home by "Al," who tried to talk to her throughout. *Id.* at 93:14–94:4.[6] Ruzinski did not include information about Bartoletti's interaction with Al in his official interview notes, so Holloway's defense team did not learn about it until Assistant District Attorney Terry Magowan disclosed the interaction on July 27, 1993. ECF No. 131-14 at 1. Magowan had first learned of the interaction from Bartoletti on July 15, 1993. *Id.* at 2.[7]

---

[6] Holloway stresses that "Al" followed *both* the roommate and G.D. home that night, ECF No. 138, ¶¶ 85–87, however the cited testimony and evidence does not appear to support the assertion that the roommate caught up to G.D. and "Al" followed both of them home. *See* ECF No. 131-15, ¶ 3 ("[The roommate] said that she was scared because the black male was making references to her car, wanted to know where she lived, and pestered her most of the way home until she met some of her neighbors and friends and the black male went on his way."); ECF No. 131-21 at 93:17–20 ("So I just ignored him and crossed the street and then he had followed me home talking to me while I was going home"). Ruzinski did not investigate further "because [the roommate's] neighbors and friends described the guy that had followed her home as more or less the neighborhood drunk that everybody knew, possibly named Al." *Id.*

[7] In addition to the above, Defendant Ruzinski also did some follow-up work on Holloway's case at the request of the prosecuting attorney, including checking the status of a phone number and timed driving of a route-of-travel to evaluate Holloway's alibi for the assault of M.G. ECF No. 132, ¶¶ 22–23; ECF No. 110, ¶ 15.; ECF No. 138, ¶ 74–75.

The next day, September 27, Defendant Det. Gregory Nowakowski responded to G.D.'s neighbor's property to inspect a knife found in the yard. *Id.*, ¶ 61. Nowakowski observed fingerprints and dried blood on the knife, which was subsequently identified by G.D.'s roommate as her kitchen knife that was taken from their home at the time of G.D.'s assault, and then placed the knife in MPD inventory. *Id.*, ¶¶ 62–63. Nowakowski also met with a woman named Elsa Gomez who lived near G.D. and who thought she may have interacted with G.D.'s attacker on the night before her assault. *Id.*, ¶ 64.

In late September 1992, Defendant Det. Michael Carlson was investigating the September 26 assault of R.R. at her home in the area of UWM, where Milwaukee abuts Shorewood. ECF No. 132, ¶¶ 42–43. While working on that case, Carlson contacted the Shorewood Police Department ("SPD") about any similar offenses in the area within their jurisdiction. *Id.*, ¶ 43. SPD Sgt. Glenn Wagner identified Holloway as a suspicious person, having been stopped by both SPD and police from neighboring Whitefish Bay on September 21, 1992, and taken into custody and cited by SPD for prowling. *Id.*, ¶ 44; ECF No. 138, ¶¶ 33–34. Holloway is a Black male who is 5"10 in height, left-handed, and, at the time, was a regular smoker who smoked approximately half-a-pack of cigarettes per day. ECF No. 138, ¶¶ 2–3. Wagner also indicated that Holloway was on parole for a 1985 sexual assault conviction. ECF No. 132, ¶ 44. Upon researching that conviction, Carlson found Holloway had sexually assaulted and burglarized a woman in the bedroom of her residence while threatening to kill her; Carlson found that these facts matched the circumstances and descriptions from the R.R., G.D., and M.G. assaults in that they all involved a home invasion, a single woman who was home alone, and a perpetrator who

assaulted them, threatened to kill them, and stole their property. *Id.*, ¶ 45; ECF Nos. 114-12 & 114-13 (criminal complaint & judgments of conviction).[8]

Having identified Holloway as a suspect, Carlson obtained a booking photo of his, placed that photo in an array, and showed the array to R.R. on September 29, 1992. ECF No. 132, ¶ 46. R.R. stated that the photo looked similar to her attacker but that she was not 100% sure and would like to see him in person to make a positive identification. *Id.*, ¶ 47; ECF No. 138, ¶ 41. Carlson also showed G.D. a photo array containing Holloway's booking photo, but she was unable to identify him. ECF No. 132, ¶ 48; ECF No. 138, ¶ 40. Based on R.R.'s statement and the similar description from Holloway's 1985 criminal complaint and conviction, MPD officers arrested Holloway at Carlson's request on September 30, 1992. ECF No. 132, ¶ 49; ECF No. 138, ¶ 42.

After the arrest, Defendant Det. Joseph Lagerman took Holloway's statement, told him of the charges for which he was under arrest, and advised him of his Miranda rights. ECF No. 132, ¶¶ 73–74.[9] Holloway denied any involvement in the crimes under investigation and indicated that he was willing to stand in a lineup and volunteer samples of his blood, hair, and saliva. *Id.*, ¶¶ 36, 69, 75; ECF No. 138, ¶¶ 90, 92. He also volunteered alibi information for the relevant dates. ECF No. 138, ¶¶ 70–73; ECF No. 132, ¶ 76.

---

[8] While Holloway admits to the existence of the 1985 conviction, he claims that he and the victim engaged in consensual sex; only after they found out that he was only seventeen years old (and thus underage) did she claim sexual assault and seek to press charges, to which Holloway accepted a plea deal to avoid a higher charge and a longer prison sentence. ECF No. 132, ¶ 45; ECF No. 127, ¶ 21. Holloway also points out that Carlson did not contact the police from either Whitefish Bay or UWM with a similar inquiry. ECF No. 138, ¶ 35. Nor did he did obtain any other names of other potential suspects, such as Ernest McIntosh, who was identified by A.K. as the man who attacked her on August 29 at a lineup conducted by SPD on September 11, 1992. *Id.*, ¶¶ 32, 36. In response, Defendants note that Carlson was not involved in that particular lineup because it was run by Shorewood PD; SPD also did not give Carlson McIntosh's name, only Holloway's. *Id.*

[9] This appears to be Lagerman's only involvement in the investigation. *See* ECF No. 132, ¶¶ 77–80.

