In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-3007

DARYL HOLLOWAY,

*Plaintiff-Appellant*,

*v.*

CITY OF MILWAUKEE, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 19-cv-1460 — **Lynn Adelman**, *Judge*.

———————————

ARGUED JUNE 1, 2022— DECIDED AUGUST 8, 2022

———————————

Before EASTERBROOK, WOOD, and SCUDDER, *Circuit Judges*.

WOOD, *Circuit Judge*. After serving 24 years in prison for burglary and sexual-assault convictions, Daryl Holloway was exonerated by DNA evidence and the State of Wisconsin vacated his convictions. Upon his release, Holloway filed a lawsuit under 42 U.S.C. § 1983 against the City of Milwaukee and various police officers who investigated him at the time of the assaults.

Holloway alleged that the police and the City violated his due-process rights in a variety of ways: the use of overly suggestive identification procedures; the suppression of evidence favorable to his defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); an arrest without probable cause in violation of the Fourth Amendment; a conspiracy to deprive him of his constitutional rights; and, in the City's case, the failure to enact policies that were essential to avoid constitutional violations. The district court granted summary judgment in defendants' favor on all claims.

For the most part, we agree with the district court's assessments of these arguments. But our reasoning differs in one important respect. As we see the record, the officers' identification procedures may well have violated Holloway's right to due process. At minimum, that question was not properly resolved on summary judgment. Nevertheless, summary judgment was appropriate for a different reason: the officers' conduct was not "clearly established" as unlawful at the time, *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018), and so the defendants were entitled to qualified immunity. Thus, we affirm.

**I**

In the summer of 1992, there were five sexual assaults in Milwaukee that shared some basic characteristics: White women were robbed in their homes and sexually assaulted at knifepoint by a Black man. Holloway was charged and convicted for the assaults of two of the five victims: M.G. and G.D. M.G. indicated that her attacker was a Black man in his mid-twenties, medium-to-muscular build, 5'7'' to 5'8'' in height, and that he wore a bright handkerchief around his face under his eyes. G.D. indicated that her attacker was a

No. 21-3007                                                    3

Black man, about 5'8" in height, "approximately 160, 170 pounds," but that poor lighting in her room prevented her from getting a good look at his face. All three additional victims—K.R., R.R., and A.K., for whom Holloway did not face charges—offered similar descriptions of their attacker: a Black man of roughly medium height and build. R.R. added that her attacker had "a very strong odor of smoke, especially on his clothes."

Detective Daniel Ruzinski initiated the investigation into G.D.'s complaint. Ruzinski spoke with one of G.D.'s roommates, Tonya Bartoletti, who told Ruzinski that she had been followed home from the store the night before the assault by a Black man known as "Al," who tried to talk to her throughout the walk. Ruzinski did not include information about Bartoletti's interaction with Al in his official interview notes. Thus, Holloway's defense team did not learn about it until one week before trial, when Assistant District Attorney Terry Magowan disclosed the incident. Magowan himself learned of it only three weeks or so before trial.

While investigating the assault of R.R., Detective Michael Carlson contacted the Shorewood Police Department ("SPD") and inquired about any similar offenses in its jurisdiction. (Milwaukee and Shorewood border one another.) An officer with the SPD identified Holloway as a person of interest. He related that Holloway had recently been stopped for prowling, that he was on parole for a 1985 sexual-assault conviction, and that he was a Black man, approximately 5'10" in height, who smoked cigarettes. Carlson dug further into the 1985 conviction and found that its underlying facts resembled those of the recent sexual assaults in the area: Holloway apparently had burglarized and sexually assaulted a woman in her home

while threatening to kill her. Carlson identified Holloway as a suspect, obtained a booking photo of him, placed the photo in an array, and showed the photo array to R.R. and G.D.