### 4. September 30, 1992 lineup

At about 7:50 p.m. on September 30, 1992, Holloway was placed in a lineup at the Milwaukee Police Administration Building with four other men from the Milwaukee County Jail. ECF No. 138, ¶ 43. The four other men were chosen by now-deceased Det. William Stawicki, with help from Defendant Det. William Herold, to act as "fillers" for the lineup and were supposed to be similar in height, size, facial features, and skin tone to Holloway. *Id.*; ECF No. 132, ¶ 26. Det. Nowakowski also assisted with conducting the lineup. ECF No. 132, ¶ 66. All five men in the lineup were dressed in identical coveralls to give them "the same general shape;" all five also had similar hairstyles, skin tone, and facial features. ECF No. 132, ¶ 90.[10] Holloway was placed at position #2 at the direction of his public defender, who made no objection to the lineup that day. *Id.*, ¶ 91. At 5'10'', he was the shortest man in the lineup, noticeably shorter than suspects #1, #3, and #4, and only slightly shorter than suspect #5. *See* ECF No. 138, ¶¶ 2, 46; ECF No. 112-1 at 6. The men in the lineup were standing on a stage that was approximately 2½ to 3 feet in height above the ground, and at least 15 feet from the witnesses who viewed the lineup, perhaps as much as 25 feet away. ECF No. 138, ¶ 52. The lineup would also involve a voice identification. ECF No. 138, ¶ 45.[11]

During the lineup, G.D. identified Holloway as her attacker based on his voice and general body shape. ECF No. 132, ¶¶ 28, 67; ECF No. 138, ¶ 57. G.D. indicated to Det. Herold that she was absolutely sure that Holloway was the person who sexually assaulted

---

[10] Holloway also points out that he had black shoes while three other participants were wearing white shoes. ECF No. 132, ¶ 90; ECF No. 138, ¶ 48. The man at position #5 also had black shoes. *See* ECF No. 138, ¶ 46; ECF No. 132, ¶ 7; ECF No. 112-1 at 6.

[11] Holloway points out that Stawicki was unaware that voice identification would also be involved and he had apparently never been involved in a lineup with voice identification. ECF No. 138, ¶ 45.

her and that she recognized his voice as the voice of her assailant, who said "Don't scream, if you scream, I'll kill you" during her assault. ECF No. 132, ¶ 29; ECF No. 112-2 at 76–78. G.D. also stated that Holloway shared the same general physical characteristics as her attacker, including height and build. ECF No. 132, ¶ 30. On a scale of 1 to 10, G.D. indicated that her identification of Holloway was a 10. *Id.*, ¶ 31. M.G. also identified Holloway as the person who sexually assaulted her, telling Nowakowski that "she was 'positive' that Mr. Holloway was the person who assaulted her, and that he looked 'exactly like' her rapist." *Id.*, ¶ 67; ECF No. 108, ¶ 8; ECF No. 108-1 at 58.[12]

While G.D. and M.G. made positive identifications of Holloway, R.R. did not identify him as her attacker at the lineup. ECF No. 138, ¶ 58; ECF No. 124, ¶ 8.[13] A.K., A.K.'s roommate, L.G., and Elsa Gomez also failed to identify Holloway at the lineup. ECF No. 138, ¶ 59; ECF No. 132, ¶¶ 64–65.[14]

Holloway moved to suppress the lineup, arguing that it was tainted and suggestive. Judge Jeffrey Wagner, who presided over Holloway's trial, denied the motion at a pretrial hearing, ruling that the lineup was conducted in a "fair and impartial manner, using the

---

[12] Charles Humes, a potential witness who lived near G.D., also participated in the September 30 lineup and positively identified Holloway as a person he encountered in the neighborhood on September 25 and 27, 1992. ECF No. 132, ¶ 32; ECF No. 138, ¶ 60. Specifically, Humes recalled encountering an individual (self-identified as "Al") with a strong smell of alcohol on his breath and who "lived at the Mission"; Humes gave this person a ride on Friday, September 25 and this person came to Humes's house on Sunday, September 27, asking to use the bathroom. ECF No. 138, ¶¶ 60, 88. Herold subsequently took Humes's statement and had technicians check Humes's car for Holloway's fingerprints, however no such fingerprints were found. ECF No. 132, ¶¶ 33–34. *See also* ECF No. 138, ¶ 99.

[13] A neighbor of M.G. was also a potential witness, however the neighbor was not present at the September 30 lineup. ECF No. 138, ¶ 63; *see also* ECF Nos. 131-11 & 131-24 (photo arrays with MPD officers). Nor was G.D.'s roommate, Tonya Bartoletti, referenced above, *see supra* note 6. ECF No. 138, ¶ 87. In total, there were fourteen potential witnesses present; thirteen to view Holloway as a potential suspect, and one to view a different potential suspect from another crime. *Id.*, ¶ 54. The group of victims and witnesses who viewed the lineup did not say anything to each other, nor did they gesture or make any motions, after the lineup panel came into the room. ECF No. 132, ¶ 91.

[14] The lineup marks the extent of Herold's involvement in this case and the end of Nowakowski's involvement. ECF No. 132, ¶¶ 35, 38–39, 68.

necessary means to avoid any type of suggestiveness whatsoever." ECF No. 132, ¶ 93; ECF No. 114-1 at 3.

### 5. Post-lineup search & continued investigation of Holloway

After the lineup, Carlson swore out a search warrant for Holloway's home looking for items belonging to R.R. and A.K. despite their inability to identify him at the lineup. ECF No. 138, ¶¶ 64–65; ECF No. 132, ¶ 52. No such items were found. ECF No. 138, ¶ 67; ECF No. 132, ¶ 52. Previously, Carlson had also obtained a sweater and pair of tennis shoes from Holloway, however the prints from those shoes did not match shoeprints found in G.D.'s bedroom and R.R. could not identify the sweater as a clear match with the one worn by her attacker. ECF No. 132, ¶¶ 51, 55–56; ECF No. 138, ¶ 62; ECF No. 124, ¶ 9. Carlson also had information from SPD about Holloway's car but MPD never searched the car. ECF No. 138, ¶¶ 68–69. Holloway's fingerprints were also found on the music box missing from L.G.'s home, which was eventually found in Shorewood. ECF No. 138, ¶ 37. Holloway indicated in a written statement that he had found the music box in an alley in Shorewood while walking back from a trip to Lake Michigan. *Id*., ¶ 39.

Carlson and Ruzinski also did some follow-up work checking on Holloway's alibis. Ruzinski was tasked with verifying Holloway's alibi for the September 2 assault of M.G., checking on phone calls Holloway made to his fiancée at Froedtert Hospital that morning. ECF No. 138, ¶ 74; ECF No. 132, ¶ 23. Holloway emphasizes that Ruzinski waited to do this task until the morning of his trial. ECF No. 138, ¶ 74. He also points out that Ruzinski claimed at trial that one of the numbers was constantly busy, however Ruzinski testified at his recent deposition that only the specific number was constantly busy and that he only made one attempt to call it, so he just assumed it was non-working. *Id*. He only dialed

the number one time, then called the Froedtert Hospital main switchboard. *Id*. Holloway also emphasizes that Ruzinski testified to the jury that the drive from M.G.'s home to Holloway's home only took ten minutes, but he was unable to identify the route he took at his deposition. *Id*., ¶ 75. *See also* ECF No. 129-3 at 118:11–124:13.