G.D. was unable to identify Holloway. R.R. stated that the man in the photo resembled her attacker but that she was not certain and needed to see him in person to make a positive identification. Based on R.R.'s statement and Holloway's 1985 conviction, officers arrested Holloway at Carlson's request. After being advised of his *Miranda* rights, Holloway denied any involvement in the assaults, volunteered to stand in a lineup, and offered alibi information for the relevant dates. Holloway was placed in a lineup alongside four other men of similar height, size, features, hairstyles, and skin color. (For ease of reference, we have included a photograph of the lineup in the Appendix to this opinion.) All five wore identical coveralls, although Holloway was one of only two men who did not wear white sneakers. At 5′ 10′′, Holloway was the shortest man in the lineup. He was only marginally shorter than one of the suspects, but he was noticeably shorter than the rest. The lineup also involved a voice identification.

Based on his voice and general body shape, G.D. identified Holloway as her attacker, indicating that she was "absolutely sure" and that on a scale of 1 to 10, her identification was a 10. M.G. also identified Holloway as the person who sexually assaulted her, indicating that she was "positive" and that he looked "exactly like" her attacker. On the other hand, R.R., A.K., and A.K.'s roommate were unable to identify Holloway. Holloway moved to suppress the lineup as tainted and overly suggestive, but his motion was denied. Holloway was convicted after a jury trial of the charges related to the assaults of M.G. and G.D. and received four consecutive 30-year

No. 21-3007 5

sentences. The Wisconsin appellate court affirmed his convictions. *State v. Holloway*, 195 Wis.2d 85 (unpublished); No. 94-1257-CR, 1995 WL 321942 (Wis. Ct. App. 1995).

At the time of Holloway's investigation and trial, the Wisconsin State Crime Lab had not yet begun conducting DNA analysis; it did not begin to do so with any regularity until the mid-1990s. Holloway's post-conviction counsel eventually reached an agreement with the district attorney's office to have DNA testing performed by the State Crime Lab. This testing showed that someone other than Holloway may have been the source of seminal fluid. A subsequent round of tests by a private lab produced a report that Holloway and the State agreed was exculpatory. In 2016, 24 years after the assaults, Holloway's convictions were vacated and his charges dismissed with prejudice.

Holloway then brought a suit under 42 U.S.C. § 1983 against the City of Milwaukee and several officers with the Milwaukee Police Department. He now appeals the district court's decision to grant summary judgment in the defendants' favor.

## II

We assess a district court's grant of summary judgment *de novo*. See *Stevens v. United States Dep't of State*, 20 F.4th 337, 342 (7th Cir. 2021). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that

party's favor. *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021).

Holloway raised seven constitutional claims against the defendants, but only six are before us. The district court deemed Holloway's malicious-prosecution claim waived at the summary-judgment stage, and Holloway has not contested that determination in this court. We address the six remaining claims below.

A

Holloway's first claim is his strongest. He argues that the defendants violated his due-process right to a fair trial by using unduly suggestive identification procedures. The right to a fair trial, guaranteed by the Due Process Clause of the Fourteenth Amendment, is "violated if unduly suggestive identification techniques are allowed to taint the trial." *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006).

To determine whether such a violation has occurred, we conduct a two-step inquiry. *United States v. Sanders*, 708 F.3d 976, 983–84 (7th Cir. 2013). The first question is whether the "identification procedure used by law enforcement was 'both suggestive and unnecessary.'" *Id.* If so, we then decide, based on the totality of the circumstances, whether the identification was sufficiently reliable to outweigh the effect of the tainted procedure. *Id.*

1

Before we undertake this analysis, we take a moment to consider the nature of the right at issue in light of the Supreme Court's recent decision in *Vega v. Tekoh*, 142 S. Ct. 2095 (2022). The question presented in *Tekoh* was "whether a violation of the *Miranda* rules provides a basis for a claim under § 1983."

No. 21-3007                                                7

*Id.* at 2101. The Supreme Court held that it does not. *Id.* It reasoned that the right conferred by *Miranda* is only a trial right, not a free-standing constitutional right; defendants may thus seek to suppress evidence obtained in violation of their *Miranda* rights at their criminal trials, but they may not sue officials under section 1983 for that violation. See *id.*

This case is not about *Miranda*. But at oral argument, while the Court's decision in *Tekoh* was pending, we asked the parties whether the protection against unduly suggestive identification procedures is, like *Miranda*, only a trial right, or whether it is more broadly enforceable, through either a suit under section 1983 or otherwise. This is an important question, but we conclude that it need not be resolved in this opinion. The parties paid no heed to it until we raised the issue at oral argument. And there are at least two plausible answers: perhaps the right to be free from suggestive identification procedures is a substantive right that flows from the Due Process Clauses; or perhaps, even though a constitutional right, it is just a trial right that is not violated unless there is a tainted identification at trial. As we explain below, the outcome of Holloway's case does not turn on these distinctions. We thus flag the issue and save it for another day.