Carlson was tasked with checking Holloway's alibi for the September 26 assault of G.D. ECF No. 138, ¶ 76. Holloway told detectives that he was supposed to work at Hardee's but was told not to report because the restaurant was not busy that day, so he worked on his car all day until midnight with a friend, Ted Blunt. *Id*., ¶¶ 76, 79.[15] Carlson went to the relevant Hardee's in March 1993 and met with a new manager, who provided him a copy of the schedule and roster of workers for September 26, 1992. *Id*., ¶ 77. Carlson subsequently testified at trial that Holloway was in fact supposed to work on September 26 but failed to show up; however, when told at his recent deposition that at least six workers that were listed on the September 26 roster did not clock in or out, Carlson conceded that it is possible that Holloway was told not to come in to work. *Id*., ¶ 78. Carlson also interviewed Holloway's mother, who told him Holloway was outside her home, working on his car with three other men from approximately 4:30 p.m. until at least midnight on September 26 and that she received a call from Holloway's fiancée around midnight confirming that Holloway had just returned home. *Id*., ¶¶ 82–83.[16]

---

[15] Blunt backed up Holloway's story when interviewed by a MPD detective in March 1993. ECF No. 138, ¶¶ 80–81.

[16] Holloway's fiancée also indicated to MPD detectives that she and Holloway drove to Janesville on September 27 to visit with family and friends and therefore Holloway could not have been the same person ("Al") that Charles Humes, *see supra* note 12, saw that day. ECF No. 138, ¶ 84.

### 6. Charges, evidence, trial & conviction

Holloway was ultimately charged with First Degree Sexual Assault and Burglary in connection with both the September 2 attack of M.G. and the September 26 attack of G.D., as well as Burglary as to the September 28 robbery of L.G. ECF No. 130-1 (criminal complaints filed 10/5/92 & 11/13/92). Defendants assert that after their hard copy case reports were filed, each officer maintained their memo books and/or steno pads so that their notes were available for their future reference and copying by anyone from the district attorney's office or by defense counsel. ECF No. 132, ¶ 6. Holloway disputes this assertion, arguing that his trial counsel was only provided the Detectives' typed reports and that material information regarding R.R.'s assailant was erroneously left out of Detective Carlson's report that was written in his memo book, *id*. (citing ECF No. 126, ¶¶ 3–6), specifically the fact that R.R.'s assailant had a strong cigarette odor, which could have been raised during his cross-examination of the M.G. and G.D., *i.e.*, whether their assailant also had a strong odor of smoke. *Id*. (citing ECF No. 126, ¶¶ 3–6). The District Attorney's office made the decision to charge and prosecute Holloway and all decisions regarding the presentation of evidence at trial were made by the prosecutor assigned to the case, not by any of the detectives. ECF No. 132, ¶¶ 87–88.

At the time of Defendants' investigation and the subsequent trial, the Wisconsin State Crime Lab had not yet begun to conduct any DNA analyses and it appears that they did not begin regularly conducting DNA analyses until the mid-1990s. ECF No. 132, ¶¶ 81–82; ECF No. 113, ¶¶ 5–6. In any event, the decision to send out evidentiary items for DNA analysis was made by the assistant district attorney assigned to the case, not by any MPD personnel assigned to the case. ECF No. 132, ¶ 83; ECF No. 113, ¶¶ 7–11. In

1992 and 1993, prosecutors with the Office of the Milwaukee County District Attorney could submit evidence for DNA testing to a few private laboratories, but only in limited circumstances, and those decisions were largely based upon the strength of other evidence in the case, the costs associated with the testing, and the length of time needed to complete the testing. ECF No. 132, ¶ 84; ECF No. 113, ¶¶ 7–11. Any such testing was expensive and was paid for by the DA's office in conjunction with Milwaukee County. ECF No. 132, ¶ 85; ECF No. 113, ¶ 10.

At trial, Wisconsin State Crime Lab serologist Raymond E. Menard testified as an expert, without objection from defense counsel. ECF No. 132, ¶ 95.[17] Menard testified that he analyzed some vaginal and cervical swabs attributed to victim M.G., and a preliminary test indicated the presence of semen, but that he was unable to determine any potential source of semen found in those samples because there "physically was not enough present," so he could not provide information regarding the person who produced the semen and that he could not include or exclude M.G.'s assailant by blood type. *Id*., ¶¶ 96–97. Menard further testified that he analyzed two blankets retrieved from the residence of G.D., he detected the presence of semen in the blue blanket, he conducted further testing, and was able to determine that the source of that semen was a "non-secretor," and the source of semen found on the white blanket was most likely an individual who was an "AB secretor." *Id*., ¶ 98–99. Holloway points out that no tests were run to exclude G.D.'s boyfriend as the secretor, and that Holloway was excluded as a

---

[17] Menard also confirmed that as of the date of his testimony in August 1993, the FBI and two private firms were conducting DNA testing but the state crime lab did not do DNA testing and Menard did not anticipate that the state crime lab would be doing DNA testing for at least another five months. ECF No. 132, ¶¶ 104–05. Menard also explained that the state crime lab was not a law enforcement agency, and that defense attorneys could also ask the lab to perform certain tests. *Id*., ¶ 106.

source of the semen on G.D.'s blankets as Holloway is a secretor with blood type A. *Id*., ¶¶ 98–99, 102. Menard also explained that a semen stain can remain in fabric, such as a blanket, indefinitely, so there was no way of knowing how long the stains had been in those two blankets, nor was there any way for him to determine how long sperm or semen had been in a woman's vaginal tract, from a vaginal swab provided to him. *Id*., ¶¶ 100–01. Menard further testified that the blood type of the blood stains found on the two blankets was consistent with G.D.'s blood type. *Id*., ¶ 102. Holloway's shoes and sweater were tested, but no blood was detected on those items. *Id*., ¶ 103. Finally, no fingerprint evidence was presented at trial that tied Holloway to the attacks on M.G., G.D. ECF No. 138, ¶ 99.

 Holloway was found not guilty on the burglary charge related to the L.G. robbery but was convicted on both the sexual assault and burglary charges related to the attacks on M.G. and G.D, receiving four consecutive thirty-year sentences. *See* ECF No. 114-11.

### 7.  Appeal & post-conviction release

On appeal, Holloway argued, among other points, error in admitting the lineup, insufficient evidence to convict, and error in admitting evidence of his prior sexual assault conviction from 1985. ECF No. 114-3 at 2. The appellate court affirmed the convictions, noting as to the lineup that "[t]he fact that each participant varied slightly in height, weight and age will not render a line-up impermissibly suggestive" and that "line-up participants do not need to have characteristics identical to the suspect." ECF No. 114-3 at 7–8; ECF No. 132, ¶ 94. The appellate court also rejected Holloway's claim that the voice identification aspect rendered the line-up "virtually worthless" as unsupported by citation to authority. ECF No. 114-3 at 8 (citing another case for the proposition that "arguments

that are not supported by legal authority will not be considered"). In finding sufficient evidence to sustain the convictions, the appellate court highlighted the fact that "[b]oth victims were certain of their identifications," and noted that other witnesses' testimony placed him near the scenes and his alibi defense did not cover the exact time periods of the crimes. *Id*. at 4. And evidence of Holloway's 1985 sexual assault conviction was admissible given factual similarities to the M.G. and G.D. assaults, not so remote in time as to render its admission erroneous, and properly accompanied by a cautionary instruction from the trial court judge. *Id*. at 6.