2

We turn now to the substance of Holloway's argument. Holloway contends that "the defendant officer's lineup was unduly suggestive because … (1) Holloway was the shortest participant in the lineup, and (2) GD was primed with a photo array one day prior to the … lineup with Holloway's booking photograph." In granting summary judgment in defendants' favor, the district court concluded as a matter of law that the officers' identification procedures did not violate Holloway's

constitutional rights. We are not persuaded: in our view, there is at least a genuine dispute over the suggestiveness of the identification procedures.

G.D. was shown a photograph of Holloway only 32 hours prior to the lineup. This may have caused G.D. mistakenly to identify Holloway, believing that she recognized him from the day of the assault when really she recognized him from the photograph she saw the day before. In social-science parlance, this well-documented psychological phenomenon is known as "unconscious transference." See Kenneth A. Deffenbacher, Brian H. Bornstein & Steven D. Penrod, *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 LAW AND HUM. BEHAV. 287, 299–306 (2006) (discussing unconscious transference); see also *Reyes v. Nurse*, --- F.4th ---, No. 20-1432, 2020 WL 2338573, at *6 (7th Cir. 2022) (same).

The district court dismissed this concern, observing that it was "undisputed … that G.D. identified Holloway based on his voice and general body shape," not his face. "This indicates," the court reasoned, "that G.D. was not, in fact, affected by the photo array. The photo array contained headshots, not full body photographs or voice samples. If the photo array primed G.D., she would have based her identification on Holloway's facial features."

This is too much of a leap at the summary-judgment stage. It may be undisputed that G.D. *said* that her identification was based on Holloway's voice and general body shape. But a jury could well have concluded that G.D. was subconsciously influenced by having seen Holloway's face only 32 hours earlier. This is precisely why the phenomenon of unconscious transference presents such a vexing problem: it operates at the

No. 21-3007                                                                    9

level of the subconscious, and so even a sincere and well-intentioned witness can unwittingly identify the wrong person.

We note as well that the Supreme Court has never barred the use of photographs as a means of identification. See *Simmons v. United States*, 390 U.S. 377, 384 (1968). *Simmons* was a case, not unlike this one, in which "[a] serious felony had been committed," "[t]he perpetrators were still at large," and some admittedly "inconclusive clues" pointed to Simmons. Taking all the circumstances into account, the Court refused to find a due process violation or an occasion for the use of its supervisory authority. *Id.* at 385–96.

Granted, there were more facts in *Simmons* pointing to the defendant than we have here. But that does not help the ultimate disposition of Holloway's section 1983 action, however, because summary judgment was appropriate on different grounds. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation marks omitted). A party seeking to defeat qualified immunity must show both elements; on the other hand, the defendant obtains qualified immunity by blocking either part. Here, even if the defendants violated Holloway's constitutional rights, Holloway cannot show that the unlawfulness of their conduct was "clearly established at the time." *Id.*

"The unlawfulness of challenged conduct is 'clearly established' … only if it is 'dictated by controlling authority or a robust consensus of cases of persuasive authority,' such that it would be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Estate of Davis v.*

*Ortiz*, 987 F.3d 635, 638 (7th Cir. 2021). "It is essential to evaluate the public official's conduct at the correct level of granularity." *Id.* Because Holloway can point to no controlling or persuasive authority that clearly established that it was impermissible for the police to use a photo array only a day or so before the physical lineup, defendants are entitled to qualified immunity as a matter of law.

B

Holloway next makes a series of *Brady* arguments. "[T]he suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The prosecutor thus has an obligation to "turn over to the defense all potentially exculpatory evidence." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). "That obligation extends to police officers, insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." *Id.* "To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police 'suppressed' the favorable evidence, and prejudice ensued because the suppressed evidence was material." *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019).