According to his notice of injury to the City of Milwaukee, Holloway's post-conviction counsel reached an agreement with the DA's office to have new DNA testing performed by the Wisconsin State Crime Lab, which showed that there may have been a different source of seminal fluid evidence than Holloway. ECF No. 130-21 at 1–6 (notice of injury), ¶¶ 17–18. Another round of testing by a private lab produced a report that both Holloway and the State agreed was "exculpatory in nature." ECF No. 130-21 at 8–9 (stipulation with joint recommendation to vacate conviction), ¶¶ 2–3. The parties further agreed that had this evidence been available to Holloway at trial, "a reasonable probability exists that the jury would have reached a different result" and that, in light of this new evidence, "it would be difficult for the State to prove guilt beyond a reasonable doubt in a retrial[.]" *Id*., ¶¶ 4–6. On October 4, 2016, Judge Wagner adopted the parties' stipulation, ordering the convictions vacated and the charges dismissed with prejudice. ECF No. 130-21 at 11–12 (findings and order to vacate convictions).

## II.    STANDARD OF REVIEW

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. I view the evidence in the light most favorable to the non-movant and must grant the motion if no reasonable juror could find for that party, *id*., and must draw all reasonable inferences in favor of the plaintiff as the non-moving party, *Kirsch v. Smith*, 894 F. Supp. 1222, 1228 (E.D. Wis. 1995), *aff'd*, 92 F.3d 1187 (7th Cir. 1996) (citing *Anderson*).

"[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.    DISCUSSION

Holloway brings each of his claims under 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983 "To succeed on [his] § 1983 claim, [Holloway] must prove (1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law." *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 468 (7th Cir. 2016). The parties do not dispute that Ruzinski, Herold, Carlson, Nowakowski, and Lagerman were acting under color of state law at all times material to this action. Nor do the parties dispute that the City of Milwaukee is a "person" for purposes of Holloway's *Monell* claim. Therefore, the key issue in the discussions below is whether Holloway has made a sufficient showing to establish the deprivation of a constitutional right.

## A. Count I: Due Process

Holloway claims that the defendant-officers violated his right to a fair trial guaranteed by the Fourteenth Amendment by (1) using unduly suggestive identification procedures, and (2) withholding evidence.

### 1. Identification procedures

Holloway challenges the identification procedures used by the defendant-officers as unduly suggestive on two grounds: (1) he was the shortest participant at the September 30 lineup, and (2) the September 29 photo array primed G.D. to identify him at the September 30 lineup.

The Constitution does not set a particular standard of quality for police photo arrays and lineups. *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006). The Fourteenth Amendment's Due Process Clause does, however, guarantee the right to a fair trial. *Id.* "[T]hat right is violated if unduly suggestive identification techniques are

allowed to taint the trial." *Id.* To determine whether a such a violation has occurred, courts conduct a two-step inquiry. *United States v. Sanders*, 708 F.3d 976, 983–84 (7th Cir. 2013). The plaintiff must first establish that the "identification procedure used by law enforcement was 'both suggestive and unnecessary.'" *Id.* (quoting *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012)). If the plaintiff meets this burden, the court must then look at the totality of the circumstances to determine whether the identification was nonetheless reliable. *Id.*

### a. September 30 lineup

Holloway contends that the September 30 lineup was unduly suggestive because he was the shortest of the five participants. Defendants contend that the lineup was not unduly suggestive because the participants were reasonably similar in appearance.

There is not a per se rule against making a suspect the shortest participant in a lineup. *See United States v. Curry*, 187 F.3d 762, 769 (7th Cir. 1999); *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996). Instead, "the participants in a lineup need only have 'descriptive features within a reasonable range of similarity to each other.'" *Curry*, 187 F.3d at 769 (quoting *Funches*, 84 F.3d at 253).

The September 30 lineup easily meets this standard. All five men had similar hairstyles, skin tone, and facial features, and each wore identical coveralls to give them "the same general shape." ECF No. 132, ¶ 90. They ranged in height from Holloway at 5'10" to participant number 4 at 6'1". ECF 130-12 at 1. The Seventh Circuit has concluded that more drastic height differences do not make a lineup unduly suggestive. *See Funches*, 84 F.3d at 253 (lineup not unduly suggestive even though suspect was three to five inches shorter than other participants). I find that making Holloway the shortest

participant in the September 30 lineup was not unduly suggestive.[18] Accordingly, I will grant summary judgment for the Defendants on this claim.

### b. G.D.'s identification

Holloway also contends that the September 30 lineup was unduly suggestive because Carlson showed G.D. a photo array containing his photo on September 29. "But viewing a physical lineup after a photo array, with both containing the defendant, is not on its own unduly suggestive." *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007); *see also United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002) ("[T]here is nothing impermissible about placing the same suspect in two different identification procedures."). Rather, when confronted with repetitive procedures, the Seventh Circuit has "often focused on the mitigating effect of elapsed time between the identifications." *United States v. Sanders*, 708 F.3d 976, 989 (7th Cir. 2013)

The Seventh Circuit has held that as little as eleven days can mitigate the suggestiveness of repetitive procedures. *Stewart v. Duckworth*, 93 F.3d 262, 265 (7th Cir. 1996); *see also Sanders*, 708 F.3d at 989 (collecting cases upholding repetitive procedures). Here, however, less than 32 hours elapsed between the photo array and the lineup. Carlson showed G.D. the photo array containing Holloway's photograph on September 29 at 1:00 p.m., and she could not identify him. ECF No. 132, ¶ 48; ECF No. 138, ¶ 40; ECF No. 130-13 at 1. Then, on September 30, at 7:50 p.m., she participated in the lineup and identified Holloway as her attacker. ECF No. 132, ¶¶ 28, 67; ECF No. 138, ¶ 57.

---

[18] Because Holloway failed to show that making him the shortest participant was unduly suggestive, I need not consider whether the identifications from the lineup were otherwise reliable. *United States v. Sleet*, 54 F.3d 303, 309 n.3 (7th Cir. 1995).

This, without more, could suggest that less than 32 hours does not mitigate the priming effect of the photo array. It is undisputed, however, that G.D. identified Holloway based on his voice and general body shape. ECF No. 132, ¶¶ 28, 67; ECF No. 138, ¶ 57. This indicates that G.D. was not, in fact, affected by the photo array. The photo array contained headshots, not full body photographs or voice samples. ECF No. 112-1 at 6. If the photo array primed G.D., she would have based her identification on Holloway's facial features.