Holloway's first contention is that Carlson failed to disclose in his official report that R.R.'s attacker smelled like cigarette smoke. We agree with defendants that summary judgment was appropriate, because this information was neither exculpatory nor useful to Holloway for impeachment.

No. 21-3007                                                    11

(Favorable evidence includes both exculpatory and impeach-
ment evidence. *United States v. Bagley*, 473 U.S. 667, 676
(1985).)

Holloway argues that had he known R.R.'s attacker
smelled like cigarette smoke, he could have cross-examined
G.D. and M.G. about whether their attacker also smelled like
cigarette smoke. If either or both said "no" on the stand, he
suggests, their testimony would have been exculpatory since
Holloway, a regular smoker at the time, would likely have
smelled like cigarette smoke. This argument is a nonstarter.
For one thing, it effectively concedes that the information
about R.R.'s attacker was not, itself, exculpatory. At best, the
argument suggests that the information was somehow neces-
sary to obtain other information that *was* exculpatory. But it
was not necessary. Nothing prevented Holloway from at-
tempting to elicit such testimony from G.D. or M.G.; he could
have done so whether or not he knew what R.R.'s attacker
smelled like.

The information would similarly not have been useful for
impeachment purposes. Neither G.D. nor M.G. ever testified
about whether their attacker smelled like cigarette smoke, let
alone whether R.R.'s attacker did, and R.R. never testified at
all. Thus, even if Holloway had known that R.R.'s attacker
reeked of cigarette smoke, there would have been no one for
him to impeach on that ground. Because the information
could neither exculpate nor impeach, the district court was
correct to conclude as a matter of law that Carlson's failure to
disclose it was not a *Brady* violation.

Holloway next argues that the defendants violated his
*Brady* rights because they did not disclose Bartoletti's account
of being followed by Al until one week before trial.

No. 21-3007

Defendants respond that summary judgment was appropriate because the information was not suppressed. Evidence is suppressed if "(1) the State failed to disclose known evidence before it was too late for him to make use of the evidence; and (2) the evidence was not otherwise available to him through the exercise of reasonable diligence." *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002).

We appreciate that one week is not a lot of time to interview and prepare a witness. But it was far from "too late for [Holloway] to make use of [it]." *Id.* If nothing else, it was long enough for Holloway to seek a continuance, which he did not do. Under these circumstances, we agree with the district court that this information was not suppressed as a matter of law.

Finally, Holloway contends that the defendants failed to turn over lab reports regarding K.R.'s assault. But Holloway brought forth no evidence establishing that such reports even existed. In any event, Holloway was not tried for K.R.'s assault, and no one testified at trial regarding K.R.'s assault. Thus, a K.R. report, if one existed, could neither exculpate nor impeach. There was no *Brady* violation on this basis.

C

We address Holloway's unlawful-detention and failure-to-intervene claims in tandem because they both fail for the same reason. Holloway argues that Carlson lacked probable cause to arrest Holloway when he directed other officers to do so, and in that way he violated Holloway's right to be free from unreasonable seizures. U.S. Const. amend. IV. He also contends that certain defendants are liable for failing to intervene when Carlson directed officers to arrest Holloway

without probable cause. See *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (discussing failure-to-intervene claims).

Both claims fail because, despite his ultimate exoneration, the officers had probable cause to arrest Holloway. A police officer has probable cause to arrest a person when "the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. Ohio*, 379 U.S. 89, 96 (1964). "If the underlying facts supporting the probable cause determination are not in dispute," as is the case here, "the court can decide whether probable cause exists." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993).

At the time that Carlson directed other officers to arrest Holloway, Carlson knew the following: Holloway matched the physical descriptions of the attacker offered by the five victims; Holloway had recently been cited for prowling in a nearby area where several home intrusions had occurred; Holloway had a prior conviction for sexual assault and burglary, whose underlying facts closely resembled those of the assaults under investigation; and R.R. identified Holloway in the photo array, albeit tentatively. Taken together, these facts establish probable cause, notwithstanding the tentative nature of R.R.'s identification. See *McDaniel v. Polley*, 847 F.3d 887, 895 n.5 (7th Cir. 2017) (a single witness's identification from a photo array, even if tentative, can establish probable cause).