Even if the September 29 photo array was suggestive, Holloway must demonstrate that it was *unnecessarily* suggestive. An identification procedure is unnecessarily suggestive if there is no "good reason for the failure to resort to a less suggestive alternative." *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007).

Neither party addresses the necessity issue. Nonetheless, I find that Carlson's actions are similar to the FBI's conduct in *Simmons v. United States*, 390 U.S. 377 (1968). In that case, the criminal defendant, Simmons, committed an armed robbery with an accomplice. *Id.* at 382. The next morning, the FBI obtained photos of Simmons with the suspected accomplice. *Id.* The FBI showed the photos to witnesses, all of whom identified the criminal defendant as a one of the robbers. *Id.* Simmons challenged the use of photographic identification as a violation of his right to a fair trial. *Id.* The Supreme Court disagreed, reasoning that the following circumstances justified the procedure:

> A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to Andrews and Simmons. It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities.

*Id.* at 384-85.

In this case, a serious felony had also been committed: G.D. was assaulted. ECF No. 138, ¶ 9. The perpetrator was also still at large. Within two days of the assault, Carlson possessed some clues that pointed to Holloway. He learned that the Shorewood and Whitefish Bay police departments had stopped Holloway on September 21, 1992. ECF No. 132, ¶ 44; ECF No. 138, ¶¶ 33–34. The Shorewood police had taken Holloway into custody and cited him for prowling. ECF No. 132, ¶ 44; ECF No. 138, ¶ 34. Carlson also learned that Holloway was on parole for a sexual assault conviction. ECF No. 132, ¶ 44. Holloway had assaulted and burglarized a woman in her bedroom of her residence while threatening to kill her. *Id.*, ¶ 45; ECF Nos. 114-12 & 114-13. Carlson concluded that these facts matched the circumstances and descriptions from the R.R., G.D., and M.G. assaults in that they all involved a home invasion, a single woman who was home alone, and a perpetrator who assaulted them, threatened to kill them, and stole their property. ECF No. 132, ¶ 45. The following day, Carlson, armed with this new information, conducted the photo array with G.D. ECF No. 132, ¶ 48; ECF No. 138, ¶ 40; ECF No. 130-13 at 1. With G.D.'s attacker still on the loose, the September 29 photo array was necessary to confirm or dispel Carlson's suspicions at that juncture of the investigation. *Cf. Sanders*, 708 F.3d at 986-87.

Even if Carlson's use of the photo array on September 29 was unduly suggestive, Carlson "cannot be liable under § 1983 unless [Holloway] shows how the flaws in [the] identification techniques made his trial unfair." *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006). That Holloway's conviction was later vacated is not sufficient. *Id.* at 556. Instead, Holloway must point to specific evidence showing how the photo array compromised his constitutional right to a fair trial. *Id.* at 555. For example:

What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?

*Id.* In his briefing on this claim, Holloway does not cite once to his proposed finding of fact or to the trial transcript. At a minimum, I would expect him to provide the relevant testimony that he is challenging, but he has not done even that. "[I] cannot connect the dots for him. That he must do on his own." *Id.*

On an independent review of the trial transcript, I nonetheless find that G.D.'s testimony is reliable. Courts consider five factors in making the reliability determination:

[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

### i. Opportunity of the witness to view the criminal at the time of the crime.

G.D. never saw her attacker's face. ECF No. 129-1 at 44. However, she saw his height and build three times and heard his voice at least four times. *Id.* at 46, 48-49, 59-65. On the night of the assault, G.D. was in her bedroom and the only light was coming from underneath her bedroom door. *Id.* at 44. When the perpetrator came into her room, she saw a "silhouette" and "body shape." *Id.* at 46. She could tell the perpetrator was a Black male. *Id.* She described him as 5'8", 160-170 pounds, and stocky. *Id.* at 59-60. She described his hair as "very short." *Id.* at 59. She could not identify any facial hair. *Id.* at 60. When G.D. screamed, the perpetrator said three or four times, "Don't scream. If you scream, I'll kill you." *Id.* at 48. He also said, "I don't want money. I want you." *Id.* at 49. At

one point, the front doorbell rang. *Id.* at 58-59. The perpetrator walked out of the bedroom and into the fully lighted kitchen with his back to G.D. *Id.* at 59. Once again, G.D. could see the perpetrator's height and build. *Id.* When the perpetrator returned, he asked G.D. why she had called 911. *Id.* at 62. G.D. could not get a good look at his face at this point because of the lack of lighting in her room. *Id.* at 61. However, she was able to see the perpetrator's height and build for a third time. *Id.* He told G.D. to put her pillow over her head. *Id.* at 62. He then turned on the bedroom lights. *Id.* G.D. could not see his face because of the pillow. *Id.* The perpetrator then said, "I'm getting out of here," and left. *Id.* at 63. G.D. ran outside but only saw a white car driving away. *Id.* at 64-65.

This factor might seem to weigh in Holloway's favor because G.D. did not see her perpetrator's face. However, G.D. did not identify Holloway by his face. She identified him based on his body type and voice. ECF No. 132, ¶¶ 28, 67; ECF No. 138, ¶ 57. She heard her perpetrator's voice on at least four occasions and saw his height and build on at least three. Because G.D. identified Holloway based on his voice and body type, and she had ample opportunity to observe both, this factor weighs against Holloway.

### ii. The witness's degree of attention.

G.D. was "no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Neil v. Biggers*, 409 U.S. 188, 200 (1972). This factor weighs against Holloway.

### iii. The accuracy of the witness's prior description of the criminal

G.D. described the perpetrator as a Black male who was 5'8", 160-170 pounds, and stocky. ECF No. 129-1 at 59-60; ECF No. 138, ¶ 9. She described his hair as very short. ECF No. 129-1 at 59-60. This is no evidence that G.D. gave the police a description of Holloway's voice. At the time, Holloway, a Black male, was 5'10" and weighed 200

pounds. ECF No. 138, ¶ 2; ECF 130-12 at 1. A review of a photo of the lineup indicates that Holloway had short hair. ECF No. 130-11 at 6.

Holloway argues without citation that the two-inch difference is not accurate enough for this analysis. However, I find that this height difference to be negligible. Holloway fits G.D.'s description with respect to height, body type, and hair length. While Holloway is 30 pounds heavier than G.D. described, he can fairly be characterized as stocky. This factor weighs against Holloway.