## D

Holloway next broadly argues that defendants conspired to frame him for a crime he did not commit. "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that

14                                                              No. 21-3007

(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

As we have discussed, all but one of Holloway's claims cannot survive summary judgment because Holloway cannot show a deprivation of his constitutional rights. Even if he could move past the first step of the conspiracy inquiry, those claims would fail as a matter of law on the second. The one exception is the claim based on the officers' identification procedures, which would survive step two on a summary-judgment posture. But it has other problems. Holloway has not pointed to evidence that would allow a trier of fact to conclude that the officers reached an agreement to deprive him of his due-process rights. Holloway's purported evidence of such an agreement consists of the following observations: these assaults were highly publicized; the police were under great pressure to solve the crimes; and upon identifying Holloway as a suspect, the police were shoddy in their investigation of other leads. This is far too conjectural to create a genuine dispute over the question whether the officers agreed to deprive Holloway of his rights.

E

Finally, we briefly address Holloway's arguments against the City of Milwaukee under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A municipality is liable in a section 1983 claim under *Monell* if the constitutional violation was caused by: "(1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011).

The typical case involves an affirmative policy or custom-and-practice. But Holloway argues that the *absence* of certain policies renders the City liable here. He complains that the City: (1) lacked a policy regarding officer investigatory notes; (2) had an inadequate policy regarding lineups and photo arrays; and (3) lacked a policy regarding the police use of DNA testing.

The Supreme Court has recognized that omissions, such as failures to act or to train, may provide a basis for *Monell* liability. See *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011); *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997); *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); see also *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 382 (7th Cir. 2017) ("[T]he failure to make policy itself may be actionable."). But to be liable for its inaction, a municipality must have notice of the risk of a constitutional violation and fail to act even in the face of such notice. See *Connick*, 563 U.S. at 61–62; see also *J.K.J. v. Polk County*, 960 F.3d 367, 379–80 (7th Cir. 2020).

Plaintiffs may show such notice in one of two ways: "Sometimes the notice will come from a pattern of past similar violations; other times it will come from evidence of a risk so obvious that it compels municipal action." *J.K.J.*, 960 F.3d at 381. Holloway has adduced no evidence of a pattern of prior violations that would have put the City on notice of the risk of the violations he alleges. And as troubled as we are by the overly suggestive identification procedures, we do not believe a reasonable jury could conclude that the risk of the alleged violations was so obvious as to place this case in the narrow set where "obvious[ness] … compels municipal action." *Id.* Thus, summary judgment was also appropriate on Holloway's *Monell* claims.

No. 21-3007

## III

We **AFFIRM** the district court's grant of summary judgment in defendants' favor.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 21-3007                                                                                    17

APPENDIX: THE LINEUP



(Holloway is in Position 2.)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

August 8, 2022

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Before

FRANK H. EASTERBROOK, *Circuit Judge*
DIANE P. WOOD, *Circuit Judge*
MICHAEL Y. SCUDDER, *Circuit Judge*

|  | DARYL HOLLOWAY,<br>            Plaintiff - Appellant |
|---|---|
| No. 21-3007 | v. |
|  | CITY OF MILWAUKEE, et al.,<br>            Defendants - Appellees |
| **Originating Case Information:** | |
| District Court No: 2:19-cv-01460-LA<br>Eastern District of Wisconsin<br>District Judge Lynn Adelman | |

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

Clerk of Court

form name: **c7_FinalJudgment**     (form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

August 30, 2022

To:  Gina M. Colletti
     UNITED STATES DISTRICT COURT
     Eastern District of Wisconsin
     Milwaukee, WI 53202-0000

|  |  |
|---|---|
| No. 21-3007 | DARYL HOLLOWAY,<br>              Plaintiff - Appellant<br><br>v.<br><br>CITY OF MILWAUKEE, et al.,<br>              Defendants - Appellees |

**Originating Case Information:**

District Court No: 2:19-cv-01460-LA
Eastern District of Wisconsin
District Judge Lynn Adelman

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                    No record to be returned

form name: **c7_Mandate**     (form ID: **135**)