### iv. The level of certainty demonstrated by the witness at the confrontation.

G.D. could not identify Holloway in the September 29 photo array. ECF No. 132, ¶ 48; ECF No. 138, ¶ 40. She identified Holloway at the September 30 lineup based on his voice and general body shape. ECF No. 132, ¶¶ 28, 67; ECF No. 138, ¶ 57. She initially focused on Holloway and participant number 3 based on their builds. ECF No. 129-1 at 70. Then the participants were asked to say, "Don't scream. If you scream, I'll kill you." *Id.*; ECF No. 130-23 at 1. At that point, G.D. identified Holloway. ECF No. 132, ¶ 29; ECF No. 129-1 at 70. She stated she was absolutely sure that Holloway was the perpetrator. ECF No. 132, ¶ 29; ECF No. 129-1 at 71. On a scale of 1 to 10, G.D. indicated that her identification of Holloway was a 10. *Id.*, ¶ 31.

Holloway cautions the court in crediting G.D.'s confidence because it could be the product of the unduly suggestive identification procedures. However, I have found that the photo array and lineup were not unduly suggestive so G.D.'s certainty weighs against Holloway.

### v. The length of time between the crime and the confrontation

The photo array occurred three days after G.D.'s assault and the lineup occurred after four. This favor weighs against Holloway. *United States v. Lovejoy*, No. 18-CR-190, 2019 WL 7602163, at *8 (E.D. Wis. June 26, 2019) ("Four days is an insignificant time gap.").

Taken together, even if the photo array was unduly suggestive, I find that G.D.'s identification was nonetheless reliable. Considering the totality of the circumstances, there was not "a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. Any weakness in G.D.'s testimony was for the jury to weigh. *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."). Accordingly, I will grant summary judgment for the Defendants on this claim.

### 2. *Brady* claims

Holloway claims that Defendants violated his right to a fair trial guaranteed by the Fourteenth Amendment by withholding evidence on three occasions: (1) Carlson's failure to disclose the fact that R.R.'s attacker smelled of cigarette smoke; (2) Ruzinski's failure to disclose Bartoletti's interaction with Al; and (3) Defendants' failure to turn over sexual assault reports about other victims.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This places a duty on "the prosecutor [to] turn over to the defense all potentially exculpatory evidence." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). "That obligation extends to police officers,

insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." *Id.* "To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police 'suppressed' the favorable evidence, and prejudice ensued because the suppressed evidence was material." *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019).

### a. Carlson's notes

Holloway contends that Carlson's failure to disclose the fact that R.R.'s attacker smelled like cigarette smoke in his official report violated his *Brady* rights. Defendants contend they are entitled to summary judgment because the information about R.R.'s attacker was not relevant to Holloway's defense—i.e., it was not favorable.

Carlson interviewed R.R. on September 26, 1992. ECF No. 124, ¶ 3. He recorded his initial notes about this interview in a memo book. ECF No. 131-19. Carlson's handwritten notes show that R.R. described her attacker as having a "cigarette odor." ECF No. 131-19 at 1; see also ECF No. 124, ¶ 3. The parties dispute whether Carlson failed to include this fact in his official report of the interview. However, this is summary judgment, so I will view the evidence in Holloway's favor and assume that Carlson did not disclose the fact that R.R.'s attacker smelled like cigarette smoke.

Favorable evidence includes both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Holloway was charged and tried for the assaults of M.G. and G.D., not R.R. ECF No. 114-10. The fact that R.R.'s attacker smelled of cigarette smoke clearly does not exculpate Holloway from the assaults of M.G. and G.D., and Holloway does not argue that. Instead, Holloway argues that he could have

cross-examined G.D. and M.G. about whether their attacker smelled of cigarette smoke if only he had known R.R.'s attacker had such an odor. The flaw here is that the evidence must be useable for impeachment. G.D. and M.G. never testified about whether their attacker smelled of cigarette smoke—let alone whether R.R.'s attacker smelled of cigarette smoke—and R.R. was not called to testify. Holloway could not have impeached anyone even if he had known R.R.'s attacker smelled of cigarette smoke. In the end, Holloway's chief complaint is that his defense counsel did not elicit testimony from G.D. or M.G. about whether *their* attackers smelled of cigarette smoke. This could have been exculpatory because Holloway smoked at the time of his arrest. ECF No .138, ¶ 3. But that line of questioning was not dependent on knowing whether R.R.'s attacker had a cigarette odor. Accordingly, I will grant summary judgment for the Defendants on this claim.

### b. Ruzinski's notes

Holloway contends that the belated disclosure of Tonya Bartoletti's interaction with "Al" violated his *Brady* rights. Defendants contend they are entitled to summary judgment because Assistant District Attorney Magowan's disclosure gave Holloway ample time to effectively use the evidence—i.e., it was not suppressed.

Ruzinski interviewed Tonya Bartoletti, G.D.'s roommate, on September 26, 1992. ECF No. 132 ¶ 10. During that interview, Bartoletti told Ruzinski that a Black male named "Al" followed her home from a store the night before G.D.'s assault. ECF No. 131-15 at 2. As the man followed Bartoletti, he said something about her car, asked her where she lived, and pestered her until she arrived home. *Id.*; *see also* ECF No. 129-1 at 94. Ruzinski did not follow up on this incident with "Al" because Bartoletti's neighbors and

friends described the man as the "neighborhood drunk" that everyone knew. ECF No. 131-15 at 2. Holloway's defense team did not learn about Bartoletti's interaction with "Al" until Assistant District Attorney Terry Magowan disclosed it on July 27, 1993, one week before trial. *Id.* at 1. Magowan had first learned of the interaction from Bartoletti on July 15, 1993. *Id.* at 2. In his disclosure, Magowan informed Holloway's defense team of the details recounted above. *Id.* at 2.

Evidence is suppressed if "(1) the State failed to disclose known evidence before it was too late for him to make use of the evidence; and (2) the evidence was not otherwise available to him through the exercise of reasonable diligence." *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002). The relevant inquiry, then, is whether "time remains for the defendant to make effective use of the exculpatory material." *United States v. Mota*, 685 F.3d 644, 649 (7th Cir. 2012) (quoting *United States v. Gray*, 648 F.3d 562, 567 (7th Cir.2011)).

The disclosure of Bartoletti's interaction with Al did not come too late for Holloway to make effective use of the evidence. One week is ample time for Holloway to interview Bartoletti or to attempt to find an individual named Al who frequents Bartoletti's neighborhood. Nor does Holloway argue otherwise. Holloway could have also sought a continuance. *United States v. Mota*, 685 F.3d 644, 649 (7th Cir. 2012) ("[W]hen a defendant realizes that exculpatory evidence has been withheld, the appropriate course is to seek a continuance if more time to investigate the exculpatory potential of the evidence is needed."). There is no evidence that he did so. Accordingly, I will grant summary judgment for the Defendants on this claim.

### c. Other reports

Holloway argues that the Defendants' failure to turn over lab reports regarding the assault of K.R. violated his *Brady* rights. Defendants contend they are entitled to summary judgment because those materials, if they existed at all, would not have been favorable to Holloway.

K.R. was assaulted on July 7, 1992, in her home in the Riverwest neighborhood. ECF No. 138, ¶ 24; ECF No. 125, ¶¶ 2–5. She attended the September 30, 1992, lineup, at which Holloway was a participant.  ECF No. 138, ¶ 24. Subsequently, the Milwaukee Police Department had four rape kits tested in April 1993. *Id.*, ¶ 93; ECF No. 130-6. Those kits were associated with the assaults of L.S., P.P., E.C., and J.S. ECF No. 130-6. None of the reports implicated Holloway. *Id.*, ¶ 93; ECF No. 130-6. Holloway questions why any report on K.R. was not turned over to Holloway's prosecutors.

Holloway's questioning is not enough to save this claim. He has failed to bring forward any evidence to establish that a K.R. report existed. Even if he was able to produce a K.R. report that did not implicate him, his claim fails for the same reason his cigarette odor claim does—the report would not be "favorable" in the *Brady* sense. He was not tried for K.R.'s assault, and no one testified at his trial about the K.R. assault. The report could neither exculpate nor impeach. Finally, Holloway has not provided any evidence to demonstrate prejudice.[19] Accordingly, I will grant summary judgment for the Defendants on this claim.

---

[19] To the extent Holloway is claiming that Defendants had a duty to create such a report, this also fails as a matter of law. *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("The failure to create exculpatory evidence does not constitute a *Brady* violation.").

## B. Count II: Federal Malicious Prosecution

In Count II of his complaint, Holloway asserted a "federal malicious prosecution" claim against the defendant-officers under Section 1983. He alleged that the defendant-officers initiated judicial proceedings against him without probable cause in violation of the Fourth and Fourteenth Amendment. He further alleged that his state law remedies were inadequate because Wisconsin caps tort damages at $50,000.

Defendants cite *Newsome v.* McCabe, 256 F.3d 747 (7th Cir. 2001), *abrogated on other grounds by Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), for the rule that no constitutional tort of malicious prosecution exists when state law provides an adequate remedy for the plaintiff. Since Wisconsin recognizes a common law tort of malicious prosecution, they argue, Holloway cannot assert a federal claim.

A plaintiff who fails to defend a claim on summary judgment has abandoned that claim. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (internal citations omitted) ("In her response to Ameritech's motion for summary judgment, Ms. Maclin failed to defend her claim against these arguments. She therefore abandoned the claim."). Holloway agrees with Defendants that he cannot raise a federal malicious prosecution claim. He therefore has abandoned this claim. Accordingly, I will grant summary judgment to Defendants on this claim.

Having abandoned a malicious prosecution claim under Section 1983, Holloway then pivots to Wisconsin's tort of malicious prosecution. However, a plaintiff cannot raise a new claim on summary judgment. *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) ("Anderson also asserted violations of the FMLA for the first time in his response to USPS's motion for summary judgment. Anderson waived these claims."). Holloway did

not plead a Wisconsin malicious prosecution tort claim. In fact, he explicitly rejected relief under Wisconsin's tort law because he did not believe it adequately compensated him for his alleged injuries. He may not about-face in his response to Defendants' motion for summary judgment. He therefore has waived this claim.

### C. Count III: Unlawful Detention

Holloway claims that Carlson violated his right to be free from unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments when Carlson directed other officers to arrest him without probable cause. Defendants contend that Carlson is entitled to summary judgment because probable cause existed for Holloway's arrest.[20]

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. CONST. amend. IV. Because arrests are seizures, claims of wrongful arrests sound in the Fourth Amendment. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017). Generally, "'seizures are "reasonable" only if based on probable cause' to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979)). Thus, the existence of probable cause is ordinarily an absolute bar to a claim for unlawful arrest under the Fourth Amendment and Section 1983. *Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018). A police officer has probable cause to arrest an individual when "the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. Ohio*, 379 U.S. 89, 96 (1964) (quoting *Carroll v. U.S.*, 267 U.S. 132, 162 (1925)).

---

[20] Defendants also raise the defense of qualified immunity, asserting that at least arguable probable cause existed for Holloway's arrest. Because I find that probable cause existed for Carlson to direct Holloway's arrest, I need not consider this defense.

I can properly decide this issue on summary judgment because the parties do not dispute the underlying facts available to Carlson when he directed other officers to arrest Holloway. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) ("If the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists.").

Carlson gathered those facts while investigating R.R.'s September 26 assault. ECF No. 132, ¶¶ 42–43. During the investigation, R.R. told Carlson that her attacker was a Black male in his 30s who stood 5'7" to 5'8" and weighed 165–175 pounds. ECF No. 138, ¶ 21; ECF No. 124, ¶ 6.  On September 28, Carlson asked the Shorewood Police Department about similar offenses in their area. ECF No. 132, ¶ 43.  Shorewood police indicated that several home intrusions had recently occurred. ECF No 138, ¶ 34.  Shorewood Police Sergeant Glenn Wagner told Carlson that his department and the Whitefish Bay Police Department had stopped Holloway on September 21, 1992; that Shorewood police took Holloway into custody and cite him for prowling; and that Holloway was on parole for a sexual assault conviction. ECF No. 132, ¶ 44; ECF No. 138, ¶¶ 33–34. Carlson then researched Holloway's conviction. ECF No. 132, ¶ 45. He found that Holloway had assaulted and burglarized a woman in her bedroom of her residence while threatening to kill her. *Id.*, ¶ 45; ECF Nos. 114-12 & 114-13. Carlson concluded that these facts matched the circumstances and descriptions from the R.R., G.D., and M.G. assaults in that they all involved a home invasion, a single woman who was home alone, and a perpetrator who assaulted them, threatened to kill them, and stole their property. ECF No. 132, ¶ 45. From there, Carlson obtained a booking photo of Holloway and placed it in a photo array. ECF No. 132, ¶ 46. He showed the array to R.R. on September 29, and R.R.

stated that the photo looked similar to her attacker but that she was not 100% certain and would like to see him in person to make a positive identification. ECF No. 132, ¶ 47, ECF No. 138, ¶ 41. The following day, officers arrested Holloway at Carlson's direction. ECF No. 132, ¶ 49.

It is well settled that a single, credible witness identification can establish probable cause. *Tangwall v. Stuckey*, 135 F.3d 510, 516 (7th Cir. 1998). R.R identified Holloway in the photo array. That identification suffices to establish probable cause, unless there is reason to believe R.R. was not telling the truth. *See Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986) (internal citations omitted) ("When an officer has received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause."). Holloway has not come forward with any evidence suggesting such deception.

Instead, Holloway argues that R.R.'s identification cannot establish probable cause because it was a tentative identification. However, the Seventh Circuit has recognized that "tentative" identifications can establish probable cause. *E.g.*, *McDaniel v. Polley*, 847 F.3d 887, 895 n.5 (7th Cir. 2017) (probable cause established when one witness selected a suspect's photo out of a photo array and stated that the suspect "looked like" the individual he saw at the crime scene, even though criminal defendant characterized the identification as tentative); *United States v. Daniels*, 64 F.3d 311, 314 (7th Cir. 1995) (probable cause established when three witnesses selected a suspect's photo out of a photo array but stated they could not be sure without seeing him in person).

Two other facts bolster this probable cause determination. First, Carlson checked Holloway's criminal history and concluded that Holloway's prior conviction for sexual

assault mirrored the assaults of R.R., M.G., and G.D. While an individual's criminal history cannot alone establish probable cause, it is certainly relevant to the probable cause determination. *See United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005) (prior similar convictions cannot alone corroborate informant's account but can combine with other items to establish probable cause); *see also United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006) ("The application of this test is not fettered by the presumption of innocence embodied in the test for conviction. Instead, a 'person of reasonable caution' would take into account predilections revealed by past crimes or convictions as part of the inquiry into probable cause.").

Second, Holloway "bore a fair resemblance" to the descriptions given by R.R., M.G., and G.D. *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. 2001) (probable cause established when suspect "bore a faire resemblance" to witness descriptions even though he "did not match exactly" the descriptions). Each woman stated that her attacker was a Black male and approximately 5'7"-5'8". ECF No. 138, ¶¶ 5, 9, 21; ECF No. 124, ¶ 6; ECF No. 130-19 at 2. M.G. indicated her attacker was medium-to-muscular build, R.R. estimated 165-175 pounds, and G.D. estimated 160-170 pounds. ECF No. 130-19 at 2; ECF No. 129-1 at 59; ECF No. 124, ¶ 6. Holloway, a Black male, is 5'10" and, at the time, weighed 200 pounds. ECF No. 138, ¶ 2; ECF 130-12 at 1. The two-inch heigh difference is within reason. *United States v. Carpenter*, 342 F.3d 812, 815 (7th Cir. 2003) (two-inch height difference did not defeat probable cause). While a 25-to-30-pound difference is more significant, a 200-pound man is certainly of a medium-to-muscular build.

Taken together, R.R.'s identification, Holloway's prior conviction's similarities to the R.R., M.G., and G.D. assaults, and his fair resemblance to the victims' descriptions are sufficient to establish probable cause to arrest Holloway for the assault of R.R. Accordingly, I will grant summary judgment for the Defendants on this claim.

## D. Count IV: Conspiracy

Holloway claims that the defendant-officers conspired to frame him for a crime he did not commit. Defendants argue that they are entitled to summary judgment because Holloway has failed to bring forward evidence to meet either of the two elements of a civil conspiracy.

"To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

Holloway has, in fact, failed to present any evidence on either of these elements. He argues that "[the Defendants'] failures in conjunction with specific omissions [sic] of facts and materials point to such circumstantial evidence to frame Holloway for rapes he never committed." But his briefing on this claim is devoid of any evidence from his proposed findings of fact or otherwise that point to specific failures and omissions regarding the investigation of the M.G. or G.D. assaults. "It is not the job of this court to develop arguments for [parties]," *Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 609 (7th Cir. 2008), even for claims that implicate constitutional rights. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). To the extent he grounds his conspiracy claims in the constitutional violations alleged in Counts I–III, I have already concluded

that Holloway has not established that the defendant-officers deprived his Due Process and Fourth Amendment rights. Accordingly, I will grant summary judgment for the Defendants on this claim.

### E. Count V: Failure to Intervene

Holloway claims that the officer-defendants are liable under Section 1983 because they failed to intervene to prevent Carlson from directing other officers to arrest Holloway without probable cause. Defendants argue that they are entitled to summary judgment because Carlson had probable cause to direct Holloway's arrest.

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)

Holloway's failure to intervene claim fails for the same reason his unlawful detention claim fails. Carlson had probable cause to direct Holloway's arrest. He, therefore, fails to establish the first element of a failure to intervene claim. Accordingly, I will grant summary judgment for the Defendants on this claim.

### F. County VI: *Monell*

Holloway claims that the City of Milwaukee is liable under Section 1983 on three grounds: (1) the City lacked a policy regarding officer investigatory notes, (2) the City had an inadequate policy regarding lineups and photo arrays, and (3) the City lacked a policy regarding the police use of DNA testing.

"A municipality is not liable under § 1983 unless the deprivation of constitutional rights is caused by a municipal policy or custom." *Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). The Supreme Court has stated that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). Holloway's *Monell* claims fail because he has not established a deprivation of his constitutional rights.

### 1. City's policy regarding officers' investigatory notes

Holloway contends that the City should have had a policy requiring police officers to preserve and submit their investigatory notes in the district attorney's file. Holloway contends that the City's inadequate policy violated his right to a fair trial because it caused Ruzinski to not disclose Bartoletti's interaction with Al and Carlson to not disclose the fact that R.R.'s attacker had a cigarette odor. In other words, Holloway is relitigating his *Brady* claims under *Monell*. I have already concluded that Ruzinski and Carlson did not violate Holloway's *Brady* rights. He, therefore, has not established an essential element of this *Monell* claim. Accordingly, I will grant summary judgment for the Defendants on this claim.

### 2. City's policy regarding lineups and photo arrays

Holloway claims that the City should have had a policy addressing the priming effect of photo arrays conducted before lineups and a more robust policy regarding "the specificity needed to avoid a tainted lineup." Holloway contends that the City's inadequate policies violated his right to a fair trial because they caused Holloway to be subjected to unduly suggestive identification procedures. In other words, Holloway is relitigating his

Due Process claims under *Monell*. I have already concluded that the September 29 and September 30 identification procedures were not unduly suggestive. He, therefore, has not established an essential element of a *Monell* claim. Accordingly, I will grant summary judgment for the Defendants on this claim.

### 3. City's policy regarding police us of DNA testing

Holloway claims that the City should have had a policy addressing the police's use of DNA testing. However, he does not identify what constitutional right was violated by this allegedly inadequate policy. *Smith v. City of Chicago*, 3 F.4th 332, 336 (7th Cir. 2021) (quoting *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017)) ("The 'threshold inquiry in a § 1983 suit' is to 'identify the specific constitutional right at issue.'"). Holloway could implicitly be arguing that he has a constitutional right to DNA testing. That is unavailing, however, because the Supreme Court has concluded that there is no "freestanding right to DNA evidence." *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 72 (2009). As with his other *Monell* claims, Holloway has failed to establish a constitutional violation. Accordingly, I will grant summary judgment for the Defendants on this claim.

### IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Defendants' motion for summary judgment (ECF No. 106) is **GRANTED in full**. The Clerk of Court shall enter final judgment accordingly.

**IT IS FURTHER ORDERED** that Defendants' motion to stay proceedings (ECF No. 140) is **DENIED as moot**.

Dated at Milwaukee, Wisconsin this 29th day of September, 2021.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge